UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case Number <br> <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| WALGREEN CO., GREGORY D. WASSON and WADE MIQUELON, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of a verified complaint filed by the former Chief Financial Officer ("CFO") of Walgreen Co. ("Walgreens" or the "Company"), emails by the Company's senior executives, Walgreens' Securities and Exchange Commission ("SEC") filings, media reports, conference call transcripts, analyst reports about the Company, and Company releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This securities fraud class action is brought on behalf of all persons who purchased or otherwise acquired the common stock of Walgreens between March 25, 2014 and August 5, 2014, inclusive (the "Class Period"), against Walgreens, its former Chief Executive Officer ("CEO") Gregory Wasson ("Wasson"), and its former CFO Wade Miquelon ("Miquelon") (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 (the "1934 Act"). Defendants made materially false and misleading statements overstating the purported benefits of the Company's recently announced merger, which artificially inflated the price of Walgreens' stock during the Class Period.

## INTRODUCTION AND OVERVIEW

2. Walgreens is the largest drug retailing chain in the United States. Based in Deerfield, Illinois, the Company sells prescription and non-prescription drugs and general merchandise through its Walgreens stores.

3.     On June 19, 2012, Walgreens announced that it had entered into a strategic partnership with Alliance Boots GmbH ("Alliance Boots") to create a global pharmacy-led health and wellbeing enterprise (the "Walgreen-Alliance Boots Transaction").

4.     Defendants heralded the partnership as providing an unmatched supply chain, an unparalleled portfolio of health and wellness brands, and a unique platform in developed and emerging markets.  The deal would occur in two parts.  Under "Step One," which took place in 2012, Walgreens acquired a 45% equity ownership stake in Alliance Boots in exchange for approximately $6.7 billion in cash and stock.  Under "Step Two," Walgreens acquired the remaining 55% on December 31, 2014 for approximately $5.3 billion in cash and 144.3 million shares of Walgreens' common stock.  Significantly, whereas the first step of the transaction did not require a shareholder vote, the second step did require shareholder approval.

5.     As part of the strategic partnership, in August 2012, the Executive Chairman of Alliance Boots, Stefano Pessina ("Pessina"), was appointed to Walgreens' Board of Directors (the "Board") and acquired control over approximately 8% of Walgreens' common stock, making him the Company's largest single shareholder.

6.     In August 2012, after Step One of the Walgreen-Alliance Boots Transaction closed, the Company provided a set of publicly announced goals for fiscal year 2016 ("FY 2016 Goals"). Defendants spoke about the benefits of the partnership and the FY 2016 Goals became critically important metrics that were regularly discussed by the Company and followed by analysts because they quantified the purported benefits of the merger and were important to assessing the merits of voting in favor of Step Two of the merger. The goals included $1 billion in combined synergies and $9 to $9.5 billion in adjusted earnings before interest and taxes ("EBIT").

7.     The Company's $9 to $9.5 billion EBIT goal was particularly important to investors because it reflected the potential profit during the first full fiscal year of operation after completion

of the merger. The synergy target of $1 billion was fundamental, as it was a key component of the EBIT goal, *e.g.*, the $9 to $9.5 billion was composed of $1 billion in synergies and $8 to $8.5 billion of other earnings. The EBIT goal represented a considerable increase over the earnings of Walgreens and Alliance Boots as independent organizations, and it quantified the purported benefits of merging.

8. By summer 2013, the Company's internal data showed it was tracking hundreds of millions of dollars below the FY 2016 EBIT goal. In July 2013, as part of its annual long-range plan review ("LRP"), Walgreens' data showed it was tracking at $8.7 billion, $300 million below the low-end and $800 million below the high-end of the EBIT range provided to investors. By late 2013, this shortfall had increased by 100% to approximately $500 to $600 million below the low-end and more than $1 billion below the high-end of the range, primarily due to a sharp increase in the cost of generic drugs and the failure of Walgreens' contracts to provide relief for inflation in the cost of generics. Defendants' concealment of this material information from investors, both the massive amount of the shortfall and the reasons therefor (generic inflation and Walgreens' contracts providing no relief), made their Class Period statements misleading.

9. Shortly before the start of the Class Period, during a December 20, 2013 Company earnings call, rather than disappoint investors and admit the massive EBIT shortfall and relatedly that the purported merger benefits would be much more modest than promised, Miquelon and Wasson reassured investors that the Company would achieve its FY 2016 Goals. Defendants told investors that Walgreens was tracking just a "bit below" the compound-annual-growth-rate ("CAGR") to achieve the FY 2016 EBIT goal, but concealed that what they called "a bit below" on the CAGR meant they were actually internally tracking hundreds of millions of dollars below the FY 2016 EBIT goal. Defendants concealed not only the massive amount of the shortfall, but the reasons for it. Defendants further trivialized the massive gap by falsely reassuring investors they remained

determined to meet the goal and had various opportunities and initiatives to do so. Given these statements, analysts failed to realize the extent of the shortfall, and, after the call, analysts reported that Walgreens was on track to meet all of its FY 2016 Goals and some actually increased their stock price targets for the Company.

10.     In the first few months of 2014, the shortfall in the FY 2016 EBIT goal grew even larger.  Between year-end 2013 and an April 9, 2014 Board meeting, the Company had identified additional risks to the FY 2016 EBIT goal well "in excess" of $1 billion, primarily based on third-party reimbursement negotiations (including Medicare Part D contracts), continued generic drug price inflation, and the underperformance of Alliance Boots.  These additional risks lowered FY 2016 EBIT to $7.5 billion, or less.  Thus, the $300 million low-end shortfall as of July 2013 that doubled by late 2013 to $500 to $600 million, then tripled again to $1.5 billion or more by April 2014.  Averaging this increase, the shortfall had grown by over $300 million in each calendar month of 2014 from January through March.

11.     During the Class Period, Wasson and Miquelon were facing significant pressure from activist investors, some of whom preferred Pessina to lead the post-merger entity.  Wasson confided in Miquelon that he feared losing his job and articles reported that Wasson might be losing control of Walgreens.  Moreover, Wasson was still recovering from the fallout of decisions he made in 2012 in a dispute with Express Scripts Holdings Co. ("Express Scripts"), which some blamed for the loss of $4 billion in revenue.

12.     Thus, during the Class Period, Defendants continued to mislead investors concerning the purported extraordinary benefits of the merger by reassuring investors that they remained confident in Walgreens' ability to achieve the FY 2016 EBIT goal and by failing to disclose either the amount of the shortfall or the contractual limitations that left them unable to deal with the generic price inflation.  In choosing to discuss the FY 2016 EBIT goal at each investor meeting and in

answering numerous questions from analysts regarding the FY 2016 EBIT goal, Defendants had an obligation to provide full and fair disclosure to investors and to make sure their public statements fairly aligned with the information in their possession. Specifically, in order to make their reassuring statements about the EBIT goal not misleading, Defendants had to disclose the reasons for the shortfall, the amount, and that despite any purported opportunities and initiatives, the shortfall was growing.

13. Due to the misleading statements, investors and analysts were completely unaware of the amount of the Company's forecasted shortfall and the lack of a reasonable basis for the FY 2016 EBIT goal at the time the reassuring statements were made. For example, in March 2014, defendants issued their second quarter fiscal 2014 Form 10-Q and held a conference call. During the call, defendant Miquelon said: "*As stated on our last call our adjusted operating income goal of $9 billion to $9.5 billion is currently tracking below the CAGR required to meet this goal and below our initial expectations. We continue to recognize that there are risks to achieving this goal; however, we remain focused on delivering it. And as I also stated we have identified a range of further opportunities . . . which can all help mitigate these risks*." Defendants also presented a *slide showing the FY 2016 EBIT goal remained at $9-$9.5 billion*.

14. As a result, investors remained unaware of the amount of the shortfall, the reasons for it, and that it was growing, notwithstanding any purported plans and initiatives, and Walgreens' stock traded at artificially inflated prices.

15. Defendants provided similar false and misleading reassurances in May 2014. Then, at the end of May, Miquelon indicated a desire to leave Walgreens. Wasson told Miquelon he wanted him to get a "slug of money" for his work. However, by June, the soon-to-be-departing Miquelon now advocated disclosing the shortfall in the FY 2016 EBIT goal, but was pressured by Wasson to delay the disclosure, causing Miquelon to ask Walgreens' general counsel for some

"moral support." Wasson wanted to delay the disclosure of the bad news until it could get "bundled" with more positive news. Wasson continued to push for the aggressive and unsupportable FY 2016 Goals, pressuring Miquelon to support earnings-per-share ("EPS") guidance of $6, to which Miquelon responded in a text that even $5 EPS would take a "miracle." Wasson texted back "No choice. Need a 6."

16. On a June 24, 2014 earnings conference call, Defendants withdrew the FY 2016 EBIT goal, telling investors they did not expect to meet it. However, Defendants continued to conceal the amount of the FY 2016 EBIT shortfall and the true reasons for it (generic price inflation and contract limitations). Rather, consistent with the strategy to delay and obscure the truth until it could be bundled with other news, Wasson withdrew all of the FY 2016 Goals, including the synergy goal they said they were on track to exceed. Wasson claimed the Company needed to reformulate its goals as "a result of the many Step 2 considerations and current business performance" and said the Company would provide new goals by July or August. As a result, investors were still unaware of the massive amount of the shortfall in the FY 2016 EBIT goal, the reasons for it, and that the merger benefits were not nearly as robust as advertised.

17. On August 4, 2014, Walgreens announced that Miquelon would be resigning. Two days later, on August 6, 2014, Defendants finally disclosed the shortfall by lowering the FY 2016 EBIT target to $7.2 billion, $1.8 billion below the low-end and $2.3 billion below the high-end of the range that they had repeatedly touted to investors. Walgreens and Wasson attempted to "bundle" this bad news with numerous optimistic statements about the merger, including that Step Two of the merger would occur several months early.

18. Despite their effort to soften the impact by rolling out the bad news over several months and burying it with other news, investors were stunned to learn that the claimed merger benefits would be meager or non-existent. Analysts reacted negatively to the disclosure of the

massive shortfall, with one writing that it was "a Major Disappointment," stating that "Management Overpromises and Underdelivers" and observing that "[a]fter more than a year of positive investor meetings and earnings calls . . . management shocked investors when its new fiscal '16 targets fell well short of elevated expectations of prior guidance."

19.     Following these disclosures, Walgreens' share price plummeted, dropping from a close of $69.12 on August 5, 2014 to a close of $59.21 on August 6, 2014, a drop of over 14% on massive volume of more than 84 million shares, or approximately 14 times its average trading volume for the prior 60 days. The revelation of the truth caused substantial economic loss and damages to the putative class, who bought shares when the stock price was inflated based on Defendants' misleading statements, which omitted to disclose the massive amount of the shortfall that Defendants belatedly disclosed at the end of the Class Period.

20.     Subsequently, Wasson and Pessina met with investors and reportedly claimed Miquelon's group had "lax controls." [1] *The Wall Street Journal* reported these claims, writing that "directors got a shock" when "Miquelon suddenly cut that forecast by $1.1 billion" and "Walgreen directors have told investors they were stunned by the change in the pharmacy forecast, which was for earnings before interest and taxes [EBIT]."

21.     Miquelon responded by filing a lawsuit for defamation and attaching emails and texts between the Defendants. Miquelon admitted that the FY 2016 EBIT shortfall was neither a surprise nor the result of a forecasting error by his group, but rather was something Walgreens' management had been aware of for many months during which time he was getting pressured to delay disclosing

---

[1]     *See* Verified Complaint, *Miquelon v. Walgreen Co.*, No. 14CH16825 (Ch. Ct. Cook Cnty. Il Oct. 16, 2014), attached hereto as Exhibit A ("Complaint"). The unredacted Complaint is publicly available on various websites. *See* http://www.chicagotribune.com/business/chi-walgreen-cfo-lawsuit-20141031-htmlstory.html; http://online.wsj.com/public/resources/documents/miquelonsuit.pdf. The unredacted Complaint is also an exhibit to a complaint filed in this District. *See* Complaint, Ex. A, *Hays v. Babiak, et al.*, No. 14-cv-9786 (N.D. Ill. Dec. 5, 2014).

it until it could be "bundled" with other more positive news. In turn, Walgreens claimed Miquelon was responsible for the forecast and had been too optimistic with forecasts. The fallout continued as, contrary to prior statements that Wasson would be CEO post-merger, it was announced that Wasson would also be leaving the Company. In the end, both the CEO and CFO were gone and so were billions of dollars of investors' money, for which investors are seeking to recover lawful damages in this lawsuit.

## JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

23. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District, Walgreens maintains its principal place of business in this District, and certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in this District.

24. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

25. Plaintiff Washtenaw County Employees' Retirement System purchased the common stock of Walgreens during the Class Period as set forth in the certification attached hereto and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

26.     Walgreens operates as a retail drugstore chain in the United States.  Walgreens maintains its headquarters at 108 Wilmot Road, Deerfield, Illinois 60015.  The Company sells prescription and non-prescription drugs and general merchandise through its Walgreens drug stores. Founded in 1901, Walgreens has grown to be the largest drug retailing chain in the United States, with net sales of approximately $76 billion in the fiscal year ended August 31, 2014.  As part of a corporate reorganization completed in connection with its acquisition of Alliance Boots on December 31, 2014, Walgreens became a wholly owned subsidiary of Walgreen Boots Alliance ("WBA"), a global pharmacy-led health and wellbeing commercial enterprise headquartered in Deerfield, Illinois.  Throughout the Class Period Walgreens stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "WAG."

27.     Wasson was at all relevant times President, CEO and a director of the Company.  He unexpectedly announced his retirement in December 2014, effective upon completion of Step Two on December 31, 2014.  Wasson had served in various positions at Walgreens since joining the Company in 1980.

28.     Miquelon was Walgreens' CFO from in or about June 2008 until he left the position on or about August 4, 2014, to remain in a non-officer role through December 2014.

29.     Wasson and Miquelon, because of their positions with the Company, possessed the power and authority to control the contents of Walgreens' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They had access to and/or were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and access to material non-public information available to them but not to the public, Defendants knew or recklessly disregarded that the adverse facts specified herein had

not been disclosed to and were being concealed from the public and that the positive representations being made were, as a result, materially false and misleading.

## BACKGROUND LEADING TO START OF THE CLASS PERIOD

30. Walgreens reports its results on a fiscal year ending on August 31. Thus, its first quarter ("1Q") ends on November 30, its second quarter ("2Q") ends on February 28, its third quarter ("3Q") ends on May 31, and its fourth quarter ("4Q") and fiscal year end on August 31. As a public company, its quarterly financial results are disclosed in publicly filed reports on Form 10-Q and its annual results are disclosed in reports on Form 10-K. Walgreens' management typically took several weeks after the end of a quarter to prepare and file the Company's financial statements and to hold conference calls to discuss its results. In addition, near each fiscal year end, Walgreens would prepare its LRP, which would cover a three-year period and was used internally.

31. On June 19, 2012, Walgreens announced that it had entered into a strategic partnership with Alliance Boots in order to create the world's first global pharmacy-led health and wellbeing enterprise. Under the terms of the deal, Walgreens would acquire a 45% equity ownership stake in Alliance Boots in exchange for approximately $6.7 billion in cash and stock, with the option to acquire the remaining 55% in approximately three years' time. The Company hailed the merger as providing substantial synergies and benefits that would translate into increased earnings.

32. As part of the deal, the Executive Chairman of Alliance Boots, Pessina, was elected to the Company's Board in August 2012. In addition, another Alliance Boots director was to join the Walgreens Board, and four Walgreens directors joined the Alliance Boots board.

33. In announcing the deal, Wasson and Miquelon, along with Alliance Boots management, met with investors to emphasize the benefits of the transaction. Defendants touted that the combined business would yield substantial synergies and accelerate growth and profitability. For example, whereas Walgreens revenues alone had been approximately $73 billion, they were

projected to increase, after the merger, to over $130 billion by 2016. Miquelon told investors during a June 2012 conference call that "we believe this transaction will create significant value for shareholders." Pessina added that investors were skeptical of a prior merger he did between Alliance Unichem and Boots, but it had created "a huge, huge return for shareholders," and added that this merger would also be "hugely successful." The Company identified a series of FY 2016 financial goals at this time.

34.     Then, on the Company's September 28, 2012 earnings conference call for fiscal 4Q and year-end 2012 (ending on August 31, 2012) the Company announced the $9 to $9.5 billion FY 2016 EBIT goal.

35.     Wasson and Miquelon told investors and analysts that they would provide updates on how the Company was tracking toward the FY 2016 Goals. Defendants not only discussed their progress toward the FY 2016 Goals, but also toward interim goals during each period.

36.     On the Company's June 25, 2013 earnings conference call for fiscal 3Q 2013, Miquelon reiterated the Company's FY 2016 Goals. Miquelon said Walgreens was "off to a good start in our 2016 goals" and raised the lower end of the Company's FY 2013 synergy target from $100 million to $125 million, which indicated that the Company was currently tracking ahead of plan. He informed investors that the Company would be providing a "deeper dive on [its] 2016 goals with respect to [its] progress [and its] risks and opportunities across each of these measures" once a year on a quarterly earnings call.

37.     The following month, in July 2013, as part of preparing and approving Walgreens' LRP, the Company reviewed its FY 2016 Goals and determined that its progress toward the EBIT goal had already fallen $300 million below the low-end of guidance provided to investors, for a revised internal FY 2016 forecast of $8.7 billion. Although Defendants were aware of the lower forecast, this information was not publicly disclosed.

38.     By late 2013, Defendants had identified an additional $200 to $300 million of risk in the Company's FY 2016 EBIT goal, which meant that the Company had fallen behind its publicly disclosed EBIT goal by as much as $500 to $600 million.  The largest source of this shortfall was inflation in the price of generic drugs, which depressed the Company's profit margins as Walgreens' contracts with payers failed to provide inflationary relief.

39.     Throughout this time, Miquelon kept Wasson and the Board apprised of the impact changing market conditions had on the Company's ability to meet its forecasts.  In addition, Jeffrey Berkowitz and John Donovan were responsible for generic drug procurement and reported directly to Wasson.  Kermit Crawford ("Crawford") had oversight for the third-party contracts and also reported directly to Wasson.

40.     Defendants did not discuss the negative impact generic inflation was having on the Company.  For example, a November 1, 2013 UBS report stated that they had recently hosted investor meetings in Europe with "management of Walgreens."  The report noted that "when asked about generic drug price inflation trends, management seemed dismissive of any generic inflation trends negatively impacting them in the upcoming quarter."

41.     During 2013 and 2014, Wasson was still attempting to recover in the eyes of investors from a failed alliance with Express Scripts, the largest U.S. pharmacy benefit manager, which reportedly had caused the Company to lose billions of dollars in annual sales in 2012 after a contract dispute.  Thus, given the importance of the transaction with Alliance Boots, the presence of Pessina, and the increased pressure from activist investors, Wasson was under intense pressure to deliver on the FY 2016 Goals.  Furthermore, Walgreens' corporate bylaws left management and the Board vulnerable to being quickly replaced if they failed to perform as directed.

42.     By late 2013, Defendants realized that the $300 million shortfall had doubled and they were now tracking at $500 to $600 million below the low-end and over $1 billion below the

high-end of the FY 2016 EBIT goal. Nevertheless, Defendants made several reassuring statements regarding the critical FY 2016 EBIT goal during their December 20, 2013 earnings call and concealed the amount of the shortfall. Defendants minimized the shortfall by claiming they were tracking just "a bit" below the CAGR required as part of meeting the FY 2016 EBIT goal, while making numerous other statements to assure investors they would nevertheless still meet the goal.

43.     On the Company's December 20, 2013 earnings conference call for fiscal 1Q 2014, (which ended November 30, 2013) Defendants made the following statements regarding Walgreens' progress towards meeting the Company's FY 2016 EBIT goals, which concealed the amount of the known shortfall and reassured investors as to the continued validity of the goal:

(a)     **Miquelon**: Miquelon stated that he wanted to "close today with a brief update on progress towards our fiscal year 2016 goals." Miquelon then said Walgreens was "on track with or slightly ahead of our expectations" with regard to four of the Company's five goals. With regard to the fifth goal of EBIT of $9 to $9.5 billion, Miquelon stated that Walgreens' "[p]erformance to date with respect to our adjusted operating income [EBIT] goal of [$9 to $9.5 billion] is currently tracking a bit below the CAGR required to meet this goal, largely because of gross profit dollar growth pressure domestically, as I discussed today, and a challenging environment in some international markets." Miquelon added:

> While we recognize there are risks to achieving this goal [of EBIT of $9 to $9.5 billion], we remain focused on delivering it, and have identified a range of further opportunities, including . . . incremental Alliance Boots synergies, . . . all [of] which can help mitigate these risks. We intend to continue to update you on our progress against these goals in future calls. In summary, we continue to be very optimistic and excited about our future.

Thus, rather than disclose the specific amount of the shortfall, Miquelon trivialized the $500 million to $1 billion shortfall by describing the CAGR as "a bit" below the goal while simultaneously reassuring investors that they had several opportunities for delivering it, including synergies which

- 13 -

were tracking ahead of plan (albeit much less than needed to make up the $500 million to $1 billion shortfall).

(b) **Wasson**: An analyst inquired about the incremental synergies, asking "Can you talk about what's driving the upside there, and the cadence of those synergies going forward in 2014?" Wasson reinforced Miquelon's statement, stating: "It [the synergies] is tracking ahead. Good observation. It does give us confidence, actually even more so leading up to those fiscal 2016 goals that Wade talked about," and "we feel confident in $1 billion [the FY 2016 synergy goal] and we believe there's upside."

(c) **Miquelon**: An analyst asked: "Wade, first of all related to the 2017 [sic] commentary.[2] When do you expect to give us some update as to how these numbers are playing out? When you talk about adjusted operating income [EBIT] tracking a little bit lighter, does that also include now the benefit of ABC [AmerisourceBergen Corporation]?"[3] Miquelon responded, in relevant part: "Yes. I mean I think – we obviously put these goals before ABC. When we announced ABC, we said that there was additional opportunity, but we wouldn't be changing our goals. That's in part because $9 billion [low-end of the FY 2016 EBIT goal] we already believe is a very meaningful, large goal to hit, and an appropriate goal." Thus, rather than disclose that they were tracking $500 million to $1 billion below the low- and high-end of the FY 2016 EBIT goal, Miquelon suggested that they were being conservative by not raising the goal in light of the purported additional opportunity from ABC synergies and reassured investors it was "an appropriate goal."

---

[2] It is clear from the context of the analyst's question that he was referring to the 2016 commentary, as there had been no discussion of 2017 and his other questions related to the FY 2016 EBIT goal.

[3] AmerisourceBergen was a drug distributor that Walgreen acquired a stake in after announcing the Alliance Boots two-step transaction.

(d)  **Miquelon**:  As a follow up to the prior question, the same analyst asked: "Any sense on just timing of when we'll be getting an update, you think?"  Miquelon responded:

> Quarter to quarter we look at it, and say are these still realistic based upon all the risks and opportunities we have internally.  If we ever feel that's not the case, we'll certainly tell you. You can put together a glide path like we can, and take our numbers and put it along that path.  But we continue to do assessment and say do we think it's still possible to hit these, and do we have the right bullets in the chamber, if you will, and at this point we do.

Thus, Miquelon assured investors that they were tracking the FY 2016 Goals quarterly to ensure they were "realistic" and promised that they would inform investors if they were not.

(e)  **Wasson**:  After Miquelon answered, Wasson emphasized the point, adding:

> This is Greg [Wasson].  I would say that we're doing this quarter by quarter. Obviously, we're kicking the tires as we go to make sure that we can achieve those goals and [that] we do.
>
> So, I would somewhat consider this as an update.  At the same time, you can rest assured that we'll continue to look at those numbers and make sure that we're confident.  And I think to Wade's point, we think that we've got ways to achieve those goals and the CAGR on the operating adjusted income is a little bit soft, but we think the change in the mix of the business will allow us to get it [the FY 2016 EBIT goal].

Thus, Wasson reinforced the misimpression Miquelon created when he said they were "a bit below" the CAGR required for the FY 2016 EBIT goal by claiming it was just "a little bit soft" and reassuring investors they were kicking the tires and making sure the goals had a reasonable basis.

(f)  **Wasson**:  According to the National Community Pharmacists Association ("NCPA"), pharmacists across the country reported "'huge upswings in generic drug prices'" in the second half of 2013.  An NCPA survey indicated that, in some cases, the price of generics rose 600%-1000%.  During the December 2013 conference call, an analyst commented that "generic price inflation" was "obviously" a "big topic," and further noted that one of Walgreens' competitors "called this out as a headwind to them in the quarter."  The analyst asked, "I guess specifically anything worth calling out in the quarter as far as generic price inflation goes, and more broadly,

how should we think about an environment where it does appear that generic price inflation will continue?" Rather than disclose that the Company had internally recognized that generic price inflation – coupled with the Company's inability to obtain meaningful inflationary relief through contractual terms – was having and would continue to have a material adverse effect on the Company's earnings, Wasson stated that generic inflation had "a little bit of impact" on the prior quarter, but the Company was "on top of it" and "very well positioned . . . to provide value and offset anything that may occur" in the future.

44.     Yet, at the same time Defendants were promising they were kicking the tires and would keep investors informed if they lost confidence in their ability to hit the FY 2016 Goals, they did not disclose that they were tracking hundreds of millions of dollars below the FY 2016 EBIT goal.

45.     These statements were made in the context of other optimistic statements that reinforced the message that Walgreens was on track to achieve the highly touted merger benefits and could "offset" any generic price inflation.

46.     As a result, analysts remained upbeat and, after the call, noted that the Company had reaffirmed its ability to meet *all* of its FY 2016 Goals and had stated that the modest softness in its operating income numbers would be offset by other initiatives and synergies from the merger. On December 20, 2014, J.P. Morgan issued a report entitled "We Remain Positive on Longer Term Opportunity as 2016 Goals Remain Intact – ALERT." The report stated in part:

> We remain positive on WAG and continue to focus on the longer term opportunities associated with the Alliance Boots transaction, the ABC relationship, and increased coverage related to ACA. While the 1Q14 performance for the underlying business was below our expectations, and the company pointed to continued headwinds for 2Q14, we note that, more importantly, the company did reaffirm the combined 2016 goals despite the weaker underlying business trends, pointing to incremental opportunities that can offset that weakness.
>
> •     The combined 2016 goals are still intact. We note that there has been some recent concern around the company's ability to achieve the 2016 goals

based on the performance of the underlying business. Management did acknowledge that with respect to the operating income goal, the company is currently tracking below the required CAGR due to gross profit dollar growth pressure on the WAG business and the challenging environment in some international markets. However, the company did note that it has identified a range of further opportunities to help offset this, including: 1) the AmerisourceBergen relationship (which the company didn't have when the combined targets were initially established); 2) incremental Alliance Boots synergy expansion; 3) new initiatives, including: expanding the breadth of services, working with big Pharma, Theranos, etc.; and 4) accelerated cost savings.

47.     In early February, members of Walgreens' management began a series of meetings with investors and analysts. Analysts published reports on these meetings which communicated to investors the further reassurances by Walgreens' management that Walgreens' was on track to meet its FY 2016 EBIT goal.

48.     In a February 7, 2014 report, UBS reported that it "recently hosted WAG [Walgreens] mgmt in a group of investor meetings" in which UBS received "further conviction from mgmt Thursday [February 6]" on certain matters. The report was entitled "Takeaways from Recent Mgmt Meetings" and disclosed to investors statements that Walgreens reaffirmed that it was then on track to achieve the FY 2016 EBIT target. Specifically, UBS reported that the first "key takeaway[]" from the meeting was that "mgmt remains committed to all of the FY16 financial targets that were originally laid out with the AB merger announcement, including adjusted EBIT of $9.0-9.5 bil[lion]." As a result, UBS remained upbeat and reported that it "expect[s] Walgreens shares to continue outperforming due to anticipated gross profit margin expansion resulting from the upcoming wave of generic drug launch activity beginning in 2014, purchasing synergies related to its Alliance Boots deal, and accelerating front-end sales recovery."

49.     On February 11, 2014, Deutsche Bank issued a report entitled "The Precision of a Swiss Watch – With as Many Moving Parts." Walgreens made essentially the same false and misleading statements as it made in the UBS meeting by reaffirming that Walgreens was on track for

the FY 2016 Goals, including the EBIT goal of $9 to $9.5 billion. Specifically, the report, which

was issued just days after the UBS report, disclosed, in relevant part:

> We Spent Two Days in the UK with Alliance Boots.
>
> We recently hosted investors on meetings with the Alliance Boots and Walgreens management teams in the U.K. We came away increasingly confident that the Boots business can deliver unique product and service offerings that are leveragable in Walgreens US stores, and that both above and below the line synergies are likely underappreciated and underestimated by investors. We are increasingly confident in Walgreens [sic] ability to recognize its 2016 synergy and earnings targets, and that longer term estimates could prove conservative**. We maintain our Buy rating on a favorable risk reward profile.
>
>           *      *      *
>
> The Highlights of the Trip
>
> . . . We are increasingly confident in Walgreens [sic] ability to recognize its 2016 synergy and earnings targets, and that longer term Street EPS estimates could prove conservative. Should many of the ideas discussed at our meetings go right, estimates could be too low by as much as $2 in EPS on a ~$5 number, implying significant positive revisions.

50. Other analysts began to take note of the impact the statements were having on

Walgreens' stock price, which increased dramatically from $55.57 per share at the close on February

3, 2014 to $66.39 per share on February 13, 2014. On February 12, 2014, Sun Trust Robinson

Humphrey noted, "We understand that management is in London for an investment conference

which would, naturally, give management an opportunity to express confidence regarding synergy

targets."

51. *The Wall Street Journal*'s MarketWatch blog reported on the meeting on February 11,

2014: "Shares of Walgreen Co. jumped nearly 6% to an all-time high Tuesday, but the cause for the

stock move is somewhat of a mystery as there was no news on the drug retailing giant that hit the

wires. Instead, analysts on Wall Street say they are hearing that Walgreens management spoke in

bullish tones at an investor conference in London, which was also attended by its international

partner, Alliance Boots."

52.     After the February 2014 investor meetings, Walgreens' outlook for the purported merger continued to worsen, yet Defendants continued to reassure investors they were on track.

53.     According to former CFO Miquelon, "by March 2014" it had become "increasingly clear" that generic price inflation had become a "systemic[] . . . inflationary trend."  Gross margin pressure from generic drug pricing had not improved, and Walgreens' long-term contracts did not provide meaningful inflationary relief.

54.     In addition, at about the same time, Crawford's pricing and contract group at Walgreens was facing substantial difficulties in its negotiations with various payers over reimbursements and Alliance Boots was underperforming, adding increased risk and uncertainty to the FY 2016 EBIT goal. Despite these adverse developments, during the Class Period defendants continued to mislead investors concerning the FY 2016 EBIT goal by concealing the amount of the shortfall, the reasons for it, and that it was increasing.

## DEFENDANTS' FALSE AND MISLEADING
## CLASS PERIOD STATEMENTS

**Defendants' March 2014 Misleading Statements**

55.     On March 25, 2014, Defendants caused to be issued a release summarizing Walgreens' fiscal 2Q 2014 results.  Wasson primed the market with encouraging statements emphasizing the Company's "'solid top-line growth'" in the quarter "'driven by record quarterly sales and record second-quarter prescriptions filled.'"  Wasson further represented that the Company "'continued to gain prescription market share while we maintained a firm hold on our costs'" and expected "'the generic drug headwind that affected the first half will ease and turn around by the end of the year.'"  With regard to the synergy goal, which was related to the EBIT goal, Wasson stated that the "'joint synergy program with Alliance Boots is expected to exceed its second-year estimate.'"

56.     That same day, the Company held an earnings conference call to discuss its fiscal 2Q

2014 results.  Wasson and Miquelon, along with several other Company executives, participated on

the call.  In his prepared remarks, Wasson made optimistic statements about the Company's ability

to offset earnings pressure, stating: "While we did see some pressure on our gross profit dollar

growth we were able to balance that with ongoing cost discipline."  Later, Miquelon expounded on

the optimistic statements and expected trends:

> Taking a look at our adjusted gross margin trends this quarter's 140 basis
> point decrease was versus [a] 120 basis point increase a year ago.  In essence, the
> benefit of the generic wave last year reversed itself this year.  We expect this impact
> to continue to moderate in the third and fourth quarter and become a tailwind to some
> degree in the fourth quarter of fiscal 2014.

57.     Miquelon further emphasized that the Company was "running ahead of our original

estimate of $350 million to $400 million of combined synergies for the year" and reiterated that the

Company was "on track with or slightly ahead of our expectations" for four of the five FY 2016

Goals.

58.     The statements regarding Walgreens' ability to offset profit pressure and the

purported tailwind regarding generics, along with the statement that Walgreens was running ahead of

the synergy goal, which was related to the FY 2016 EBIT goal, put into context and served to

reinforce the misleading nature of the following two false and misleading statements:

(a)     <u>Miquelon's statement during the March 25, 2014 earnings call</u>:

> ***As stated on our last call our adjusted operating income goal of $9 billion to
> $9.5 billion is currently tracking below the CAGR required to meet this goal and
> below our initial expectations.  We continue to recognize that there are risks to
> achieving this goal; however, we remain focused on delivering it.***
>
> ***And as I also stated we have identified a range of further opportunities
> including benefits from our AmerisourceBergen relationship, incremental Alliance
> Boots synergies, business expansion and new initiatives and cost savings which***

***can all help mitigate these risks***.[4]   The asset optimization program that Greg described highlights our focus on efficiencies while the increase in our fiscal-year 2014 synergy estimate demonstrates that we are driving additional synergies with Alliance Boots and AmerisourceBergen.

(b)   Slide presentation during March 25, 2014 earnings call:   Notwithstanding Miquelon's vague reference that the Company was tracking "below" the CAGR required to meet its EBIT goal, his comments were accompanied by a slide restating and affirming the "Fiscal Year 2016 Goals," including "***Adjusted Operating Income [EBIT] . . . $9.0 - $9.5 Billion.***"   The slide presentation was made publicly available on Walgreens' website.

59.   The March 25, 2014 statements were materially false and misleading when made. The true facts, which were concealed and known or recklessly disregarded by Defendants, were:

(a)   Defendants internal documents showed they were tracking materially below the FY 2016 EBIT goal.  Defendants expressed confidence in and reassured investors regarding the FY 2016 EBIT goal of $9 to $9.5 billion by claiming they "remain[ed] focused on delivering it" and had "identified a range of opportunities to" mitigate the risks.  Defendants misled investors as to the massive amount of the shortfall by merely stating that they were tracking "below" the CAGR required for the FY 2016 EBIT goal, which they had previously characterized as only a "bit" below and "a little bit soft," and by keeping the number unchanged on the slide presentation.  In doing so, Defendants intentionally concealed material information necessary in order to make the statements made not misleading – namely, that Walgreens was tracking $500 to $600 million below the low-end and over $1 billion below the high-end of the range by late 2013, which, assuming an average rate of growth of $300 million each month in 2014, would equate to a FY 2016 EBIT of approximately $7.5 billion by the end of March.

---

[4]   In this section, the false and misleading statements are provided in sufficient context to show how they would be understood by a reasonable investor with the specific portions of the statements that are alleged to be false or misleading due to omissions emphasized through bold and italics.

(b)     Defendants concealed that the massive shortfall existed and was growing at an increasing rate since the summer of 2013, notwithstanding any purported opportunities and additional synergies.

(c)     Defendants concealed that the primary reason for the massive shortfall in the FY 2016 EBIT goal was generic price inflation and that they were unable to recover those increases based on their contracts, as it had become "increasingly clear" that the price inflation trend was continuing.

60.     Following the release of Walgreens' 2Q 2014 financial information, several analysts increased their price targets for Walgreens' stock, citing Defendants' affirmation of Walgreens' FY 2016 Goals.  For example, on March 26, 2014, J.P. Morgan raised its price target for Walgreens from $67 to $74, noting that "[t]he previously discussed combined 2016 targets remain intact, as management again highlighted opportunities to mitigate risk around underlying business growth, including: the ABC relationship; AB synergies (WAG raised the FY14 synergy guidance), new initiatives and cost savings (including the benefit from planned store closings)."  On the same date, Morgan Stanley raised its price target for Walgreens from $68 to $75, and identified management's representations about "synergies" and "further opportunities" to mitigate risk as "Key highlights" from the earnings conference call.

61.     Had Defendants revealed the truth, far from concluding that the FY 2016 targets "remain intact" and raising their price targets, analysts would have recognized that Defendants' reassurances were false and that the purported benefits of the merger were not nearly as substantial as represented, leading the stock price to decline.

**Defendants' April and May 2014 Misleading Statements**

62.     On or about April 9, 2014, an interim LRP update was shared with the Board.  The Board was informed that from the prior $500 to $600 million shortfall ($8.5B EBIT), the Company,

according to Miquelon's Complaint, "now appeared to have an additional risk well in excess of $1 billion." In other words, the FY 2016 EBIT of $8.5 billion as of late 2013 would have been $7.5 billion or much less. The shortfall was primarily the result of (1) inflation in the price of generic drugs; (2) unfavorable third-party reimbursement negotiations, including Medicare Part D contracts; and (3) the underperformance of Alliance Boots. At this same meeting, the Senior Vice President of Pricing and Contracting made a presentation to the Board regarding his view on third-party reimbursement trends. The joint venture co-Presidents also made an extensive presentation on inflation and pricing trends in the generic drug market. Both of these groups ultimately reported up to Wasson.

63.     At the same time the shortfall in the critically important FY 2016 EBIT goal was growing, the pressure placed on Wasson to perform also increased. For example, on or about April 11, 2014, a private meeting took place in Paris, France between Walgreens' management and a group of Walgreens' shareholders. Wasson and Miquelon participated. At the meeting, attended by Goldman Sachs Investment Partners and hedge funds JANA Partners, Corvex and Och-Ziff, investors expressed their desire for the Alliance Boots' management team to take a greater role in the merged business after expressing frustration at Walgreens' refusal to consider relocating for tax inversion purposes.

64.     Similarly, on April 14, 2014, *Crain's Chicago Business* published an article titled "Is Wasson Losing Control of Walgreen?" The article noted that Wasson was still recovering from fallout over his battle with Express Scripts in 2012, which reportedly cost Walgreens $4 billion in revenue, and that certain investors were losing confidence in him.

65.     April 21, 2014 JP Morgan Report: On April 21, 2014, J.P. Morgan issued a report regarding its 2014 CEO Conference Call discussion with Wasson on or about April 17, 2014. During that meeting Wasson made additional false and misleading statements. As reported by J.P.

Morgan, the "overall tone of the call was positive" and "served to reinforce our bullish view on the outlook for" Walgreens. J.P. Morgan reported that ***during the call with Wasson it was expressed that management was extremely confident in the FY 2016 synergy goal and pointed to additional opportunity beyond the $1 billion, adding that "[s]ynergies have been coming in above expectations thus far and are mainly from procurement."*** Walgreens and defendant Wasson made or caused to be made the false and misleading statements communicated to the market through analysts because they knew, from prior experience with analysts, that analysts would generate reports reflecting statements or information shared by Walgreens during these meetings.

66.     The April 21, 2014 statement was materially false and misleading when made. The true facts that were concealed and were known or recklessly disregarded by defendant Wasson were:

(a)     Defendant Wasson's statement about the synergy goal tracking ahead and his confidence in meeting the synergy goal was a half-truth which omitted to disclose what had been discussed in the recent Board meeting, namely that the FY 2016 EBIT goal was tracking at least $1.5 billion below and any additional synergies of tens of millions of dollars were grossly insufficient to bridge the massive shortfall. Defendants had made clear to investors, and analysts had reported, that the synergy goal was related to and would impact the overall FY 2016 EBIT goal. By touting that one component of the FY 2016 EBIT goal, synergies, was tracking ahead, defendants continued to mislead investors as to the massive shortfall and that the purported benefits of the merger were not nearly as robust as claimed. Defendants' statements were materially misleading because the statements concealed the extent of the shortfall, the reasons for it, and that it had been increasing notwithstanding any purported increase in synergies. Without this information, investors reasonably assumed that any shortfall was not significant.

67.     On April 30, 2014, Rick Hans, Divisional Vice President of Investor Relations and Finance, presented at the Barclays Retail and Consumer Discretionary Conference. Hans focused his

comments on the introduction of generic drugs and the impact of generics on the Company's

financial results. Hans discussed positive trends that were expected in the rate of new generics being

introduced. When asked by an analyst how overall generic synergies would benefit the Company's

FY 2016 financial performance, as Defendants had previously represented, Hans suggested the FY

2016 goals might be conservative by replying:

> But, as far as the – how this relates to our goals for FY16, it's a little complicated in
> that. We had a – we had embedded in those goals some benefits from a different
> distribution model, and I won't go into it, but we had a different distribution model in
> mind. So that now came out, now with AmerisourceBergen which we think was
> better than the old model, gets plugged in, some of that is not new to the EBIT goal is
> my point. Do you follow my thinking on this? So, some of it is incremental, but
> some of it is actually embedded in our goals.

68.     By late April and early May 2014, Crawford's Medicare Part D negotiations, which

Wasson was significantly involved in, were not going well. At the same time, the pressure by

activist investors on Wasson continued to increase with many calling for Walgreens to undergo a tax

inversion to lower its taxes.

69.     On May 14, 2014, Barry Rosenstein ("Rosenstein"), the founder of JANA Partners,

told investors at a Las Vegas conference that he had been working behind the scenes to influence

Walgreens management in its merger with Alliance Boots. "'Effectively, this is Alliance Boots

taking over,'" Rosenstein was quoted as telling the crowd. Rosenstein went on to express his

preference that Pessina, whom he described as a "'great entrepreneur'" that he had gotten to know

well, run the combined company. Rosenstein followed these comments up with a May 17, 2014

interview with *Barron's* in which he stated that he would stay on top of Walgreens' management and

Board, "making sure" that they keep their promises to investors.

70.     The amount of pressure from the increasing shortfall and the increasing speculation of

Wasson losing control at Walgreens was taking its toll. Around the same time, in May 2014,

Wasson confided to Miquelon that he feared he would lose his job.

71. <u>May 16, 2014 Conference Call</u>: On or about May 16, 2014, Defendants made and/or caused to be made additional false and misleading statements which concealed the impact Walgreens was facing from generic inflation and their inability to address inflation through their contracts. Specifically, Wasson and Miquelon participated in an analyst conference call. Morgan Stanley summarized the call in a May 16, 2014 report entitled "Walgreens CEO/CFO Conference Call: Full Steam Ahead to Step 2." The report begins: "We hosted CEO Greg Wasson and CFO Wade Miquelon as part of our management conference call series. Our key takeaways from the call follow." Under the heading "Generic price inflation," the analyst reported from the conference call that "***WAG has not seen any unusual activity, but purchasing JV leaves it in better shape than peers to cope with generic price increases***."

72. Defendants' statements on May 16, 2014 were materially false and misleading when made. The true facts, which were concealed and known or recklessly disregarded by Defendants, were:

(a) Defendants concealed that the massive shortfall in the FY 2016 EBIT goal existed and was growing at an increasing rate since the summer of 2013, notwithstanding any increased synergies, additional opportunities, or distribution model benefits. The true facts, which were then known by or available to Defendants, were that Walgreens was tracking over $1.5 billion below the low-end and nearly $2 billion below the high-end of the FY 2016 EBIT goal.

(b) Defendants concealed that the primary reason for the massive shortfall in the FY 2016 EBIT goal was "unprecedented" generic price inflation and that the Company was unable to recover those increases based on its contracts, as it was "increasingly clear" that the price inflation trend was continuing.

(c) Defendants concealed that, rather than being "in better shape than peers to cope with generic price increases," Walgreens' contracts placed the Company in a worse position

than its peers to cope with generic price increases. For example, CVS subsequently indicated that the price increases on generic drugs did not affect the company's earnings or forecasts, and Barclays noted on August 22, 2014 that, unlike Walgreens, CVS "may have already built protections into its contracts or it was quick to see them coming and could therefore work with manufacturers and perhaps payors in advance."

**Defendants' June 2014 Misleading Statements**

73. On May 30, 2014, Miquelon told Wasson that he was declining the offer to stay on with the Company post-merger and that they should let investors know he would not be the CFO. Wasson told Miquelon he would like to see him "get a slug of money" for his work.

74. By late May-early June 2014, Miquelon and his team worked to finalize the LRP. At meetings in New York on or around June 11 and 12, 2014, Wasson was informed that the FY 2016 EBIT goal was tracking at $7.2 to $7.5 billion.

75. In addition, Wasson pressed Miquelon to report a $6 EPS goal, but Miquelon resisted because no evidence supported it, though Wasson told him on many occasions "I need a 6, get me a 6." On or about June 11, 2014, Wasson sent a text to Miquelon saying "Let's push for a 6.00 somehow," to which Miquelon responded "I don't think there is anyway we could ensure that. Getting a 5 is a miracle." Wasson replied "No choice. Need a 6. We'll find a way." Later, when the truth began to be revealed in August, the Company would report an EPS goal of only $4.25 to $4.60, nowhere close to the $6.00 EPS amount Wasson was pressuring Miquelon to disseminate or even the $5 that required a "miracle," but which Wasson had no reasonable basis to believe was reasonable.[5]

---

[5]    Note that the mid-point of the $4.25 to $4.60 EPS is $4.42, which multiplied by 1.63 equals the $7.2 billion EBIT the Company disclosed simultaneously in August. Assuming a proportional relationship, if that same multiplier of 1.63 is applied to Wasson's $6 EPS it would equate to an EBIT of approximately $9.7 billion, higher than the top-end of the FY 2016 EBIT range of $9 to $9.5 billion and much higher than the $7.2 to $7.5 billion Miquelon discussed with Wasson and Pessina.

76.     Having now effectively announced his departure, in June 2014, Miquelon pressed to withdraw the publicly announced FY 2016 EBIT goal of $9 to $9.5 billion, which Wasson and Miquelon knew was not possible, but Wasson advocated for delay.  Miquelon told Wasson that a Board member would not support the delay, but Wasson responded, in Miquelon's view "dismissively," by sending a June 11, 2014 email to Miquelon saying "We need to do what is best . . . and tell [the Board member] what we are doing."

77.     Realizing he could not conceal the massive and growing FY 2016 EBIT shortfall forever, Wasson told Miquelon that they should delay the withdrawal of the FY 2016 EBIT goal so negative news could get "bundled" with other more positive news about Step Two of the merger.

78.     In a June 11, 2014 email to Wasson, Miquelon suggested that to "manage the earnings and deal timing dilemma" they withdraw all of the FY 2016 Goals (including even the synergy goal, which they repeatedly said was above target) on an earnings call scheduled for June 24, 2014, and further suggested they promise to offer new goals as part of a "comprehensive plan" to revise all guidance and frame this new guidance as part of an accelerated merger strategy in later earnings calls.

79.     On June 18, 2014, a Barclays report, entitled "Investors in the Driver's Seat; Upgrade to Overweight," detailed the behind the scenes pressure being placed on Walgreens' management by activist investors and the vulnerability of management and the Board to being replaced quickly if they failed to perform.  The report stated that "Walgreens' management and Board appear to have begun to internalize the constructive criticisms of increasingly vocal shareholders," and that it appeared these investors were "in the driver's seat."  The report cited the increasing influence of Pessina, a board structure and bylaws that afforded little protection to management, and tensions from the current management's poor performance as the reasons for the activist investors' extraordinary influence over the Company's management and its affairs.

80.     On June 24, 2014, Defendants made and/or caused to be made additional false and misleading statements which withdrew the FY 2016 EBIT goal but concealed the amount of the shortfall and the true reasons for the withdrawal, as they instead tried to bury the news and bundle it with other information.

(a)     **June 24, 2014 Release**:  On June 24, 2014, Defendants caused to be issued a release.  The release included optimistic statements bundled with the withdrawal of the FY 2016 Goals – for example, a quote from Wasson that "'We will be accelerating our optimization efforts, including taking additional steps to lower expenses companywide.  ***In addition, our joint venture with Alliance Boots continues to generate significant benefits***.'"  The release also reported that the "joint synergy program is now estimated to deliver second-year combined synergies of $400-$450 million, an increase from the previous second-year estimate of $375-$425 million."  The release also stated:

> ***As a result of the many step two considerations and current business performance, the company is withdrawing its fiscal year 2016 goals that were previously announced in 2012.  Specifically, once key decisions have been made on the above matters, Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August***.  At that time, the company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal year 2016.

(b)     **Statements During the June 24, 2014 Conference Call**:  That same day, the Company held an earnings conference call to discuss its fiscal 3Q 2014 results.  Wasson and several other Company executives participated on the call.

(i)     **Wasson's Statements**:  Wasson continued to obscure the true reason for the withdrawal of the FY 2016 EBIT goal and to omit the massive shortfall in FY 2016 earnings by withdrawing all of the FY 2016 Goals (including the synergy goal they were purportedly tracking ahead of) and doing so within a mass of purported good news, stating:

We remain focused on cost discipline to offset the negative effects of our gross profit dollar growth. ***We will be accelerating our optimization efforts***, taking additional steps to lower our expenses companywide.

I appointed a key member of my executive team to lead this effort. We've been making tremendous progress in identifying opportunities. ***When combined with additional synergies and cost reduction initiatives that are part of Step 2 and the completion of the strategic transaction with Alliance Boots, we expect to drive sustainable efficiencies and value for the combined enterprise***.

*       *       *

Turning to headwinds facing the industry, we have seen an increase in reimbursement pressure as well as a shift from historical patterns of deflation in generic drug cost to inflation. Over the past year we have seen cost increases on a subset of generic drugs and in some cases these increases have been significant. Both reimbursement pressure and generic inflation are having an adverse effect on margin.

*       *       *

***One final note, as a result of the many Step 2 considerations and current business performance the Company is withdrawing its fiscal year 2016 goals that were previously announced in 2012***. The Company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal 2016 and we will communicate those to you on our call, which we expect to hold in late July or early August.

***Let me speak directly to two of the prior goals regarding our adjusted operating income goal of $9 billion to $9.5 billion. On previous calls we noted we were tracking below the CAGR required to meet the goal. We now no longer expect to reach that goal***.

***On our combined synergy goals I noted earlier, we are tracking ahead of that goal and we expect to exceed the $1 billion amount by the end of fiscal 2016. As noted above, some of the opportunities we are pursuing are below the operating income line on the income statement and decisions about those will be reflected in our new goals and metrics***.

(ii)     **Miquelon's Statement**:  On the same call, Miquelon reinforced Wasson's statements, adding:

***Since I usually end with commentary on the fiscal year 2016 goals, let me reiterate the comments made in the press release and by Greg regarding these goals. As a result of the many Step 2 considerations in current business performance we are withdrawing the fiscal year 2016 goals that were previously announced in 2012***. As Greg mentioned, we are evaluating the proposed transaction including the potential timing and structure and combined management team, continued synergy and cost reduction initiatives and potential changes to our future

- 30 -

capital structure, all through the lens of what is in the best interest of our shareholders long term.

Once key decisions have been made on the above matters Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August. Many of the areas under consideration are interdependent and so we believe that the prudent course is to share the scope of our decisions and related financial objectives and metrics together all at that time.

In summary, our strategies remain sound in the fundamentals of our business in particular with respect to top-line growth has [sic] continued to strengthen. While we have gross profit reimbursement pressure in the traditional pharmacy, as mentioned, we also have significant opportunities to drive additional cost efficiency and also turn the front end of our business into a very meaningful profit pillar.

(iii)     **Wasson**: An analyst asked Defendants "could you just provide a little color on . . . how much of the shortfall to EBIT in 2016 is the Walgreens business versus the Alliance Boots business? Any color there I think would be helpful." Wasson continued to minimize the undisclosed massive shortfall, stating:

[Wasson:] Maybe I will start, Ed, and let Wade fill in. I think obviously still a challenging environment in some of the countries throughout Europe.

I think as I've said, Stefano [Pessina] and his team, pretty solid team, they are managing through that. But they are [sic] indeed have had some challenges in some areas of the business. I do think when you look at their business compared to the markets whether it's the retail business, Boots business or the wholesale business and compare them to the market, to their other competitors, *they are actually winning against the rest of the market and therefore that's encouraging. They are growing share. But as we have had some softness in parts of our business that we are correcting for, they have had softness in parts of their business that they are working to correct*.

[Miquelon:] I think, and I guess I would just augment it and say I think they've also done some great work below the line. . . .

[Wasson:] And I do think, as we have said, certainly we weren't hitting the CAGR to hit our adjusted earnings we had. And their CAGR, *their EBIT CAGR, has not been – is below their original plan but they are doing a lot of things to try to offset that and correct for it*.

(iv)     **Wasson**: In response to an analyst question about whether the U.S. business was not going to be as profitable going forward as they thought, Wasson responded "no, I

don't necessarily think that we should assume that the US Business cannot continue to grow on profitability. . . . *[W]e think that we actually have tremendous opportunity to grow EBIT* . . . ."

> (v)     **Wasson**:   An analyst also asked: "And just one follow-up on your 2016 commentary.  Are you optimistic that the below-the-line considerations may potentially offset the shortfall on the EBIT, or even more than offset the shortfall on the EBIT as you sort of think about 2016?"  Wasson again jumped in ahead of Miquelon, and rather than disclose the massive amount of the shortfall, suggested there was "potential" to offset the massive, albeit undisclosed, EBIT shortfall, and claimed that they did not have "clarity" on the issue, stating:

> Ed, I will jump and let Wade – I'm hesitant to go there.  *I think, as I said, we just have too many moving parts right now that we are working through.  There is potential, obviously, and that's what we are looking through from all of those how they come together.*

> *But I think give us the four to six weeks and we will be able to give – we will have a lot more clarity on how this is coming together and be able to give you a lot more information at that time*.

> 81.     The above statements were materially false and misleading when made.  The true facts, which were concealed and known or recklessly disregarded by Defendants, were:

> (a)     Defendants concealed that they did not need four to six more weeks to have "more clarity" but had already determined Walgreens was tracking toward a FY 2016 EBIT of approximately $7.2 to $7.5 billion, an astonishing $2.0 billion below the high-end of the prior goal, despite any opportunities, which facts they concealed as they attempted to string out the bad news over multiple months and bundle it with other information. Rather than disclosing the amount of the shortfall, throughout the call, Defendants tried to bury the bad news in a series of optimistic statements that repeatedly emphasized Walgreens' cost-saving initiatives and synergies with statements such as Wasson's statements claiming they were "working on accelerating optimization efforts across the entire organization," and "[w]e are identifying additional opportunities and we are going to combine those with the opportunities we have at Step 2."  While Defendants stated they no

longer expected to hit the FY 2016 EBIT goal of $9 to $9.5 billion, they misleadingly referred to these additional opportunities to offset or even increase EBIT, all of which misled investors and concealed the massive amount of the shortfall causing the stock price to remain at artificially inflated prices.

(b)     Defendants concealed that the merger was not generating the "significant benefits" they touted throughout the Class Period, and the quantifiable benefits were virtually non-existent. The EBIT shortfall had been growing at an increasing rate since the summer of 2013 and the massive shortfall was growing notwithstanding any purported opportunities and additional synergies which Defendants "bundled" with the withdrawal of the FY 2016 EBIT goal.

(c)     Instead of disclosing that they were withdrawing Walgreens' FY 2016 EBIT goal of $9 to $9.5 billion because it was unattainable and disclosing that the benefits of the merger as reflected in the earnings of the combined entities were expected to be far less than previously announced, Defendants bundled the news with optimistic statements about purported opportunities and synergies and obfuscated it by withdrawing all of the FY 2016 Goals, including the synergy goal they claimed to be ahead of, as part of a purported process of evaluating Step Two. Although they disclosed they no longer expected to meet the FY 2016 Goals, they did not disclose the massive amount by which they would fall short and instead made all of these optimistic statements which were designed to and did conceal the amount of the shortfall and the true reason for withdrawing the FY 2016 EBIT goal. This was part of Defendants' strategy to delay the bad news until it could be further bundled with their August 2014 announcement concerning accelerating Step Two of the merger.

(d)     Defendants did not withdraw the FY 2016 Goals as a result of the "many Step 2 considerations," but rather because they knew that the goals had no reasonable basis in fact, and instead were concealing the true reasons for the shortfall (generic inflation and their contractual

- 33 -

limitations) and manipulating the disclosure of the adverse facts in an effort to blunt the impact of the negative news.

(e)     Defendants further misled investors as to the size of the shortfall by merely referring to it as "some softness" and then claiming, with regard to the Alliance Boots side, that Alliance Boots was purportedly "winning against the rest of the market" and doing things to "offset" its portion of the EBIT shortfall, while simultaneously claiming, with regard to the U.S. side of the business, that they had "tremendous opportunity to grow EBIT," all of which misled investors as to the size of the shortfall and falsely suggested that it could be offset or that EBIT could even grow when in truth the massive shortfall existed notwithstanding any purported opportunities.

(f)     Defendants had no reasonable basis to believe and did not in fact believe that there was "potential, obviously," to make up the undisclosed EBIT shortfall, as the shortfall was actually $2 billion.

82.     After the June 24, 2014 conference call, consistent with the increasing pressure to perform management was facing from activist investors, an activist hedge fund investor complained that Defendants should not be pulling the goals but should be increasing EBIT and suggested that Pessina should be the one developing the Company's financial goals, as he "and his team clearly see the huge potential upside and have a track record of 30,000 percent return over 20 years."  The investor told Miquelon that activist investors at JANA Partners and Corvex Capital "are coming after you" and  would "stop at nothing to get you out of the way including getting personal dirt on you and embarrassing you publicly. . . . I wouldn't be surprised if that wheel was in motion."  This angry reaction further confirms the pressure Defendants were facing in 2014 to continue to conceal the massive FY 2016 EBIT shortfall.

83.     After the release of Walgreens' 3Q 2014 earnings, many analysts viewed Defendants' statements as signaling that they would be adopting more aggressive strategies and they failed to

appreciate the size of the shortfall. For example, following the call, a June 24, 2014 J.P. Morgan report increased the price target for Walgreens' shares from $74 per share to $76 per share. The report stated, in part:

> While the company withdrew the previously-discussed combined FY16 goals, management will provide updated targets on a separate call in 4-6 weeks, following the finalization of key decisions around the transaction timing and structure, the combined management team, ***additional synergy and cost reduction initiatives*** and the future capital structure. . . . Our rating on WAG is Overweight, and ***we remain positive on the longer term opportunities associated with the Alliance Boots transaction*** . . . .

84.     On July 1, 2014, Walgreens released its Form 10-Q for 3Q 2014. For the first time, Walgreens added to its list of risk items the phrase "generic prescription drug inflation" and added a reference to "the impact of private and public third party payers [sic] efforts to reduce prescription drug reimbursements."

85.     At Board meetings on July 8-9, 2014, Miquelon advised the Board that the revised 2016 EBIT forecast was still tracking to $7.5 billion.

86.     On July 24, 2014, the fallout began as the Company announced that Crawford – Vice President of Pharmacy, Health and Wellness and the head of the group responsible for negotiating payer contracts – would retire effective December 31, 2014.

87.     On July 31, 2014, the Board approved the revised FY 2016 Goals. Around this time, the Board also accepted the recommendation of the Special Committee that a tax inversion was not feasible and agreed to accelerate the proposed merger with Alliance Boots by several months.

88.     On August 4, 2014, the Company announced that Miquelon would be stepping down as CFO of the Company and that Timothy McLevish would be taking his place. A release announcing the transition stated that Miquelon would be leaving "to pursue several new opportunities outside of the company," but provided no explanation about what those opportunities were.

89.     On August 5, 2014, it was reported that Walgreens and Alliance Boots would not undergo a tax inversion.  Walgreens stock price dropped from $72.11 per share at the close on August 4, 2014 to $69.12 per share at the close on August 5, 2014.  In addition, Morgan Stanley issued an August 5, 2014 report reflecting that, despite Walgreens having withdrawn its FY 2016 Goals, investors were still in the dark as to the massive shortfall, as they wrote that, in their estimation, "management could guide to FY 2016 EBIT/EPS of $8.3B/$5.35 with further upside unfolding overtime."  Morgan Stanley would find out the next day it was very wrong.

## THE TRUTH BEGINS TO EMERGE

90.     On August 6, 2014, Walgreens and Alliance Boots hosted an investor call.  During the call, Wasson and Walgreens bundled the disclosure of the new FY 2016 EBIT goal, which finally revealed the amount of the massive shortfall that had been concealed during the Class Period and that the purported benefits of the merger were not nearly as robust as represented, with numerous optimistic statements.

91.      Wasson disclosed that the Company was now tracking to a "mid-point" of $7.2 billion for FY 2016 EBIT, stating "we're not happy about lowering our previous goals." Wasson claimed "we have been challenged by the ongoing global pharmacy reimbursement pressure, which continues, and the rapid and pronounced increase in generic drug pricing, which we did not fully anticipate, and now expect to persist longer than we anticipated."  Wasson also finally disclosed the reason for the shortfall, stating that Walgreens had not been "able to fully mitigate [generic inflation] given the structure of certain existing contracts."

92.     In an effort to "bundle" this shocking disclosure of the amount of the shortfall and the true reasons for it with optimistic statements to mitigate the full impact of Defendants' prior misrepresentations, Wasson announced that Walgreens would proceed with Step Two of the merger earlier than anticipated, stating "let me just try to capture what I believe is the magnitude of this

moment. We are lifting Walgreen from a US-only business to a truly international group with Alliance Boots," adding that "[w]e also get Stefano [Pessina] and his remarkable strategic experience. . . . So, I want to thank my colleague and my friend, Stefano, for all he's done to make this day possible . . . ."

93. However, contrary to Wasson's claim, the magnitude of the moment was not in regurgitating the old news that Walgreens was proceeding with the Alliance Boots merger and getting Pessina, who was already on the Board, but in having finally disclosed that the purported benefit of that merger, namely enhanced earnings, was a fiction, as earnings of the combined entities would be essentially flat.

94. Analysts reacted with shock on the call, confirming that they were completely unaware of the size of the shortfall and reasons for it, with one analyst questioning how "basically a negative revision of more than 20%" could happen, and asking: "we're basically expecting the EBIT of the combined business to be flat to maybe even – to basically be flattish now through the end of 2016?" In response, Wasson was forced to admit: "Yes, we are looking to be, through the next couple of years, probably flat to a little up."

95. Another analyst followed up with the following exchange with Wasson:

Greg [Wasson], just wanted to go back again to the combined EBIT target of $7.2 billion. Obviously, as noted on this call, quite a bit lower than the previous range. And now, this range does include at least one year's worth of the new $1 billion of cost savings.

I guess maybe just a higher level question. It seems like things changed on you fairly dramatically since the original guidance was given. I'm curious – almost to the extent that it seems like it's wiping out a lot of the synergies. I'm curious, how much of this change in the market – you refer to generic inflation was a reaction to your transaction to begin with? And was this maybe something that you just underestimated, the ability of the market to shift along with your scale shifting?

[Wasson:] It's a fair question. It would be hard to determine what the exact cause was. I do think that it's primarily a challenge in reimbursement model across the US business that has accelerated. Specifically, as we went into FY 15 – or calendar 2015 med D contracting process, that's where we really saw a significant

change that impacted – and the generic inflation that we talked about that we didn't expect it to be quite as significant and prolonged as it is. Combine – those two combined would be the lion's share of what has impacted the new metrics from what we put out in 2012.

96.     Another analyst was more blunt, calling it "pretty shocking" that this was not known by management sooner, stating:

> I guess weighing all this, it's pretty shocking that there is such a limited visibility and control over the business, given the Company is selling consumables and pharmacy. It's been observation. With EBIT coming in, it looks like more than $2 billion lower in 2016 than what you originally contemplated . . . .

97.     Another analyst asked "can you give us an ideas [sic] of when some of those contracts are up for renewal?" and noted that their biggest competitor did not "seem to have the same reimbursement pressure that you're having today." Wasson revealed that the overhang would last into 2016 as Walgreens was unable to offset generic inflation until contract renewal, stating that "[a]s far as the reimbursement of contracts, typically the commercial contracts have two to three years. We're somewhere in the cycle of those that may be under renegotiation this year, or two years left, and we're going back to working on those contracts."

98.     After the call, analysts reacted swiftly, slashing price targets for the Company's stock and expressing massive disappointment and shock at the announcement. An August 6, 2014, Credit Suisse issued a report calling into question management credibility and the highly touted benefits of the merger stating:

> ***Updated Guidance a Major Disappointment as Management Overpromises and Underdelivers***.
>
> - CS View: ***After more than a year of positive investor meetings and earnings calls where management hinted at the large potential of a combined WAG/AB, management shocked investors when its new fiscal '16 targets fell well short of elevated expectations and prior guidance***. Fiscal '16 EBIT is now expected to be almost 20% lower than the guidance provided when the deal was initially announced (despite a new cost savings program of $1 billion by fiscal '17 and higher synergies) ***and the new EPS target of $4.25-4.60 fell well short of the market's expectation (we believe many investors were***

***thinking $6+).* Organic EBIT is expected to be essentially flat over the next few years for the combined entity***.  In addition, the much anticipated tax inversion strategy was ruled out as an option and the new $3 billion share repurchase also fell short of what many thought possible.   While the company primarily blamed unexpected reimbursement rate pressure and drug inflation, ***it seems clear that there are deeper issues and that the company mismanaged investor expectations***.  We have lowered our target price to $57 (discounting back a low-to-mid teens multiple on fiscal '16 earnings) and ***continue to recommend investors avoid the stock***.  The core underlying U.S. business is clearly challenged, Europe lacks organic growth, and below the line initiatives are not exciting enough in our view. In fact, ***we would not be surprised if questions around the merits of the AB deal arise once again given the eventual valuation***, the fact that many of the benefits could have been had through partnerships, and its secondary revenue synergy focus. In light of management's updated guidance and commentary we have lowered our EPS estimates.

99.     Because the prior withdrawal of FY 2016 Goals in June 2014 was misleading, analysts were stunned by the amount of the FY 2016 EBIT shortfall.  A Deutsche Bank report, titled "More Questions than Answers," stated that the news "***at best could be considered extremely disappointing***" and that the new EBIT guidance "would imply an earnings erosion at the underlying business that we are at a loss to explain."  William Blair reported that "***the bigger development was the magnitude of the shortfall of the company's EBIT outlook***," adding that "***a $2 billion-plus variance was unexpected, particularly when we consider the company has announced a plan to reduce expenses by $1 billion, which is incremental to the original plan***."

100.    On August 7, 2014, Cowen and Company reported that because the updated $7.2 billion EBIT estimate included a new $1 billion in cost savings that were additive to the previously disclosed $1 billion in synergies, Walgreens' base business would be declining at a negative 4% CAGR over the next two years.  This was far below the initial forecast of $9 to $9.5 billion back in August 2012 that appeared to be based on a positive CAGR.  In addition, Cowen commented that "[m]anagement's focus on the call around increased reimbursement pressures and generic inflation is a bit confusing to us, given this is not a new issue and shouldn't come as such a surprise," adding

that "everyone has known about the issues of generic inflation" and "other players in the space have been able to more than compensate for these issues."

101.    After these disclosures, the Company's stock price plummeted, dropping from a close of $69.12 per share on August 5, 2014 to a close of $59.21 per share on August 6, 2014, losing more than 14% of the value of the stock in a single day on massive trading volume of more than 84 million shares, which was approximately 14 times its 60-day average.  This drop wiped out billions of dollars of the Company's market capitalization, revealing the economic loss and damages to the putative class who bought the stock at artificially inflated prices prior to the disclosure.

## POST-CLASS PERIOD DEVELOPMENTS

102.    Wasson's effort to delay the disclosure of the shortfall and to bundle it with optimistic and purportedly positive statements in June and August 2014 had not mitigated investors' shock in learning that the purported benefits of the merger were not nearly as promising as Defendants had portrayed them during the Class Period.  In an effort to divert attention from the prior false and misleading statements, Walgreens and Wasson attempted to make the recently departed Miquelon a scapegoat.  During meetings with investors on or about August 5 to 8, 2014, they met with investors and claimed that the massive shortfall was a shock to them and was the result of a forecasting error by Miquelon.

103.    *The Wall Street Journal* learned of these meetings with investors and sought a response from Miquelon.  On or about August 13, 2014, *The Wall Street Journal* asked Miquelon to explain why "at an April board meeting you forecast $8.5B" then cut it to $7.4 billion in July, "stunning the Board and senior Walgreen executives." Miquelon denied the claim that Wasson and the Board were unaware of the changed forecasts by responding that "all senior leaders are constantly updated on all relevant financial matters and in turn apprise all board members transparently and expeditiously." *The Wall Street Journal* also asked why Miquelon did not provide

Pessina with the financial projections, which Miquelon also refuted, stating: "It has always been . . . the policy at Walgreen's to provide ALL directors with fully transparent and timely information and there has been no exception to this policy during my tenure." (Emphasis in original.) Recognizing that he was about to get publicly thrown under the bus for the disappointing and delayed news, Miquelon demanded that Walgreens correct the information conveyed to *The Wall Street Journal.* Walgreens did not.

104. On August 19, 2014, *The Wall Street Journal* published an article entitled "Walgreen Shakeup Followed Bad Projection." The article reported that Miquelon provided an "$8.5 billion" FY 2016 EBIT forecast at the April Board meeting and then "[l]ast month [July], directors got a shock [when] Miquelon suddenly cut that forecast by $1.1 billion."[6] It added that Miquelon was "pressured to leave" and suggested Crawford and Miquelon had both lost their jobs due to a "billion-dollar forecasting error" that had "alarmed big investors" and "shock[ed]" the Board. The article added:

> The bottom line: Walgreen hadn't factored in, among other things, a spike in the price of some generic drugs that it sells as part of annual contracts.
>
> \* \* \*
>
> In a call with investors two weeks ago, Walgreen Chief Executive Gregory Wasson said the company was "really, really challenged" by negotiations to get reimbursement for dispensing prescription drugs under Medicare's Part D, and it didn't "fully anticipate" a "rapid and pronounced increase in generic-drug pricing." Mr. Wasson, 56, declined to comment
>
> Walgreen directors have told investors they were stunned by the change in the pharmacy forecast, which was for earnings before interest and taxes. Stefano Pessina, the company's largest shareholder and a director, has told other investors he wasn't permitted to see the forecasts before they were distributed to the board. The 73-year-old Mr. Pessina, who holds roughly an 8% stake, was unavailable for comment.

---

[6]   The fact that Walgreen added a risk disclosure relating to "generic price inflation" on July 1, 2014, undermines Defendants Walgreen and Wasson's account, as reflected by *The Wall Street Journal* article, that Defendants first learned of the shortfall during the July 8, 2014 Board meeting.

In recent meetings, investors say, Walgreen directors told them that forecasts given to directors in April were "inadequate" and that the company's finance and pharmacy units weren't "talking to each other."[7]

\*        \*        \*

Its finance unit didn't incorporate these price changes into its April forecast of fiscal 2016 pharmacy profits. In making its July forecast, it did.

In meetings with investors two weeks ago, Walgreen officials said the company group writing contracts wasn't communicating with the finance group.[8]

Walgreen has scrambled to reflect the higher drug costs in the pricing of its contracts. It said it believes drug-price inflation will continue, and this is "baked into" future plans.

105. Thus, completely contrary to Miquelon's claims that the inflation in generic drug prices and related contract issues were well known, had been discussed for some time and were being handled by individuals reporting directly to Wasson, *The Wall Street Journal* article reported that this was news to management and the Board. *The Wall Street Journal* article cast some doubt on Walgreens' story by noting that Walgreens' "major rival – CVS Caremark Corp.'s retail arm – said price increases on generic drugs weren't unexpected. CVS didn't indicate any effect on earnings or forecasts from such changes."

106. On or about August 21, 2014, Miquelon complained to Walgreens' general counsel, Thomas Sabatino, in an email that he was "still facing public headlines of a falsity that I made a billion dollar forecasting error and the general perception that I was fired as a result."

107. On September 30, 2014, *The Wall Street Journal* released another article, titled "Walgreen Profit Remains Pressured by Drug Price Miscalculation," which reported on the

---

[7]    Miquelon refuted this, noting that the additional "in excess" of $1 billion in risks to the FY 2016 EBIT forecast was shared with the Board in April.

[8]    Miquelon also refuted this, noting that the contracting group reported to Wasson and the generic price inflation and contract issues were known for some time.

continued weakness in Walgreens' business.  The article again referenced the purported "bungled generics forecast" that "led to the departure of two top executives when it came to light."

108.    On October 16, 2014, Miquelon sued Walgreens for defamation and other claims in the Circuit Court of Cook County, Chancery Division, in a complaint that was verified by him.

109.    On or about October 20, 2014, *The Wall Street Journal* reported that Walgreens "challenged the version of events presented by its former Chief Financial Officer Wade Miquelon in a defamation lawsuit, saying in a court motion that the former executive was responsible for the disappointing financial forecast that preceded his departure."  The article added that the "company said in its motion that Mr. Miquelon resisted revising Walgreen's financial forecast and that he had long been 'overly optimistic' in projecting the chain's future financial performance," adding that "Mr. Miquelon's departure from the chain wasn't 'wholly voluntary.'"  The filing itself disputed that Miquelon "was the driving force that led Walgreens to revise its FY 2016 forecast," claiming "in fact, he defended the forecast and resisted any revision before finally relenting."  Walgreens also claimed Miquelon's "lack of attention to financial details was a central reason why Walgreens decided he could not continue in the CFO role in the new combined company" and said "Walgreens lost faith in him due to his erratic behavior."  In subsequent filings, Walgreens claimed Miquelon's purpose was "exacting some measure of revenge on the employer that no longer wanted him as CFO."

110.    In turn, Miquelon, further contended that he was "lavishly praised by Walgreens executive management until he informed . . . Wasson . . . that he wished to pursue career opportunities outside of Walgreens and declined to endorse what he believed to be inappropriate financial decisions for the Company," and that after he resigned "Wasson and Pessina seized upon the opportunity to disparage and defame their former colleague in order to deflect criticism they were facing from investors."  Miquelon contended that Wasson "lied to investors and other third

parties and falsely said that Miquelon was 'pressured to leave Walgreens' (*i.e.*, fired); and . . . Wasson and Pessina falsely stated to third parties that he [Miquelon] botched or bungled Walgreens' financial forecasting." Miquelon contended that he had heard of certain defamatory statements from several Company officers who told him an internal memo prepared from an Investor Relations Director documented some of the alleged defamatory comments. In the filings, as in his Complaint, Miquelon contended he received a voicemail from *The Wall Street Journal* reporter saying he had heard Wasson telling the Street the change in the "'2016 FY EBIT forecast was "due to bad forecasting"'" and that those statements among other were untrue.

111.    In other filings, Miquelon contended that Walgreens' general counsel informed him he could tell prospective employers to contact Wasson to get the "'real story,'" which  to Miquelon confirmed that the statements to *The Wall Street Journal* "that Miquelon made an error and was forced out . . . were utterly false" and noted that Walgreens had "provided no evidence that the Board and senior executives were 'stunned'" by the July forecast.  Miquelon continued to assert in filings that "the process for determining the Company's forecast and goals involves many hundreds of employees to validate and refine assumptions as appropriate and the highest-level executives and the Board of Directors are kept up to date on all significant developments" and that Wasson was "provided with full information about the forecasting process" in which he "participated extensively."  Miquelon refuted Walgreens' assertion that Miquelon "'had a long history of being overly optimistic in a variety of forward-looking internal discussions'" and had a "'lack of attention to financial details.'"  Rather, Miquelon continued to claim that "[a]ny notion that they [Wasson and others] did not receive information or were 'shocked' about the forecast is simply untrue." Miquelon also opposed any redaction of his Complaint, claiming with regard to certain challenged allegations that "[p]otential violations [of] securities laws are not confidential information."

112.     As a result of the chaotic events, investor groups called for an SEC investigation into Walgreens' management and Board members.  For example, the CtW Investment Group requested an investigation into whether Regulation FD was violated.  Regulation FD requires issuers who disclose material non-public information to certain shareholders to make simultaneous and public disclosure.  Based on allegations in Miquelon's Complaint referring to meetings with select investors, CtW called for a full investigation.

113.     In December 2014, contrary to earlier statements that Wasson would be CEO of Walgreens post-merger, it was announced that he was leaving the Company and would receive approximately $35 million.  The stock price increased on this news.  On December 11, 2014, *Crain's Chicago Business* reported that "Company insiders say a powerful group of institutional investors – mainly hedge funds that want the combined company to be run more efficiently and aggressively, and who are impressed by Alliance Boots' billionaire Chairman Stefano Pessina – would not approve the Walgreen-Boots union until Wasson was gone."

114.     It was announced that Pessina would be the acting CEO upon Wasson's departure.  Also in December 2014, the head of Walgreens investor relations, Rick Hans (who made reassuring statements on April 30, 2014 about the FY 2016 EBIT goal), announced his retirement, becoming the fourth Walgreens executive (joining Wasson, Miquelon and Crawford) to announce his departure since the Company retracted its FY 2016 Goals in June 2014.  Soon thereafter the general counsel, Thomas Sabatino, also announced his departure.

115.     Walgreens hosted its 1Q earnings call for 2015 on December 23, 2014.  During the call, new CFO Timothy McLevish admitted that the Company needed to "incorporat[e] inflation protection in payer contracts as they come up for renewal."  McLevish emphasized this point later in the call, noting that in order to address "the generic inflation that we've experienced over the last

year," the Company was ensuring that, as existing contracts expired, the renewed contracts would "have inflationary protection built into th[em]."

116.    McLevish also stated that he had reviewed the FY 2016 Goals, which included an EBIT target of $7.2 billion.  McLevish determined that, based on everything he had reviewed and learned, the significantly lower goal was "reasonable and reflective of the markets."  Less than a month later, McLevish would be replaced as CFO.

117.    On December 29, 2014, shareholders approved Step Two of the acquisition and the subsequent reorganization into a holding company structure.  Upon execution of the merger on December 31, 2014, Walgreens and Alliance Boots became wholly owned subsidiaries of Walgreen Boots Alliance ("WBA"), a Delaware corporation headquartered in Deerfield, Illinois.  Walgreens common stock was converted to WBA stock on a one-to-one basis.  Also upon completion of the acquisition, the Board of Walgreens became the Board of WBA, and the executives of Walgreens and Alliance Boots blended to form the leadership of WBA.

118.    Walgreens voluntarily withdrew its stock from listing on the NYSE and Chicago Stock Exchange on December 31, 2014.  Common shares of WBA stock are listed on the NASDAQ Stock Market LLC, under the ticker symbol "WBA."

## ADDITIONAL INDICIA OF SCIENTER

119.    Throughout the Class Period, Wasson and Miquelon held themselves out to investors and the market as the persons most knowledgeable about Walgreens' earnings performance and business operations.  At all relevant times, Wasson and Miquelon were Walgreens' CEO and CFO, respectively, and the persons with ultimate responsibility for directing and managing the Company's business and affairs.  In these roles, defendants Wasson and Miquelon were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Walgreens' non-management directors apprised of the state of the Company's business and

operations and on its progress toward meeting the Company's FY 2016 Goals. For example, Miquelon has acknowledged that Wasson participated in the development of the Company's FY 2016 Goals and its LRP process, which Miquelon described as "robust, time intensive, and involv[ing] dozens of meetings and planning sessions involving literally hundreds of business, financial, accounting, operational, and functional employees, executives, and stakeholders at various levels of the Company."

120. As detailed herein, Wasson and Miquelon were under intense pressure to perform and both were threatened or feared losing their jobs during the Class Period. Wasson was particularly vulnerable, due to the perception that he had mishandled a prior strategic partnership with Express Scripts and certain investors advocated that Pessina, the Executive Chairman of Alliance Boots, was better suited to lead the combined company. In addition, Walgreens' corporate by-laws made the threat of possible replacement by activist investors particularly potent.

121. Miquelon also observed Wasson's "unchecked desire to push the combination of Walgreens and Alliance Boots forward to completion" and the "pressures brought to bear on Wasson . . . and investor disappointment with a lowered earnings forecast and the Company's decision not proceed with a tax inversion."

122. As detailed herein, Defendants were tracking their progress toward the FY 2016 EBIT goal and knew or recklessly disregarded the massive amount of the shortfall every time they spoke about it during the Class Period. Defendants repeatedly assured investors that they would track their progress toward the FY 2016 Goals and timely and accurately report on it.

123. According to Miquelon, "[i]t has always been . . . the policy at Walgreen's to provide ALL directors with fully transparent and timely information and there has been no exception to this policy during my tenure." (Emphasis in original.)

124.    According to Miquelon, not only did he work on the FY 2016 EBIT goal, but Wasson "worked hand in hand with Miquelon on the FY 2016 EBIT forecast for many months and w[as] fully aware of the magnitude of the market-related challenges to achieving the goal."

125.    As detailed in ¶¶73-78, Wasson pressured Miquelon to delay disclosure of the massive shortfall in the FY 2016 EBIT goal and pressured Miquelon to report an unsupportable $6 EPS target even after Miquelon said $5 EPS would require a "miracle."  Eventually, at the end of the Class Period, the EPS disclosed was a much lower $4.25 to $4.60.  In addition, Miquelon has claimed that Wasson met with certain investors and disclosed confidential, non-public information. Notably, as discussed in ¶98, an analyst reported that some investors were expecting the $6 EPS figure, the exact number Wasson was texting Miquelon to support.

126.    As detailed in ¶112, CtW Investment Group has since sent letters to Walgreens and the SEC calling for an investigation into purported violations of federal rules and regulations relating to the statements regarding the FY 2016 EBIT goal and the private meetings with certain investors where material, non-public information may have been disclosed.

127.    As detailed in ¶¶74-78, 80-81 and 85-93, during the Class Period, Defendants attempted to cover up their wrongdoing by spreading out the disclosure of the FY 2016 EBIT goal shortfall over several months (June and August) and "bundling" the disclosure of the shortfall with other optimistic statements about the merger prospects and purported opportunities and enhanced synergies.

128.    As detailed in ¶¶102-111, Walgreens and Wasson have attempted to conceal their knowledge of the massive FY 2016 EBIT goal shortfall by falsely claiming they were unaware of the shortfall until Miquelon disclosed it in July, and that it was the result of a forecasting error by Miquelon, all of which Miquelon denied.

129.     Defendants also routinely communicated with analysts and investors during the Class Period and represented that they were informed of and knowledgeable about Walgreens' business and operations, including the Company's earnings results and prospects and the market-related trends impacting its business.   As described in ¶¶33-35, 42-43, 56-57, 67, 71, 80 and 90-97, Defendants participated in numerous Walgreens conference calls with analysts and investors and in the course of these calls presented information regarding Walgreens' earnings results, business performance and sales and earnings trends.   In particular, Defendants repeatedly discussed the FY 2016 EBIT goal and promised to keep investors apprised of any changes to the goal based on current information.

130.     Moreover, Wasson received direct reports from Jeffrey Berkowitz and John Donovan, the executives responsible for generic drug procurement, and Crawford, the executive with oversight of all third-party contracts and related negotiations.

131.     By making false and misleading statements, Defendants acted contrary to the Walgreens Code of Business Conduct, which states: "We are committed to making accurate, timely, complete, fair and clear disclosures in our reports to the U.S. Securities and Exchange Commission."

132.     In addition, Walgreens retained counsel to investigate whether Miquelon violated other provisions of its Code of Business Conduct – specifically whether Miquelon maintained a financial interest and actively participated in the business operations of liquor stores in Arkansas. Such activity could violate Walgreens' Code of Business Conduct ban on having an interest in a company that does business or competes with Walgreens.  Walgreens' counsel has claimed he was startled to learn that Miquelon did not possess a copy of the Walgreens Code of Business Conduct in effect during his tenure and has stated Miquelon has not answered all of his questions on the issue.

**LOSS CAUSATION**

133.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Walgreens common stock and operated as a fraud or deceit on Class Period purchasers of Walgreens common stock by misrepresenting the Company's business and prospects, and concealing a $1.8 to $2.3 billion FY 2016 earnings shortfall and the reasons for this shortfall from the investing public.

134.    Defendants' false and misleading statements had their intended effect and directly and proximately caused Walgreens common stock to trade at artificially inflated levels, reaching a Class Period high of $76.08 per share.

135.    As a result of Defendants' fraudulent conduct as alleged herein, the price at which Walgreens common stock traded was artificially inflated throughout the Class Period.  When plaintiff and other members of the Class purchased their Walgreens common stock, the true value of such common stock was substantially lower than the prices actually paid.  As a result of purchasing Walgreens common stock during the Class Period at artificially inflated prices, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws, when such artificial inflation dissipated.

136.    In addition, Defendants affirmatively assured investors that Walgreens' FY 2016 Goals were being pulled as part of a comprehensive plan to evaluate the business in light of the merger and in order to maximize long-term value for shareholders and realize potential opportunities.  Defendants' assurances were nothing more than a further attempt to mislead the market's expectations for the Company.  To that end, Defendants' false and misleading statements maintained and increased the artificial inflation in the price of Walgreens common stock.

137.     As a result of Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to the Defendants, plaintiff and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Walgreens common stock at artificially inflated prices during the Class Period.  Had plaintiff and other members of the Class known the truth, they would not have taken such actions.

138.     Later, on August 6, 2014, when – two days after Walgreens' CFO announced his departure – Defendants' revealed that the Company was $1.8 billion short of the low-end of its FY 2016 EBIT goal, the reasons for this shortcoming and the fact that these reasons were indicative of long-term adverse business trends that could not be meaningfully rectified through any of the Company's business plans or initiatives, the artificial inflation came out of the stock and Walgreens' stock price plummeted, declining more than 14% on massive volume of over 84 million shares. After the fraud became generally known, the market, which reacted by punishing the Company's stock price and wiping out billions of dollars of its market capitalization, clearly understood that there had been new revelations – that Walgreens' financial condition and the purported benefits of its merger were not as previously (and misleadingly) presented to the market.

139.     The timing and magnitude of the decline in the price of Walgreens common stock negates any inference that the losses suffered by plaintiff and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  During the same period in which Walgreens' stock price fell over 14% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index remained constant and the Standard & Poor's 500 Consumer Staples Index, comprised of public corporations in Walgreens' industry peer group, rose almost 1%.

140. Analyst reports reflected that the revelation of the lowered FY 2016 EBIT goal was responsible for the stock drop. Deutsche Bank reported on August 12, 2014 that "we believe the stock performance is tied to the negative operating earnings revisions versus prior targets."

141. As a result of their purchases of Walgreens common stock during the Class Period and the subsequent price decline in the value of those shares when the truth was revealed to the market, plaintiff and other members of the Class suffered economic loss, *i.e*., damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

142. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiff and other members of the Class purchased Walgreens common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

143. At all relevant times, the markets for Walgreens shares were efficient for the following reasons, among others:

(a) Walgreens stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Walgreens filed periodic public reports with the SEC and the NYSE;

(c)     Walgreens regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)     Walgreens was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of those reports was publically available and entered the public marketplace.

144.     As a result of the foregoing, the market for Walgreens common stock promptly digested current information regarding Walgreens from all publicly available sources and reflected such information in Walgreens' stock price. Under these circumstances, all purchasers of Walgreens common stock during the Class Period suffered similar injury through their purchase of common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

145.     The statements alleged to be false and misleading herein are not forward-looking statements ("FLS") and were not identified by Defendants as such, but rather historical and present-tense statements about the state of Walgreens' business and/or its progress and ability to meet certain financial targets.  The amount of the FY 2016 EBIT shortfall, the reasons for it, and the Company's inability to mitigate it, was known by or was available to Defendants at the time of their statements, but they failed to disclose this information.

146.     To the extent any of the challenged statements are considered to be FLS, they were not accompanied by specific, meaningful cautionary language identifying important factors that

could cause actual results to differ materially from the FY 2016 EBIT goal. The Safe Harbor warnings were boilerplate and did not change to reflect changes in the economic and business conditions under which Walgreens operated.

147. More specifically, Walgreens modified its risk disclosures to include specific risk warnings concerning generic price inflation only after they withdrew the FY 2016 Goals on June 24, 2014. In its Form 10-Q filed on July 1, 2014 for 3Q 2014, Walgreens for the first time referred to generic prescription drug inflation in its risk disclosures. On August 6, 2014, when the FY 2016 EBIT goal was lowered from $9 to $9.5 billion to $7.2 billion, Defendants disclosed the primary reason for the shortfall was generic price inflation and reimbursement pressure due to their contracts. In a September 30, 2014 conference call, Walgreens provided a chart that, without disclosing the amount, graphically depicted that these were the largest items responsible for the shortfall in the FY 2016 EBIT goal.

148. Consistent with these belated disclosures, *after* the Class Period ended, on or about October 20, 2014, Walgreens filed its fiscal year 2014 Annual Report on Form 10-K. In the 10-K, Walgreens identified as a risk that "Generic Drug inflation could have a significant adverse effect on our profitability." Walgreens noted that "[w]e experienced a shift from historical patterns of deflation in generic drug costs to inflation in fiscal 2014" (September 1, 2013 to August 31, 2014). Walgreens added that:

> Our existing reimbursement arrangements with payers generally provide us with only limited protection against cost increases in our generic drug procurement costs. We are seeking to address this through changes in our contracting strategies and negotiations with our vendors and payers. We cannot assure you that we will be able to mitigate the impact of increased inventory acquisition costs, in whole or in part. Failure to fully offset any such increased prices and costs or to modify our activities to mitigate the impact could have a significant adverse effect on our gross profit margins.

149. In a separate risk disclosure in the 2014 Form 10-K regarding reimbursement levels, Walgreens noted that "a shift in the mix of pharmacy prescription volume toward programs offering

lower reimbursement rates could adversely affect our profitability." It noted that "[w]e experienced a shift in pharmacy mix toward 90-day at retail in fiscal 2014 and expect that trend to continue in fiscal 2015."

150.    However, those and other new risk warnings were not included in Walgreens' Class Period risk disclosures. Specifically, they were not included in the Form 10-K filed on or about October 21, 2013, or in Walgreens' quarterly statements on Form 10-Q filed on or about December 27, 2013 and March 27, 2014. The 2013 10-K and the 1Q and 2Q 2014 Form 10-Qs filed by Walgreens contained the risk warnings relevant to the February, March, April and June 2014 false and misleading Class Period statements. For example, on the March 25, 2014 conference call, Rick Hans began by stating "[p]lease see our latest Forms 10-K and 10-Q and subsequent filings for a discussion of risk factors as they relate to forward-looking statements." Thus, the most recent filing would have been the December 27, 2013 Form 10-Q.

151.    Defendants are not entitled to the Safe Harbor because they omitted to include any similar, specific and meaningful risk warnings prior to making the false and misleading statements. Rather, Defendants' risk warnings in the 2013 Form 10-K and 1Q and 2Q Form 10-Qs failed to include any such specific warnings regarding generic price inflation and their contracts. In fact, the risk warnings in those filings were essentially the same as the risk warnings included in their financial statements prior to July 2013, which was before they had discovered the $300 million shortfall between the FY 2016 EBIT goal and their internal projections.

152.    Defendants failed to disclose the known trends and uncertainties concerning the negative effect the increase in generic price inflation was having and would have in light of their contracts. Defendants are not entitled to the Safe Harbor because their boilerplate risk warnings remained essentially the same, even as the Company's business conditions were changing. Defendants' risk warnings did not include the principal and important risks facing Walgreens at the

- 55 -

time of the statements regarding the FY 2016 EBIT goal even though, by late 2013, Miquelon and

his team had identified the unprecedented level of generic price inflation as the largest source of the

additional $200 to $300 million risk to the initial $300 million shortfall identified in the summer of

2013 and that Walgreens' contracts did not provide meaningful relief.  Moreover, by March 2014 it

was increasingly clear that the deflation in generic pricing over the last decade had reverted to an

inflationary trend and Crawford was having a difficult time negotiating with certain payers, yet

Defendants did not reduce the FY 2016 EBIT goal or provide a meaningful risk warning despite

business conditions changing for the worse.  Since Defendants knew their contracts did not provide

meaningful relief from generic price inflation, they should have disclosed that fact to the market

during the Class Period, rather than at the end and thereafter.

153.    Defendants are also liable for any false or misleading FLS pleaded because, at the

time each FLS was made, the speaker knew the FLS had no reasonable basis and therefore was false

or misleading and the FLS was authorized and/or approved by an executive officer of Walgreens

who knew that the FLS was false or misleading.

## CLASS ACTION ALLEGATIONS

154.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of all persons who purchased or otherwise acquired Walgreens common

stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their

families, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns, and any entity in

which Defendants have or had a controlling interest.

155.    The members of the Class are so numerous that joinder of all members is

impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. Walgreens has over 945 million shares of stock outstanding, owned by hundreds if not thousands of persons.

156.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

      (a)   whether the 1934 Act was violated by Defendants;

      (b)   whether Defendants omitted and/or misrepresented material facts;

      (c)   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d)   whether Defendants knew or deliberately disregarded that their statements were false and misleading;

      (e)   whether the price of Walgreens common stock was artificially inflated; and

      (f)   the extent of damage sustained by Class members and the appropriate measure of damages.

157.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from Defendants' wrongful conduct.

158.   Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

159.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

160.   Plaintiff makes the allegations herein based upon the investigation of plaintiff's counsel, which included a review of, among other things, a verified complaint filed by the Company's former CFO, emails by the Company's senior executives, Company SEC filings, media

reports and analyst reports about the Company, and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

161.     Plaintiff incorporates ¶¶1-160 by reference.

162.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

       (a)     employed devices, schemes and artifices to defraud;

       (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

       (c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Walgreens common stock during the Class Period.

164.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Walgreens common stock. Plaintiff and the Class would not have purchased Walgreens common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

165.    Plaintiff incorporates ¶¶1-164 by reference.

166.    The Individual Defendants acted as controlling persons of Walgreens within the meaning of §20(a) of the 1934 Act. By virtue of their positions with the Company, ownership of Walgreens stock, and participation in and/or awareness of the Company's operations and finances, the Individual Defendants had the power and authority to cause Walgreens to engage in the wrongful conduct complained of herein.

167.    Each Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

168.    Each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control the public statements about Walgreens giving rise to the securities violations as alleged herein, and exercised the same.

169.    Walgreens controlled the Individual Defendants and all of its employees.

170.    By reason the wrongful conduct alleged herein, Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  April 10, 2015                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          JAMES E. BARZ (IL Bar # 6255605)
                                          FRANK A. RICHTER (IL Bar # 631001)


                                          _____
                                                *s/ James E. Barz*
                                          JAMES E. BARZ

                                          200 South Wacker Drive, 31st Floor
                                          Chicago, IL  60606
                                          Telephone:  312/674-4674
                                          312/674-4676 (fax)
                                          jbarz@rgrdlaw.com
                                          frichter@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID C. WALTON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
dwalton@rgrdlaw.com
bcochran@rgrdlaw.com

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

I:\Admin\CptDraft\Securities\Cpt Walgreens.docx