**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WALGREEN CO., GREGORY D. WASSON, AND WADE MIQUELON,<br><br>Defendants. | Civil Action No. 1:15-cv-03187-SJC-MMR<br><br>Honorable Sharon Johnson Coleman<br><br><u>CLASS ACTION</u> |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS


I. SUMMARY OF ALLEGATIONS .......... 2

II. JURISDICTION AND VENUE .......... 13

III. PARTIES .......... 14

A. Lead Plaintiff .......... 14

B. Corporate Defendant Walgreens .......... 14

C. Individual Defendants .......... 14

D. Relevant Non-Parties .......... 17

IV. RELEVANT FACTUAL BACKGROUND .......... 18

A. Walgreens Generated Profits Primarily Through Sales of Generic Drugs .......... 18

B. Walgreens Faces "Unprecedented" Generic Drug Price Inflation in 2013 Leading to "Systematic" Inflation by March 2014 .......... 20

C. Prior to and During the Class Period, Walgreens Was Locked Into Disadvantageous Reimbursement Contracts That Did Not Account for Generic Price Inflation .......... 26

1. The Structure of Walgreens' Reimbursement Contracts .......... 26

2. The Impact of PBM Contracts on Reimbursement and Profit Margins .......... 27

3. The Impact of Medicare Part D Preferred Networks on Walgreens' Profit Margins .......... 30

D. Walgreens Announces Step 1 of the Alliance Boots Merger And The FY16 Earnings Targets .......... 32

E. Defendants Solidify the FY16 EBIT Target and Set Investor Expectations For The Combined Company .......... 34

F. Defendants Reaffirm the FY16 EBIT Target Despite Their Knowledge of Materially Adverse Trends Impacting the Company .......... 35

G. Internal Analysis Confirms $300-$800 Million FY16 EBIT Shortfall As Defendants Publicly Reaffirm FY16 EBIT Target .......... 37

H. Internal Walgreens Data Confirms Nearly 100% Increase in EBIT Shortfall Due to "Unprecedented" Generic Drug Price Inflation and Inability to Negotiate Relief From Unfavorable Reimbursement Contracts .......... 39

I. Defendants Continue to Reaffirm FY16 EBIT Target in January & February 2014 .......... 44

J. Defendants' Continued Failure to Disclose Material EBIT Shortfalls and Ongoing Negative Trends During the Class Period .......... 45

1. March 2014 .......... 45

2. April and May 2014 .......... 46

3. June - August 2014 ........ 48

V. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS ........ 53

A. March 25, 2014 Misstatements and Omissions ........ 53

B. April 17, 2014 Conference Call ........ 60

C. April 30, 2014 Barclays Conference ........ 62

D. May 16, 2014 Conference Call ........ 63

E. June 24, 2014 Misstatements and Omissions ........ 64

F. Defendants Failed to Comply With Item 303 of Regulation S-K By Failing to Disclose Material Known Trends in 2Q14 Form 10-Q ........ 74

VI. THE RELEVANT TRUTH EMERGES ........ 76

VII. RELEVANT POST-CLASS PERIOD DEVELOPMENTS ........ 79

A. Wasson and Pessina Attempt to Scapegoat Miquelon and Continue to Mislead Investors About the Reasons for the $2+ Billion Shortfall ........ 79

B. Defendants Admit Reimbursement Contracts Were Insufficient to Protect the Company From Generic Price Inflation During the Class Period ........ 80

C. Walgreens Becomes Walgreens Boots Alliance ........ 83

VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER ........ 84

A. Defendants' Senior-Level Positions, Responsibilities, and Access to Adverse Information Concerning the FY16 EBIT Target, Generic Inflation and the Company's Reimbursement Contracts Support a Strong Inference of Scienter ........ 85

B. Wasson's Actions Created a Deliberately Reckless "Tone at the Top" ........ 88

C. Suspiciously Timed Resignations Support a Strong Inference of Scienter ........ 90

D. Defendant Miquelon's Judicial Admissions Support a Strong Inference of Scienter ........ 92

IX. LOSS CAUSATION ........ 92

X. LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ........ 96

XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ........ 97

XII. CLASS ACTION ALLEGATIONS ........ 101

XIII. CAUSES OF ACTION ........ 103

COUNT I ........ 103

COUNT II ........ 107

XIV. PRAYER FOR RELIEF ........ 108

XV. JURY TRIAL DEMANDED ........ 109

This is a class action for violations of the federal securities laws brought by Lead Plaintiff, Industriens Pensionsforsikring A/S ("Lead Plaintiff"), individually and on behalf of all persons who purchased or otherwise acquired Walgreen Co. ("Walgreens" or "the Company") common stock between March 24, 2014 and August 5, 2014, inclusive (the "Class Period").[1] Lead Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and United States Securities and Exchange Commission ("SEC"); Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against: (i) corporate defendant Walgreens, (ii) former Walgreens Chief Executive Officer ("CEO") Gregory D. Wasson ("Wasson"), and former Chief Financial Officer ("CFO") Wade Miquelon ("Miquelon") (collectively, "Defendants").

Lead Plaintiff alleges the following based upon personal knowledge with respect to Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation undertaken by Lead Counsel. Lead Counsel's investigation included, *inter alia*, the review and analysis of: (i) Walgreens' public filings with the SEC; (ii) securities analyst reports; (iii) Walgreens' press releases and other public statements; (iv) media reports concerning Walgreens, its competitors and the retail pharmacy industry, including online news sources; (v) interviews with former Walgreens employees; and (vi) pleadings and documents filed in *Miquelon v. Walgreen Co.*, Cook County Circuit Court Case. No. 14-CH-16825.[2] Lead Plaintiff believes that substantial evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery.

---

[1] Throughout the Complaint, all emphasis is added unless otherwise noted.

[2] A copy of the Verified Complaint filed in the *Miquelon* action on October 16, 2014 (the "Miquelon Complaint"), and copies of select exhibits attached thereto are attached to this complaint as Exhibit A. The Miquelon Complaint also was filed as an exhibit to the initial complaint filed in this action on April 10, 2015. *See* Dkt. No. 1.

## I. SUMMARY OF ALLEGATIONS

1. Walgreens is the largest drugstore retail chain in the United States. Based in Deerfield, Illinois, the Company sells prescription and non-prescription drugs and general merchandise through roughly 8,300 stores in all fifty U.S. states, the District of Columbia, the Virgin Islands, and Puerto Rico. Prescription drugs sold through the Company's pharmacy division account for about two-thirds of the Company's sales; the remaining one-third comes from general merchandise, over-the-counter medications, cosmetics, and groceries.

2. On June 19, 2012, Walgreens announced that it had entered into a strategic partnership and potential merger with Swiss-based pharmacy company Alliance Boots GmbH ("Alliance Boots") to create a global pharmacy-led health and wellbeing enterprise (the "Walgreens-Alliance Boots Transaction"). Defendants touted the partnership as "creat[ing] the largest pharmacy company in the world" that would transform the pharmacy industry and generate "diversified and robust profit pools across the U.S., Europe and key emerging markets."

3. As proposed, the business combination included two steps. Under "Step 1," which took place in 2012, Walgreens acquired a 45% equity ownership stake in Alliance Boots in exchange for approximately $6.7 billion in cash and Walgreens stock. Under "Step 2," Walgreens had the option to acquire the remaining 55% of Alliance Boots for approximately $5.3 billion in cash and 144.3 million shares of Walgreens stock. Significantly, whereas the first step of the transaction in 2012 did not require a shareholder vote, the second step did require shareholder approval, which ultimately occurred in December 2014.

4. In September 2012, after Step 1 of the deal closed, Walgreens provided investors with a set of highly publicized earnings targets for fiscal year 2016 ("FY16"), the first fiscal

period following the contemplated merger of the two companies.[3] The financial targets included $9 to $9.5 billion in adjusted earnings before interest and taxes ("EBIT") (the "FY16 EBIT Target"), and $1 billion in combined synergies. Importantly, the "synergy" target of $1 billion was a key component of the FY16 EBIT Target—*i.e.*, the $9 to $9.5 billion was comprised of $1 billion in synergies and $8 to $8.5 billion of other earnings.

5. The Company's FY16 earnings targets—particularly the $9 to $9.5 billion in EBIT—were critically important to investors and stock analysts for several reasons. *First*, the targets specifically *quantified* the potential profit and purported benefits of an Alliance Boots merger during the first full fiscal year of combined operations. Thus, Walgreens' ability (or inability) to meet the FY16 targets was crucial to shareholders' assessment of the merits of voting in favor of Step 2 of the merger. *Second*, the FY16 EBIT Target provided investors with a specific model to track the overall *current* progress and financial impact of the strategic partnership on an ongoing basis, which analysts then used in formulating their ultimate valuation of Walgreens common stock. *Third*, the FY16 EBIT Target reflected a considerable *increase* in the earnings of Walgreens and Alliance Boots as stand-alone organizations, thus conveying to investors that the merger would fundamentally transform the Company and increase its overall financial growth.

6. In July 2013, Walgreens' internal data showed an FY16 EBIT shortfall of $300 million below the low-end and $800 million below the high-end of the range represented to investors. By late 2013, Defendants learned the EBIT shortfall had nearly doubled to $500 to $600 million below the low-end, and ***$1.1 billion*** below the high-end of the FY16 EBIT Target. Also by that time, the Company specifically identified that the largest source of the EBIT

[3] Walgreens reports its financial results on a fiscal year ending on August 31. Thus, its first quarter ("1Q") ends on November 30, its second quarter ("2Q") ends on February 28, its third quarter ("3Q") ends on May 31, and its fourth quarter ("4Q") and fiscal year ("FY") ends on August 31.

shortfall was "the ***unprecedented*** level of inflation in the price of generic drugs" and Walgreens' failure to structure its drug contracts to provide meaningful inflationary relief—both of which negatively impacted Walgreens' profit margins and EBIT.

7. The "unprecedented" inflation in generic drug prices, which continued to increase prior to the Class Period, was particularly troubling for Walgreens as nearly 65% of its total sales were comprised of prescription drugs, 80% of which were generics. Generic drugs, moreover, generated approximately 50% higher profit margins than their branded counterparts. Additionally, because Walgreens was locked into unfavorable fixed-price contracts that assumed a *deflationary* trend in the price of generic drugs and provided no protection in an inflationary environment, the alarming increase in generic prices disproportionately impacted Walgreens' margins and earnings.

8. These undisclosed problems were also exacerbated by Walgreens' increased participation in "preferred" pharmacy networks for several Medicare Part D prescription plans. Unbeknownst to investors, the Company had agreed to less favorable contracts with significantly lower reimbursement rates for generic drugs in order to garner increased market share. This further compounded the downward pressure on Walgreens' gross profit and EBIT leading up to the Class Period.

9. Despite Defendants' actual knowledge of the Company's massive FY16 EBIT shortfall and the company-specific reasons underlying it (*i.e.*, generic drug price inflation combined with unfavorable reimbursement contracts), Defendants concealed these material facts from investors and continued to tout the $9 to $9.5 billion in FY16 EBIT. Indeed, Defendants issued misleading investor slide presentations and/or oral investor updates explicitly reiterating the "***$9-$9.5 billion***" FY16 EBIT Target no less than ten successive times, including on June 25,

2013, October 1, 2013, November 12 and 20, 2013, December 20, 2013, January 9 and 15, 2014, February 6 and 11, 2014, and March 25, 2014. During these same presentations, Defendants also uniformly reassured investors that the $1 billion in alleged merger "synergies" was on track or even *ahead* of expectations—further indicating to investors that the FY16 EBIT Target also was on track.

10. Based on Defendants' misleading representations and omissions, securities analysts continued to reaffirm that Walgreens would meet the $9 to $9.5 billion FY16 EBIT Target. In fact, even when Walgreens announced soft quarterly results or that it was tracking "a bit below" the compound annual growth rate ("CAGR") to achieve the FY16 EBIT Target, many analysts relied on Defendants' positive assurances that Walgreens: (i) was still on track to achieve the $9 to $9.5 billion in FY16 EBIT; and (ii) already had identified numerous "opportunities" and "synergies" to offset any risk to that guidance. Indeed, following the Company's conference call on December 20, 2013, J.P. Morgan issued a report entitled "We Remain Positive on Longer Term Opportunity as ***2016 Goals Remain Intact***," confirming that "more importantly, ***the company did reaffirm the combined 2016 goals***."

11. In addition, even when analysts specifically pressed Wasson and Miquelon about the impact of generic drug price inflation on the Company, they either falsely downplayed the problem or affirmatively denied that it was affecting the Company. In November 2013, for example, nearly two months after one of Walgreens' main competitors (CVS) reported that "the cost increases on generics have also been a little stronger than we expected," UBS reported that "when asked about generic drug price inflation trends, ***management seemed dismissive of any generic inflation trends*** negatively impacting them in the upcoming quarter [2Q 2014]."

12. In the first few months of 2014, the Company's EBIT shortfall continued to grow

rapidly. Between December 2013 and an April 9, 2014 Board meeting, the Company identified "***well in excess of $1 billion***" in additional risk to the FY16 EBIT Target based on the *same* fundamental issues known in 2013, including generic drug price inflation (which had become "systematic") and unfavorable third-party reimbursement contracts. This additional $1 billion shortfall on top of the $500-600 million previously identified in late 2013, reduced the Company's FY16 EBIT Target to approximately $7.5 billion or less—roughly ***$1.5 to $2.1 billion*** lower than the EBIT range provided to investors. Put another way, during the Class Period, Defendants knew (but failed to disclose to investors) that the EBIT shortfall in July 2013 had ***doubled*** to upwards of $600 million by late 2013, and then subsequently ***tripled*** to $1.5 to $1.6 billion below the low-end—which was ***$2 to $2.1 billion*** below the high-end—of the FY16 EBIT Target represented to investors. Averaging this increase, the shortfall had grown by over $300 million in each of the three calendar months (January through March 2014), immediately preceding the Class Period.

13. Rather than disclose these facts, during Walgreens' 2Q14 earnings call on March 25, 2014 (the first day of the Class Period), Defendants distributed a presentation to analysts and investors with a slide explicitly reaffirming the FY16 Target of "***$9.0-$9.5 Billion***" with $1 billion in alleged synergies:

| | FY 2016 Goals† |
|---|---|
| Revenue | >$130 Billion |
| Operating Income (GAAP) | $8.5 - $9.0 Billion |
| Adjusted Operating Income* | $9.0 - $9.5 Billion |
| Synergies | $1 Billion |
| Operating Cash Flow | ~$8 Billion |
| Net Debt** | ~$11 Billion |

14. During the same March 25, 2014 call, notwithstanding their prior comments on the "last call" (*i.e.*, December 20, 2013) that Walgreens was tracking only "a bit below" the CAGR to achieve the FY16 EBIT Target, Wasson and Miquelon misleadingly reassured investors that they had already identified a litany of so-called "opportunities," benefits, new initiatives and cost savings (including "incremental Alliance Boots synergies"), which purportedly would "mitigate these risks."

15. Based on Defendants' reassurances, analysts continued to tout the $9 to $9.5 billion FY16 EBIT Target to investors throughout the Class Period. On March 26, 2014, for example, J.P. Morgan noted that "[t]he previously discussed combined ***2016 targets remain intact***" and that the Company "identified a range of further opportunities to help mitigate these risks." Likewise, Jefferies reported on March 25, 2014: "[w]ith ***investors focused on proforma F2016 EPS of WAG+Alliance Boots***, the market will likely look through the weak quarter and focus on the positive synergy news." Moreover, following a meeting with Wasson and Miquelon in May 2014, Morgan Stanley reported that "***WAG has not seen any unusual activity***" with respect to generic price inflation and that its purchasing joint venture with ABC/Alliance Boots purportedly "leaves [Walgreens] in ***better shape than peers to cope with generic price increases***."

16. Defendants' continued reaffirmation of the FY16 EBIT Target while concealing the effect of severe generic price inflation combined with Walgreens' unfavorable reimbursement contracts, had no reasonable basis and was deliberately reckless. By the start of the Class Period, Defendants knew but failed to disclose that: (i) Walgreens *currently* had a massive (and growing) FY16 EBIT shortfall of $1.5 to $2.1 billion; (ii) the "unprecedented" generic drug price inflation known in late 2013 had "***systematically*** reverted to an inflationary

trend"; (iii) Walgreens' unfavorable reimbursement contracts were *currently* plaguing the Company's profit margins and EBIT necessary to meet the FY16 Targets; and (iv) the Company was having severe problems negotiating with a "certain group of pay[e]rs" which added even more undisclosed risk and uncertainty to the FY16 EBIT Target.

17. At the end of May 2014, as Walgreens' EBIT shortfall continued to grow, Miquelon conveyed his decision to leave Walgreens. Knowing he was already on his way out and no longer needed to maintain the Company's façade of success to keep his job, by June 2014, Miquelon abruptly changed course and began advocating for disclosure of the EBIT shortfall that had been hidden from investors since late 2013. Fearing for his own job, however, Wasson continued to push for the unsupportable FY16 EBIT Target and even pressured Miquelon to ***increase*** the Company's public earnings per share ("EPS") target for the post-merger Company, despite his knowledge of the $1.5 to $2.1 billion FY16 EBIT shortfall.

18. As Miquelon himself admitted, on many occasions Wasson pressured him to approve EPS of $6.00 per share, stating "***I need a 6, get me a 6***," despite the fact that it was not supported by actual evidence and translated to approximately $9.7 billion in total FY16 earnings, more than $2 billion higher than the Company's internal data. Indeed, according to documents attached to Miquelon's Complaint, on June 11, 2014, Wasson sent him a text message stating: "Let's push for a 6 somehow." Miquelon responded: "I don't think there is [sic] anyway we could ensure that. ***Getting a 5 is a miracle***." Wasson's reply was telling: "***No choice. Need a 6***. We'll find a way."

19. Wasson's reckless demands were not surprising, as he was facing significant pressure from certain "activist" hedge fund investors and affiliates who stood to reap billions of dollars if Step 2 of the Walgreens-Alliance Boots Transaction closed, especially if Walgreens'

stock was trading at a higher price (*see* Section VII.C below). In fact, Wasson confided in Miquelon on several occasions that he feared losing his job if he did not accede to these demands, and media articles in 2014 speculated that Wasson was losing control of Walgreens. Moreover, Wasson was under immense pressure to turn Walgreens around and make up for the disastrous decisions in 2012 regarding the Company's highly-publicized contractual dispute with Express Scripts Holding Co. ("Express Scripts"), which some blamed for the loss of $4 billion in revenue.

20. With the pressure of the shortfall mounting in June 2014, Wasson urged Miquelon to "delay" the earnings call announcing the Company's withdrawal of the FY16 EBIT Target "so the negative news regarding withdrawing the...EBIT goal could be '***bundled***' with other, more positive developments relating to progress on Step 2 of the merger." This "bundling" tactic was intentionally designed to soften the blow (and deflect attention) from the colossal $2+ billion FY16 EBIT shortfall. Meanwhile, Wasson and others were frantically seeking to alter certain contractual arrangements amongst Walgreens, Alliance Boots, and its affiliates to ***accelerate*** Step 2 of the merger so that it could be announced at the same time as FY16 EBIT shortfall.

21. On June 24, 2014, Defendants held an earnings conference call and begrudgingly withdrew the FY16 targets, including the FY16 EBIT Target. This disclosure, however, was still materially misleading as Defendants continued to conceal the shocking amount of the EBIT shortfall and the true reasons underlying it. Rather, consistent with the Company's deliberate strategy to delay and obscure the truth until it could be "bundled" with other good news, Wasson misleadingly claimed the Company's withdrawn FY16 EBIT Target was "***a result of the many Step 2 considerations*** and current business performance" while deliberately omitting the fact that it was based on systemic generic price inflation combined with materially adverse

reimbursement contracts, both of which were known to Defendants since 2013.

22. As a result, following Defendants' June 24, 2014 announcement, investors were still unaware of the true facts known to Defendants, including: (i) the magnitude of the EBIT shortfall—*i.e.*, $1.8 to $2.3 billion below the prior range; (ii) the true underlying reasons for the shortfall, which were fundamental and systemic; and (iii) that the benefits and financial accretion from the Walgreens-Alliance Boots Transaction were nowhere close to Defendants' prior representations. Deutsche Bank later illustrated the timeline of Walgreens' representations juxtaposed against its internal data:

Figure 2: Walgreens Expectations vs Communications

| Date | Internal EBIT Target | Communicated EBIT Target | Notes |
|---|---|---|---|
| Aug-12 | $9.0-9.5B | $9.0-9.5B | Initial Adj OP target tied to the deal |
| Jul-13 | $8.7B | $9.0-9.5B | Consensus estimates tracking to $8.5B |
| Dec-13 | $8.4-8.5B | $9.0-9.5B | While noting they were behind, remained focused on delivering against goal |
| Apr-14 | $7.4-7.5B | $9.0-9.5B | Med D contracts drive $1B stepdown |
| Jun-14 | $7.2-7.5B | -- | Guidance pulled, still evaluating inversion |
| Aug-14 | $7.2-7.5B | $7.2-7.5B | Communication with investors to finally lower the bar |

*Source: Wade D. Miquelon v. Walgreen Co. lawsuit exhibits , Deutsche Bank*

23. In choosing to affirmatively speak, repeat, and reaffirm the FY16 EBIT Target at investor presentations and conference calls during the Class Period, Defendants had a legal obligation to speak truthfully. They also had a duty to provide complete and accurate information to ensure their public statements fairly aligned with, and were not contradicted by, information in their possession. Moreover, when Defendants repeatedly made representations regarding the current status of the FY16 EBIT Target and the *reasons* for, or *source* of, any negative trends impacting those numbers or the Company's profit margin, they had a duty to disclose all material facts necessary to render those statements not misleading, including the

magnitude of the EBIT shortfall, the fact that it was rapidly increasing, and the material and systemic Company-specific reasons underlying it.

24. By concealing these material facts from investors while making affirmative false and misleading statements and reiterating the FY16 EBIT Target without a reasonable basis, Defendants violated Section §10(b) and Rule 10b-5. Additionally, Defendants failed to comply with Item 303 of Regulation S-K ("Item 303") by omitting in their SEC Form 10-Q the known materially adverse trends impacting the Company's quarterly results, including, *inter alia*, adverse trends such as "price increases" (*i.e.*, generic drug price inflation).

25. On August 4, 2014, Walgreens announced Miquelon's resignation. Two days later, on August 6, 2014, Defendants finally disclosed the shocking multi-billion dollar EBIT shortfall that they had previously concealed from investors. The Company lowered the FY16 EBIT target to a "midpoint" of only $7.2 billion, ***$1.8 billion*** below the low-end and ***$2.3 billion*** below the high-end of the range that Defendants repeatedly touted to investors. Consistent with Defendants' duplicitous "bundling" tactic, the Company's August 6, 2014 press release announcing the EBIT shortfall focused almost entirely on the Company's positive news to accelerate Step 2 of the Walgreens-Alliance Boots Transaction. In fact, the Company deliberately buried the disclosure of the EBIT shortfall disclosure in ***two lines*** of a six-page press release trumpeting the benefits of the decision to complete Step 2 of the Transaction.

26. Despite Defendants' efforts to soften the negative stock price reaction by selectively (and misleadingly) disclosing bad news "bundled" with good news, Walgreens' share price plummeted following the August 6 disclosures, dropping from a close of $69.12 on August 5, 2014, to a close of $59.21 on August 6, 2014, a decline of over 14% on massive volume of

more than 84 million shares, roughly 14 times its average trading volume. The Company's revelation wiped out billions in market capitalization in a single trading day.

27. Predictably, analysts' reactions to the disclosure of the EBIT shortfall were harsh, noting that the Company had repeatedly painted a rosy picture of the FY16 EBIT Target and the financial benefits of the Walgreens-Alliance Boots partnership. For example, on August 6, 2014, Credit Suisse warned investors to "avoid the stock" altogether:

> ***After more than a year of positive investor meetings and earnings calls*** where management hinted at the large potential of a combined WAG/AB, ***management shocked investors*** when its new fiscal '16 targets fell ***well short of elevated expectations and prior guidance***. Fiscal '16 EBIT is now expected to be almost 20% lower than the guidance provided when the deal was initially announced (despite a new cost savings program of $1 billion by fiscal '17 and higher synergies) and the new ***EPS target of $4.25- 4.60 fell well short of the market's expectation*** (we believe many investors were thinking $6+).

28. Numerous analysts also expressed concern regarding the magnitude and suddenness of the discrepancy given Defendants' repeatedly bullish representations since 2013 that the $9 to $9.5 billion was on track and that generic drug inflation was not materially impacting the Company. On August 11, 2014, for example, analysts at Susquehanna reported that the new targets were "***[o]utrageous***," noting that "[t]he magnitude of revision and the short duration over which it materialized are ***purely astounding***" and that "while two executive level managers appear to have lost their jobs as a result, we believe it is not unreasonable to believe further aggressive changes need to be made."

29. In fact, certain analysts explicitly questioned Defendants' representations that the issues were "unexpected." For example, in a report on August 7, 2014, Cowen & Co. observed that "[m]anagement's focus on the call around increased reimbursement pressures and generic inflation ***is a bit confusing to us, given this is not a new issue and shouldn't come as such a surprise***." Barclays was even more skeptical: "***[w]e find it highly surprising that management***

***was not aware of the underlying inflationary trend***, and we cannot point to a single factor that would have caused them to wake up to this trend in June or July of 2014."

30. The ultimate fallout from Defendants' misconduct continued well after the Class Period. Knowing the Company needed a scapegoat to deflect attention from Walgreens' concealment of the EBIT shortfall since at least late 2013, Wasson pointed the finger at Miquelon claiming his unit was "weak" and had "lax controls." Miquelon responded by filing a lawsuit for defamation that attached e-mails and texts between the Defendants. Miquelon admitted that the FY16 EBIT shortfall was neither a surprise to Wasson or the Company nor the result of a forecasting "error" by his group. Indeed, Miquelon admitted that Wasson had "worked hand in hand" with him on the FY16 EBIT Target for many months and was fully aware of the issues impacting those metrics.

31. On December 10, 2014, contrary to Walgreens' prior representations that Wasson would be CEO of the post-merger Company, Wasson abruptly announced that he was resigning. By December 31, 2014, Kermit Crawford (Walgreens President of Pharmacy, Health and Wellness), Rick Hans (Head of Investor Relations), and Thomas Sabatino (General Counsel), all key executives involved in setting, disclosing, and revising the FY16 EBIT Target, had all announced they were leaving Walgreens.

## II. JURISDICTION AND VENUE

32. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act and 28 U.S.C. § 1331.

33. Venue is proper in the Northern District of Illinois pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 77v, and 28 U.S.C. § 1391(b). Acts giving rise to the

violations of law complained of herein, including the dissemination to the investing public of materially false and misleading information, occurred in this District. In addition, the Company is headquartered in this District with its principal executive offices located in Deerfield, Illinois. Each of the Defendants had continuous and systematic contacts with the United States and Illinois through Walgreens' conduct of its business and its Deerfield corporate headquarters.

34. In connection with the facts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

35. Lead Plaintiff, Industriens Pensionsforsikring A/S is one of Denmark's largest pension funds with at least 400,000 pensioners. Lead Plaintiff purchased the Walgreens securities that are the subject of this action as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.

### B. Corporate Defendant Walgreens

36. Corporate Defendant Walgreens is incorporated in Delaware and headquartered in Deerfield, Illinois. In 2013-2014, the Company acquired the Swiss-based Alliance Boots to form Walgreens Boots Alliance, of which Walgreens remains a corporate subsidiary. Walgreens common stock is traded on the NASDAQ under the symbol "WBA." During the Class Period, the Company's common stock traded under the symbol "WAG."

### C. Individual Defendants

37. Defendant Gregory D. Wasson served, at all relevant times, as the Company's President, CEO, and a Director on the Company's Board of Directors ("Board"). Wasson

unexpectedly announced his retirement from Walgreens in December 2014, receiving approximately $35 million in severance pay.

38. Defendant Wade Miquelon served from June 2008 through August 4, 2014, as the Company's CFO. On or about August 4, 2014, Miquelon left his position as CFO, but remained with the Company in a non-officer role through December 2014.

39. Defendants Wasson and Miquelon are referred to collectively herein as the "Individual Defendants." Defendant Walgreens and the Individual Defendants are collectively referred to herein as "Defendants."

40. Defendants are liable under Section 10(b) for making false and misleading statements and omitting material adverse facts and/or participating in the fraudulent course of conduct alleged herein. In addition, each of the Individual Defendants was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. By reason of their control of the Company, the Individual Defendants were able to and did, directly or indirectly, control the day-to-day conduct of Walgreens' business and are liable for any false and misleading statements and omissions alleged herein that are attributable to Walgreens.

41. Because of their positions and responsibilities, each of the Individual Defendants had access to the adverse undisclosed information about Walgreens' business and operations, including the FY16 EBIT Target and related, undisclosed shortfall, generic price inflation, and its effect on the Company's profit margin, and issues related to Walgreens fixed-rate reimbursement contracts, *via* access to internal corporate documents, conversations and contact with other corporate officers and directors, attendance at meetings, and receipt of and/or access to reports and other information provided to them. Each of the Individual Defendants, by virtue

of his high-level position, was directly involved in the operations of Walgreens at the highest levels and was privy to confidential information concerning the Company.

42. Their positions of control and authority as officers or directors enabled these Individual Defendants to control the content of the SEC filings, press releases and other public statements of Walgreens during the Class Period. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.

43. During the Class Period, each of the Individual Defendants substantially approved, participated in the preparation of, furnished information in connection with and had ultimate authority for Walgreens' SEC filings, press releases, and public statements, and engaged in conduct that made it necessary or inevitable that material misrepresentations would be made to investors on the basis of that conduct.

44. The Individual Defendants were obligated to refrain from issuing false and misleading public filings and were prohibited from using the instrumentalities of interstate commerce or the U.S. mails to: (a) employ any device, scheme or artifice to defraud; (b) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engage in any act, practice or course of business which operates or would operate as a fraud upon any person. Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Walgreens' securities.

45. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on

purchasers of Walgreens securities by disseminating materially false and misleading statements and/or concealing material adverse facts about the pervasive, adverse industry trends plaguing Walgreens' business and financial performance. Defendants' course of conduct deceived the investing public regarding the FY16 EBIT Target and related, undisclosed shortfall, generic price inflation, and its effect on the Company's profit margins, and issues related to the Company's fixed-rate reimbursement contracts, and caused Lead Plaintiff and other members of the Class to be damaged as a result of their acquisition of Walgreens common stock.

**D. Relevant Non-Parties**

46. Stefano Pessina ("Pessina") is currently the Executive Vice Chairman and Chief Executive Officer of Walgreens Boots Alliance. Pessina is an Italian-born multi-billionaire, who took over his family's Naples-based pharmaceutical wholesaler company in 1974 and eventually turned it into the pharmaceutical wholesale group, Alliance Santé. Pessina is well-versed in corporate mergers and acquisitions, having made an astonishing 1,500 deals over the course of his career, which landed him the moniker "the silver fox." Over the course of twenty years, Pessina has executed a long string of foreign takeovers, through which Alliance Santé acquired more than 500 companies and joined the FTSE 100 index.

47. In 2006, Pessina's Alliance UniChem PLC merged with Boots Group PLC to create Alliance Boots. In 2007, Pessina took Alliance Boots private with the help of closely affiliated and notorious private equity firm, KKR & Co. L.P. (formerly Kohlberg Kravis & Roberts Co.) ("KKR"), in a $22 billion deal. KKR is also known for its hostile takeover tactics, having been involved in the widely-publicized 1989 Nabisco deal later chronicled in the *New York Times* #1 bestseller *Barbarians at the Gate: The Fall of RJR Nabisco*.

48. In September 2012, Pessina and KKR led Alliance Boots' $26.6 billion merger with Walgreens. KKR was intimately involved in the merger and, following Step 2 of the

Transaction, received 49.4 million shares (4.6% stake) of Walgreens common stock (valued at $3.75 billion) in exchange for its equity position in the post-LBO, private Alliance Boots.

49. As part of Step 1 of the Walgreens-Alliance Boots Transaction, Pessina became a member of Walgreens' Board and also acquired control over approximately 8% of Walgreens common stock, making him the Company's largest single shareholder. As with many of his prior deals, not long after the merger was completed, Pessina also gained operational control of Walgreens by being named acting CEO when former-CEO, Defendant Wasson, announced his resignation on December 10, 2014.

50. Furthermore, Pessina was expected to hold a total of 15-20% interest in Walgreens Boots Alliance, a stake valued at $9-$12 billion, if and when the Walgreens-Alliance Boots Transaction was completed. Pessina's business partner, KKR, also stood to reap approximately $4.7 billion in cash if Step 2 was ultimately consummated. In order for Step 2 to proceed, however, Pessina and KKR, along with Walgreens, had to obtain shareholder approval.

51. As set forth herein, Pessina played a role in (i) the June 24, 2014 disclosures concerning the FY16 earnings targets; and (ii) after the end of the Class Period, deflecting attention from the FY16 EBIT shortfall and pervasive negative trends plaguing Walgreens' financial performance. For example, while announcing on August 6, 2014, that shareholder approval was required in order to effectuate Step 2, then-Board member Pessina met with "approximately twelve major investor groups" from August 5-8 to alleviate investor concern over the troubling multi-billion revision to the FY16 Earnings Targets.

## IV. <u>RELEVANT FACTUAL BACKGROUND</u>

### A. Walgreens Generated Profits Primarily Through Sales of Generic Drugs

52. Prior to and during the Class Period, Walgreens described itself in its public SEC filings as "principally a retail drugstore chain that sells prescription and non-prescription drugs."

Prescription drugs represented the Company's largest class of products, and Walgreens' ability to sell prescription drugs was the lead driver of the Company's revenue and profit margins. According to its FY14 Form 10-K, in fiscal years 2014, 2013, and 2012, "prescription drugs represented 64%, 63% and 63% of [Walgreens'] total sales, respectively."

53. Generic versions of branded drugs, also called "generic drugs" or "generics" represented the "substantial majority" of the prescription drugs sold by Walgreens both before and during the Class Period. Walgreens' total generic dispensing rate, which implies the percentage of generic drugs in a consumer's prescription, was nearly 80% in fiscal year 2012. As a result, prescription sales of generic drugs alone accounted for approximately 50% of Walgreens total sales in fiscal year 2012.

54. A generic drug is therapeutically equivalent to a patent-protected brand name drug in that it possesses the same characteristics, active ingredient(s), dosage form, strength, and intended use as a branded drug—at a much cheaper price. Upon expiration of the relevant patents, a generic drug manufacturer can rely on and appropriate many years of research, clinical testing, FDA applications, and marketing schemes funded by the branded drug manufacturer to sell a generic version, which according to the FDA, typically costs 80-85% less than its branded competitor. This is especially pronounced where there are multiple manufacturers of generic versions of branded drugs—so called multi-source drugs.

55. The relatively low cost to produce generic drugs means that it typically costs a retail pharmacy far less to procure generics for its consumers than branded drug equivalents. As a result, retail pharmacies (such as Walgreens) typically generate approximately 50% higher profit margins on generic drugs as compared to their branded competitors—provided the retail

pharmacy: (i) generates high enough sales volume of generic drugs; and (ii) receives reimbursements sufficient to both offset the costs of procurement and generate profits.

56. Given that nearly 100% of Walgreens' profits in its pharmacy business segments before and during the Class Period derived from drug sales, and a "substantial majority" of these sales were generic drugs, the interplay between generic prices—*i.e.*, the price at which they were procured and the rates at which Walgreens was reimbursed for each drug, among other things—materially affected Walgreens' financial results, particularly its profit margins and earnings. Indeed, any increase in *either* the cost to procure generic drugs—*e.g.*, price inflation—or the reduction in reimbursement rates adversely affected Walgreens' current and future margins and profits. More importantly, if a retail pharmacy like Walgreens experiences both a material increase in procurement costs *and* a reduction in reimbursement rates for generic drugs, the combination of those adverse factors would make it exceedingly difficult for the pharmacy to generate sufficient profits to maintain and grow its business. As detailed below, both of these adverse trends materially impacted Walgreens well before the Class Period began.

### B. Walgreens Faces "Unprecedented" Generic Drug Price Inflation in 2013 Leading to "Systematic" Inflation by March 2014

57. Prior to and during the Class Period, Walgreens sourced their branded and generic drugs directly from drug manufacturers such as Pfizer and Merck & Co. (branded drugs) as well as Teva Pharmaceutical Industries (generics). The Company then warehoused these drugs for 60 to 90 days before shipping them once a week to each of its pharmacies.

58. Drug manufacturers retained significant power to set the price for each of their pharmaceuticals. Those prices varied widely depending on a variety of factors including, *inter alia*: (i) whether the drug was branded or generic; (ii) whether the generic was single-sourced (*i.e.*, there only is one manufacturer of the generic who can unilaterally increase prices) or multi-

sourced; (iii) the relative supply or demand for the drug, including potential shortages; (iv) negative FDA action related to the drug itself or its manufacturing facility; or (v) consolidation of drug manufacturers and/or their various drug portfolios. Notwithstanding these economic factors, drug manufacturers also have the power to set prices on their own volition, irrespective of the market. As a result, the price for a drug is not always a rational extension of the cost to produce it and Walgreens was susceptible to both rational and irrational generic price inflation during the Class Period.

59. In the months leading up to the Class Period, adverse inflationary trends in generic drug pricing were present and steadily growing. While historically, "the highly competitive nature of the generic market led to low single-digit annual deflation," between 2011 and 2014, the market experienced "a consistent increase in the number and dollar value of generic products experiencing price increases, independent of input shortages." *See* Barclays June 25, 2014 Report, "Facing Reality, Making Changes" at 3. Specifically, beginning in 2010 and continuing through 2013, market participants saw "more . . . price increases tied to FDA action and the first signs that [generic drug] manufacturers were beginning to test price inflation strategies for mature products." *See* Barclays September 22, 2014 Report, "Downgrading to Equal Weight" at 14 (hereafter "Barclays September 22, 2014 Report"). These "price inflation strategies" on the part of generic drug manufacturers included raising prices 100% to 1,000% where there was "no visible supply shortage." *Id.* at 15. By 2012:

> [T]his type of price testing became more widespread, particularly among the larger generic manufacturers who have long sought to leverage market power where possible. The combination of increasing opportunistic price increase activity and supply disruptions in 2012 and 2013 led for the first time to net generic price inflation, with the negative 2%-5% [deflation] trend increasing to positive 0%-5% [inflation trend].

*Id*. at 15. Indeed, a survey by the National Community Pharmacists Association ("NCPA") confirmed inflation as high as ***600% to 1,000% in the second half of 2013***. In a September 19, 2013 article, Reuters confirmed, "the cost of generic drugs has begun to increase as the number of suppliers has fallen."

60. Leading up to the Class Period, therefore, market participants were aware that they were facing, as the NCPA survey concluded, "huge upswings in generic drug prices." For example, between November 2012 and November 2013, generic drugs prescribed for common ailments, such as bacterial infections (Doxycycline hyclate and Morgidox), asthma (Albuterol sulfate), and high blood pressure (Captopril) jumped by ***2,700%*** to more than ***6,000%***. Indeed, between November 2012 and November 2013, the price for Doxycycline hyclate and Morgidox, broad-spectrum antibiotics used to treat common bacterial infections, increased 6,351% and 6,000%, respectively.

61. One review of the National Average Drug Acquisition Cost ("NADAC") data for July 2013 through July 2014, determined that slightly ***more than 50%*** of all generic drugs experienced some price inflation during that period, with nearly 20% of those drugs experiencing price inflation of 75%-100% or over 100%. Notably, the top 10 generic drugs with the largest price increase between July 2013 and July 2014, also included high-volume drugs prescribed for more common conditions such as bacterial infections (Tetracycline), high blood pressure (Captopril and Doxazosin), problems associated with an enlarged prostate (Doxazosin), and fungal infections (Fluconazole).

62. As one of the largest generic drug retailers in the U.S., Walgreens was well aware of this alarming trend in generic price inflation leading up to the Class Period. Indeed, as early as the summer of 2013, Walgreens' direct competitors, Rite Aid and CVS, had both

acknowledged the problem of generic price inflation and attempted to proactively address it. Unlike Walgreens, however, its competitors candidly discussed these generic inflation trends with their shareholders and disclosed the company-specific negative impact on profit margins.

63. CVS, for example, acknowledged in an August 2014 publication the "significant" and "increasing price inflation across all sectors—brands, specialty and generics," but noted by August 2014 that it had largely mitigated the effect of generic price inflation on its profit margins by building protections into its Part D and third party payer contracts and readjusting its procurement strategies.

64. Similarly, during Rite Aid's September 19, 2013 conference call, its CEO, John T. Standley, candidly stated:

> In terms of generic drug cost increases, I think we've seen a little bit more of that activity this year than we maybe have in the past. And probably that is one thing on the down side. I think the new generics were probably a little stronger than we expected, but ***the cost increases on generics have also been a little stronger than we expected***. And again in the back half we don't have that kind of year-over-year benefit on new generics to help offset some of that. So those are a couple of things that will put some pressure on the back half in terms of the guidance.

When asked if this inflation could be offset by payments from third party payers, Standley responded, "our reimbursement rate is significantly lower on generic drugs on a percentage basis, so the increase on [the price paid to wholesalers] sometimes isn't enough to offset when you apply our reimbursement rate to what the cost increase was."

65. By contrast, Walgreens was affirmatively dismissive of the impact of generic price inflation and attempted to conceal the material impact it was already having (and would continue to have) on Walgreens' profit margins in its retail pharmacy business. In August 2013, for example, analysts at William Blair reported that despite inflationary trends in the industry, "[i]nterestingly, ***the company sees the intense analyst and investor focus on the impact of***

***generics as 'overblown'*** and believes the structure of its contracts will allow it to sustain gross profit dollar growth over time consistent with its objectives." Similarly, after speaking with Walgreens' executives in October 2013, UBS' analysts stated in a November 1, 2013 report that Walgreens' "***management seemed dismissive of any generic inflation trends***."

66. In fact, rather than acknowledging the effect of then-existing adverse trends on its business and prospects for the combined company, Walgreens continued to omit the relevant truth and touted positive factors for its generic profit margins, including: (i) vague synergies from its future merger with Alliance Boots (discussed herein); and (ii) its new 10-year distribution agreement with drug wholesaler AmerisourceBergen Corporation ("ABC") (the "ABC Distribution Agreement"), which was structured to eliminate Walgreens' need to warehouse its drug supplies for 60-90 days. Walgreens represented that the ABC Distribution Agreement would improve the Company's prescription drug profit margins and, with the merger with Alliance Boots, augment Walgreens' bargaining power with drug manufacturers to extract more meaningful price concessions. The Company, however, misleadingly "isolated" the purported positive effects of the ABC Distribution Agreement, as the "benefits" of the Agreement "accru[ed] as part of a 'synergy' number that [was] divorced from generic inflation." *See* Barclays September 22, 2014 Report at 8. In other words, Defendants only reported the potential long-term benefits to Walgreens but did not simultaneously disclose the other, more problematic issues currently plaguing the Company (*i.e.*, the severe effects of generic drug price inflation).

67. Moreover, Defendants knew the ABC Distribution Agreement was not slated to improve profit margins on Walgreens' sale of generic drugs until, at the earliest, FY15. Indeed, during a December 20, 2013 conference call with analysts, Defendant Miquelon admitted that

Walgreens would not begin to "reap the benefits of ABC in a meaningful way" with respect to generic distribution and procurement until 2015. Furthermore, "rather than a growth driver, Walgreen's grand sourcing efforts with Alliance Boots and Amerisource Bergen were necessary to simply maintain profitability levels in the face of reimbursement pressures" and generic inflation. *See* Barclays September 22, 2014 Report at 8. Defendants, therefore, knew the ABC Distribution Agreement would not begin to meaningfully counteract the effect of the inflationary trend in generic drug prices until, at best, FY16.

68. By December 2013, Defendants also were well aware—but failed to disclose to investors—that generic drug price inflation was "unprecedented" and already having a significant effect on the Company's current and future profit margins. In contrast, Walgreens' competitors continued to candidly discuss the impact of the issue with its shareholders. During a December 19, 2013 conference call, for example, Rite Aid's CFO Frank G. Vitrano disclosed that Rite Aid was seeing a "higher degree of price increases for generics than what [it] had anticipated." This increase was so substantial that it caused Rite Aid to cut its full-year profit forecast.

69. By March 2014, it had become "increasingly clear" to Walgreens "that the deflation in pricing of generic drugs that had been the trend over the last decade may have ***systematically reverted*** to an inflationary trend." *See* Miquelon Complaint, ¶71. This fact was confirmed by a NCPA survey, which found that 93% of pharmacists interviewed in early 2015 confirmed that generic drug price inflation has only "gotten worse" since 2013. Unlike Walgreens' competitors, however, Defendants continued to conceal and/or downplay the impact of generic drug inflation on its profit margins and, more importantly, its heavily scrutinized FY16 EBIT Target for the post-merger Company.

### C. Prior to and During the Class Period, Walgreens Was Locked Into Disadvantageous Reimbursement Contracts That Did Not Account for Generic Price Inflation

#### 1. The Structure of Walgreens' Reimbursement Contracts

70. For each prescription Walgreens fills, the Company typically receives a payment from its customer. If the customer is not insured or if her insurance does not cover the prescription, the customer pays Walgreens the full price of the prescription "out-of-pocket." If, however, the customer has insurance, the customer only pays Walgreens a small percentage of the cost of the drug, known as a "co-pay," as dictated by the customer's insurance plan. The customer's insurance plan then pays Walgreens a fixed reimbursement rate. In the case of generic drugs, the total payment to Walgreens, including the customer's co-pay, would not have exceeded a contractually set "maximum allowable cost" or MAC.

71. Prior to and during the Class Period, Walgreens derived almost all of its pharmacy revenues from reimbursement contracts with third party payers. Indeed, in fiscal years 2013 and 2014, more than 95% of Walgreens' prescription sales were "third party sales," where reimbursement was received from third party payers. These third party payers included: (i) private insurance companies; (ii) pharmacy benefit managers ("PBMs"); and (iii) federal and state governments, sometimes acting through private insurance companies. As illustrated in the graphic below, prior to the start of the Class Period, nearly 60% of Walgreens' prescriptions were paid for through reimbursements through private insurance plans, and nearly 30% through Medicare Part D:




*See* Deutsche Bank October 10, 2014 Report, at 3.

72. Walgreens' contracts with third party payers typically included an agreed-to reimbursement rate "formula" for branded, generic and specialty drugs. For branded and specialty drugs, the reimbursement generally consisted of a percentage of the average wholesale price ("AWP") plus a dispensing fee. For generic drugs, however, most third party payers' contracts included a MAC for each drug and dosage. As detailed below, these pricing dynamics were crucial to Walgreens' profit margin and earnings.

**2. The Impact of PBM Contracts on Reimbursement and Profit Margins**

73. Prior to and during the Class Period, the majority of Walgreens' reimbursement contracts were controlled by a small number of PBMs. PBMs act as intermediaries between the drug manufacturers, insurers, and retail pharmacies, such as Walgreens. Certain insurance companies or Medicare Part D plan sponsors hire PBMs to run their prescription insurance plans. PBMs aggregate the hundreds of millions of individuals enrolled in their insurance clients' prescription plans and harness this purchasing power to extract price concessions from retail pharmacies. In exchange, retail pharmacies gain access to hundreds of millions of prescription plan participants.

74. At the start of the Class Period, there were at least four privately held PBMs, including, *inter alia*, Express Scripts and Caremark, the latter of which was owned by CVS, a Walgreens competitor. Together, these PBMs controlled upwards of 70% of all prescriptions filled in the U.S. Many healthcare industry participants describe PBMs as mini-monopolies due to their small number, large market share and tight control over the actual revenue streams available for pharmaceuticals. As a result of this power, PBMs typically dictate terms for reimbursement contracts to retail pharmacies, including players as large as Walgreens. If a retail pharmacy rejects a PBM's terms, it risks losing business to competitors who would be highly motivated to agree to more onerous terms to gain market share. If a retail pharmacy is unable to successfully enter into a reimbursement contract with a PBM, moreover, it could lose the ability to fill prescription for hundreds of millions potential customers and billions of revenues in the process.

75. This skewed bargaining dynamic and the outsized leverage of the PBMs is best illustrated by Walgreens' infamous failed contract negotiations with Express Scripts in 2011. In a highly publicized dispute, Walgreens, led by Wasson, walked away from negotiations with Express Scripts in September 2011 and informed its Express Script customers that it would stop filling prescriptions for them at the end of the year, effectively cancelling a deal worth more than $5 billion in revenue. The fallout from the Company's decision was enormous. Walgreens and Wasson's refusal to accept Express Scripts' terms immediately resulted in millions of lost customers to rivals Rite Aid and CVS. By January 2012, Walgreens stock price had dropped more than 25% and investors actively questioned Wasson's management.

76. After Express Scripts' acquisition of a rival PBM, Medco, in early 2012, bringing even more potential customers under the Express Scripts umbrella, Walgreens finally capitulated

and the parties reached an agreement in July 2012. However, during the two quarters for which Walgreens would not fill Express Script prescriptions, the Company's prescription sales declined 9.9% quarter-over-quarter and earnings fell $113 million. The failure of the Express Scripts negotiations under Wasson's leadership increased the pressure on Wasson during the Class Period to meet or beat consensus expectations and increase Walgreens' stock price.

77. According to the Company, Walgreens renewed its fixed-rate reimbursement contracts with at least three major PBMs in 2012—namely, Express Scripts, Caremark and Optum—which, given the typical duration of these contracts (2-3 years), would have been in effect before and during the Class Period. *See* Barclays September 22, 2014 Report at 7. Significantly, the contract terms provided that Walgreens would be paid "a specific, non market-based, price" and included "no mechanism to ratchet up reimbursement should acquisition cost increase." *Id*. In other words, these contracts, assumed a deflationary trend in generic prices, *i.e*., that prices would decrease at a particular rate, and only provided for "mechanisms to share…the benefits of expected deflation," with the PBMs, leaving "the Company exposed to inflationary [pricing] trends" for generic drugs "that should have been evident to those contracting with generic manufacturers." *Id*. Thus, unbeknownst to investors, under the reimbursement contracts in place before and during the Class Period, Walgreens had no ability to pass on any of the drug price inflation to the PBMs, forcing the Company itself to absorb the price increases.

78. To remedy this predicament, Walgreens' only option was to renegotiate the fixed reimbursement rates with the PBMs. However, this was not a realistic solution because, as one analyst noted, "[t]hese contracts can span several years, making renegotiations difficult and painful as earnings results suffer." *See* Deutsche Bank Markets Research Report at 4. And, while

some retail pharmacies "with strong commercial relationships" might have been "able to garner relief for unique [generic drug] price increases," that was less likely for Walgreens whose "commercial payer relationships tend[ed] to be adversarial in nature." Barclays September 22, 2014 Report at 7.

### 3. The Impact of Medicare Part D Preferred Networks on Walgreens' Profit Margins

79. Prior to and during the Class Period, 25-30% of Walgreens' prescription drug revenues, representing $13-14 billion in revenues and $2.3 billion in profits, were derived from reimbursements from Medicare Part D plans. The federal government implemented the Medicare Part D program in 2006 to serve as the prescription drug benefit plan for Medicare subscribers. The plans are sponsored by private insurance companies and subsidized by the federal government. A patient insured under Medicare Part D has the option of using any pharmacy within the plan's network. However, if the patient uses a "preferred" pharmacy, the patient's copayment and coinsurance will be lower, saving both the patient and the plan money.

80. The prescription prices for individuals insured under a Medicare Part D plan are determined by contracts between a retail pharmacy and the plan sponsor (or, in some cases, a PBM on the sponsor's behalf). In order to be included within a Medicare Part D plan network, a retail pharmacy must sign an annual contract, renegotiated each August, which includes a federal upper limit or "FUL" set by the federal government—a fixed cost ceiling, similar to the MAC set by PBMs and private insurance companies. Although the FUL typically accounts for a retail pharmacy's costs to procure and dispense a drug, profit margins under these contracts are lower—substantially less than the margins generated from private insurance/PBM contracts. As early as October 2008, studies demonstrated that Medicare Part D was responsible for reductions in both absolute profitability and a reduction in net income for pharmacies.

81. Despite the dismal reimbursement rates, large retail pharmacies are incented to become "preferred" providers within Medicare Part D networks because doing so drastically expands the volume of potential customers—including senior citizens who typically purchase higher amounts of prescription drugs—thereby increasing market share. If a retail pharmacy wishes to be a "preferred" pharmacy within a Medicare Part D plan network, however, it must agree to accept both discounted co-pay from the customer and ***an even lower*** reimbursement amount from the Medicare Part D plan sponsor.

82. Given the lower reimbursement rates and co-pays, participation in the preferred networks negatively affects a retail pharmacy's margins and profits. As a result, because "[c]hoosing to be preferred in Medicare Part D forces a trade-off between script volume and profits," a participating retail pharmacy must carefully evaluate whether the anticipated volume of new customers justifies the contract concessions necessary to become a preferred pharmacy in a Medicare Part D network. *See* Barclays September 22, 2014 Report at 8.

83. Walgreens participated as a "preferred" pharmacy in several Medicare Part D plan networks before and during the Class Period. As a result of the Express Script debacle, "which had led to a marked decline in market share and script volume for the 12 months beginning in January 2012," Walgreens "was especially eager to expand its [Medicare] Part D business" and knew that it "could grow its Part D business quickly if it was willing to take a low enough level of reimbursement." *See* Barclays September 22, 2014 Report at 9. Indeed, according to an investor presentation in March 2014, Walgreens was part of four preferred networks which increased Medicare Part D sales by 16% in the Second Quarter of 2014, alone. Unbeknownst to investors, however, in order to gain this market share, Walgreens agreed to receive even lower

reimbursement than most retail pharmacies, further compounding Walgreens' declining profit margins and its FY16 EBIT Targets during the Class Period.

**D. Walgreens Announces Step 1 of the Alliance Boots Merger And The FY16 Earnings Targets**

84. On June 19, 2012, Walgreens issued a press release (the "June 19, 2012 Press Release") announcing that it had entered into a "strategic transaction" with Alliance Boots, the "leading international pharmacy-led health and beauty group" and "largest international pharmacy company, with approximately $40 billion in sales and operations in more than 25 countries." According to Walgreens' former CFO, Miquelon, "[t]he transaction would create the largest pharmacy company in the world." Miquelon Complaint, ¶2.

85. As referenced above, this "strategic transaction" included two steps. First, Walgreens agreed to immediately invest approximately $6.7 billion in cash and stock in exchange for a 45% equity ownership stake in Alliance Boots. Second, under the terms of the merger agreement, during the six-month period beginning two and a half years after Step 1 was completed, *i.e.*, beginning February 2015, Walgreens had the option to elect to proceed to a full combination and acquire the remaining 55% equity interest in Alliance Boots.

86. In order to effectuate Step 2, Walgreens had to seek and obtain shareholder approval of the transaction. Additionally, the stock portion of the Step 2 payment was contingent on the price of Walgreens common stock remaining at or above $31.18 per share. In the event that Walgreens common stock price fell below that price, the Company was required to provide an additional remuneration to Alliance Boots, in the form of cash or the issuance of additional common stock, to make up the difference in value below $31.18 per share. Inversely, in the event Walgreens did not elect to go forward with Step 2, its equity stake in Alliance Boots would reduce from 45% to 42% in exchange for nominal consideration to Walgreens.

87. Defendants publicly praised the transaction and its purported "synergies" by claiming in the June 19, 2012 Press Release that it would "bring together the strengths and expertise of both companies to create the first global pharmacy-led, health and wellbeing enterprise." They promised that the merger with Alliance Boots would create: (1) "unmatched supply chain and procurement expertise"; (2) "an unparalleled portfolio of retail and business brands (Walgreens, Duane Reade, Boots and Alliance Healthcare)"; (3) "diversified and robust profit pools across the U.S., Europe and key emerging markets"; and (4) "a unique platform for growth in developed and emerging markets." Defendants added that "[t]hese growth opportunities [were] expected to be key drivers of long-term shareholder value."

88. From the time that Walgreens first announced the merger, Defendants touted the alleged "synergies" it would create by FY16:

> Walgreens expects ***combined synergies*** across both companies to be between $100 million and $150 million in the first year and ***$1 billion by the end of 2016.*** The most significant short-term and long-term opportunities are: procurement ***synergies***, including prescription drug, and...revenue ***synergies***, as a result of introducing Alliance Boots product brands to Walgreens...and sharing of best practices, particularly in pharmacy operations

In a June 20, 2012, article titled, "Walgreen Spends $6.7 Billion on Boots Stake," *The Wall Street Journal* reported "[b]y investing in Alliance Boots, Walgreen wants to gain purchasing power with generic-drug manufacturers and generate $1 billion in cost savings by 2016." Significantly, the alleged $1 billion in synergies was a component of the $9 to $9.5 billion FY16 EBIT Target announced several months later.

89. On June 19, 2012, Defendants held a conference call with Alliance Boots' management to tout the purported benefits of the transaction. During the call, Wasson stated: "we believe this . . . transaction will create real and significant value all of our stakeholders," and Alliance Boots CEO Pessina boasted that the merger would be "hugely successful." Thereafter,

in August 2012, Defendants "work[ed] closely with Alliance Boots" to formulate "a set of 'goals' for [fiscal year] 2016" after completing Step 1 of the merger. Miquelon Complaint, ¶63. Analysts and investors immediately began focusing on the Company's FY16 targets as the key indicator of the Company's progress and primary driver of the stock price.

**E. Defendants Solidify the FY16 EBIT Target and Set Investor Expectations For The Combined Company**

90. On September 28, 2012, Defendants held an earnings call with investors to report on the Company's 4Q12 and FY12 performance (the "September 28, 2012 Conference Call"). During the call, Defendants announced the official FY16 targets it had generated with Alliance Boots as part of its annual Long Range Plan ("LRP") process which included, most importantly, the FY16 EBIT Target of $9 to $9.5 billion in adjusted operating income, and $1 billion or more of combined synergies. The Company's goal of $1 billion in synergies was included in and a fundamental component of the overall FY16 EBIT Target.

91. As set forth in ¶¶154, 158, 172, and 190, throughout the Class Period, Defendants routinely touted the $1 billion synergy target and performance in conjunction with the $9 to $9.5 billion EBIT Target. For example, on September 28, 2012, Miquelon prefaced the Company's announcement of its FY16 targets by stating, "[w]e continue to believe that...this partnership is going to be a great thing for our stakeholders. As [Wasson] said, our efforts to deliver real synergies...are off to a very solid start." By continuously touting that the synergies were tracking ahead of forecast, Defendants effectively gave investors the false impression that the FY EBIT Target was also on track, thereby nullifying any concerns investors had about the overall future performance of the post-merger Company.

92. In making these statements about the Walgreens-Alliance Boots Transaction in the September 28, 2012 Conference Call, Defendants emphasized to the market that the FY16

targets served to quantify the progress and performance of Walgreens' merger with Alliance Boots. Indeed, the Company's $9 to $9.5 billion FY16 EBIT Target was particularly pivotal to investors and analysts because it was the sole metric for gauging the ***profit*** generated by the combined companies. Accordingly, from that point forward, including through the duration of the Class Period, analysts and investors closely monitored and focused almost exclusively on Defendants' statements and updates about the FY16 EBIT Target.

**F. Defendants Reaffirm the FY16 EBIT Target Despite Their Knowledge of Materially Adverse Trends Impacting the Company**

93. On June 25, 2013, Walgreens held a conference call with analysts and investors to discuss the Company's performance in the third quarter of fiscal year 2013 (the "June 25, 2013 Conference Call"). During the presentation, Miquelon reiterated the FY16 EBIT Target of "***$9 billion to $9.5 billion***." Defendants also continued to tout the success of the merger by stating, "[t]o be clear, we are very pleased with...the combined synergies we are achieving." In particular, Defendants noted that Walgreens was "on track to deliver $125 million to $150 million in combined synergies, compared to our previous target of $100 million to $150 million."

94. Defendants also touted Walgreens' participation as a preferred pharmacy for Medicare Part D, emphasizing that the Company's "increase in Medicare Part D volume has exceeded the market every month . . ." with "tremendous opportunity to continue growing [its] volume over time." During subsequent meetings with investors in early August 2013, Walgreens "management" likewise noted that they were "pleased with script growth year-to-date and continues to see a steady return of Express Scripts customers and incremental share gains within its preferred Medicare Part D arrangements." William Blair Analyst Report, Aug. 5, 2013 at 2.

95. Notably, during the June 25, 2013 Conference Call, Defendants were dismissive of analysts' concerns regarding reimbursement pressure from third party payers and the effect on

the Company's profit margins, describing Walgreens as "positioned extremely well" due to "long-term contracts with predictable rates in place with many of the major commercial payers in the market." Wasson also downplayed the effect and extent of any reimbursement pressure on the Company, calling it "reasonable" and nothing more than "focus on healthcare costs from all payers." Five weeks later, during a meeting with investors in August 2013, Walgreens' management again confirmed that "[t]he company also ***remains comfortable with its reimbursement framework*** heading into next year. It has ***good visibility on all of its commercial contracts*** and does not expect any material changes to Medicare or Medicaid rates." William Blair Analyst Report, Aug. 5, 2013 at 2.

96. Similarly, when one analyst questioned Defendants about generic drug procurement during the June 25, 2013 Conference Call, they were unambiguously bullish: "[o]ne of the few work streams that's residing [in the Walgreens-Alliance Boots joint venture] is our generics. We're off to a ***very good start***" and "we're off to a good start. It is a significant part of our early synergies. As I've said before, we expect it to be a significant part of the going ones as well."

97. Moreover, in order to assuage investors' and analysts' concerns about profit margins, moreover, Defendants also reassured investors during the same call that they routinely reevaluated the FY16 targets on a rolling basis and would report on any worrisome developments: "[a]s we progress,...we plan on going into a deeper dive on our 2016 goals with respect to our progress, our risks and opportunities across each of these measures."

98. Defendants' attempts to alleviate the market's concerns succeeded as most analysts issued positive reports on Walgreens' stock and the FY16 earnings targets. Indeed, on June 25, 2013, J.P. Morgan issued a report stating "***the [FY16 targets] remained intact***."

### G. Internal Analysis Confirms $300-$800 Million FY16 EBIT Shortfall As Defendants Publicly Reaffirm FY16 EBIT Target

99. In July 2013, shortly after the June 25 Conference Call, the Company determined that the FY EBIT Target of $9 to $9.5 billion was already tracking at $8.7 billion, a shortfall of ***$300 million*** below the low-end and ***$800 million*** below the high-end of the range provided to investors. Miquelon Complaint, ¶65. According to Miquelon, this information was based on internal Walgreens data and "dozens of meetings and planning sessions" as part of the Company's LRP process. *Id.*, ¶62.

100. Nonetheless, in the following months, Defendants reaffirmed Walgreens' ability to meet the $9 to $9.5 FY16 EBIT Target and continued to make bullish statements while downplaying adverse trends or dismissing them altogether. For example, during Walgreens' October 1, 2013 conference call announcing the Company's results for FY13, Defendants continued to reaffirm the FY16 EBIT Target of "***$9 billion to $9.5 billion***," including total synergies of "$1 billion."

101. In a press release issued on the same day, Defendants represented that "***we forged long-term contracts with fair and predictable reimbursement rates*** with the major commercial pharmacy payers," but failed to disclose that these reimbursement contracts would severely hurt the Company if generic drug prices materially increased—as they had throughout 2013—because the contracts: (i) erroneously assumed a *deflationary* trend in generic pricing; and (ii) did not provide meaningful protection for Walgreens if generic prices increased. Defendants likewise boasted about Walgreens' increasing market share in Medicare Part D networks without warning investors that these agreements, which provided for lower co-pays and reimbursements than other preferred pharmacies typically agreed to, would also hinder Walgreens ability to generate increased profit margins, as generic drug pricing already was rising by 1,000%-6,000%.

102. In fact, in meetings with investors in early November 2013, Defendants were downright flippant about the generic price inflation trend, about which analysts, investors, and its competitors alike were concerned. One month after issuing its FY 2013 results, on November 1, 2013, UBS reported "when asked about generic drug inflation trends, management ***seemed dismissive of any generic inflation trends*** negatively impacting them in the upcoming quarter [2Q 2014]."

103. Defendants also repeatedly nullified analyst concerns over the attainability of the $9 to $9.5 billion FY16 EBIT Target. During Credit Suisse's November 12, 2013 Healthcare Conference, Miquelon presented the following slide which unequivocally and unambiguously reaffirmed Walgreens' FY16 EBIT Target:




104. During his presentation, Miquelon further stated:

> We've put an EBIT goal of ***$9 billion to $9.5 billion in FIFO adjusted EBIT out there***. You can see that last year we were about $6.7 billion. We've got $1 billion of planned synergies across the three parties, across six pools, things like generic procurement, indirect spend, front-end, own-brand, procurement, and the like ***and we're off to a very good start***. We seeks [sic] exceed our goal last year at over $150 million in synergies, and we think that will ramp-up to $1 billion. But effectively if you take the $1 billion out that means we need to be at the high single digits in terms of FIFO EBIT growth over the next two or three years, ***and that's really what we're targeting to do.***

105. Miquelon gave substantially the same presentation at Morgan Stanley's Global Consumer & Retail Conference approximately two weeks later on November 20, 2013, and reaffirmed the FY16 EBIT Target.

106. Based on Defendants' positive statements and affirmations, analysts continued to reaffirm the FY16 EBIT Target. For instance, on December 4, 2013, Suntrust Robinson Humphrey echoed Defendants statements by reporting that "[o]verall, the goal is for $9-$9.5B in EBIT by FY16."

### H. Internal Walgreens Data Confirms Nearly 100% Increase in EBIT Shortfall Due to "Unprecedented" Generic Drug Price Inflation and Inability to Negotiate Relief From Unfavorable Reimbursement Contracts

107. According to Defendant Miquelon's own admissions, by "late 2013," Defendants knew that the FY16 EBIT shortfall had grown by "an additional $200-300 million," thereby doubling the prior shortfall to ***$500-600 million*** below the low-end, and ***over $1 billion*** below the high-end of the FY16 EBIT range provided to investors. Miquelon Complaint, ¶66. Miquelon also admitted that the Company had internally identified the two largest sources of the EBIT deficit: (i) "the ***unprecedented level of inflation*** in the price of generic drugs that both Walgreens and the industry were experiencing ***at that time***" and (ii) "Walgreens' contracts with payors ***had been structured*** in a way that failed to provide meaningful inflationary relief." *Id*. However, neither the massive FY16 EBIT shortfall nor the material effect of the known adverse industry trends on Walgreens was disclosed to investors.

108. Instead, Defendants continued to reaffirm the FY16 EBIT Target and conceal the known impact on Walgreens of both (i) "unprecedented" generic drug price inflation; and (ii) unfavorable company-specific reimbursement contracts, which assumed ***decreases*** in generic prices and failed to include language to protect Walgreens in the then-current inflationary pricing environment. On December 20, 2013, Defendants held a call with analysts to discuss the

Company's 1Q14 results (the "December 20, 2013 Conference Call"). During the call, Defendants provided investors with a handout which represented, without reservation or conditions, that they still expected to hit the FY 16 EBIT Target of $9.0 to $9.5 billion:

Walgreens + Alliance Boots

| | FY 2016 Goals† |
|---|---|
| Revenue | >$130 Billion |
| Operating Income (GAAP) | $8.5 - $9.0 Billion |
| Adjusted Operating Income* | $9.0 - $9.5 Billion |
| Synergies | $1 Billion |
| Operating Cash Flow | ~$8 Billion |
| Net Debt** | ~$11 Billion |

109. Moreover, during the December 20, 2013 Conference Call, while Miquelon vaguely mentioned that Walgreens was tracking "a ***bit*** below" the FY16 EBIT Target due to "gross profit dollar growth pressure domestically…and a challenging environment in some international markets," he ultimately confirmed that Walgreens had identified sufficient methods and "opportunities" to mitigate these risks, the Company had "the right bullets in the chamber" "to hit" the FY16 EBIT Target, and that the Company "remain[ed] focused on delivering it."

110. Wasson likewise confirmed that Walgreens would "continue to look at those numbers [*i.e.*, FY16 EBIT Target], and make sure that we're confident," and noted that Walgreens had "ways to achieve" the FY16 EBIT Target in part because "change in the mix of the business ***will allow us to get it***."

111. Defendants also reassured investors that they would publicly disclose any information that would change the FY16 EBIT Target. Miquelon told analysts, "[q]uarter to quarter we look at it, and say are these still realistic based upon all the risks and opportunities we

have internally. If we ever feel that's not the case, we'll certainly tell you." He further assuaged analysts, "you can rest assured that we'll continue to look at those numbers, and make sure that we're confident."

112. Miquelon further characterized the FY16 EBIT Target as a ***conservative*** goal, telling one analyst who inquired as to the effect of the new ABC deal on the Target, "we obviously did these goals before ABC. When we announced ABC, we said there was additional opportunity, but we wouldn't be changing our goals. That's in part because $9 billion [the low-end of the FY16 EBIT Target] . . . is a very meaningful, large goal to hit, and an appropriate goal."

113. In reality, however, Defendants actively concealed that (i) Walgreens already was tracking $500 to $600 million below the low end and $1 to $1.1 billion below the high end of the FY16 EBIT Target; and (ii) pressure on the Company's margins was due not to "international markets" or unexplained "domestic pressure," but rather to systemic generic price inflation, the effect of which the Company could not mitigate due to its unfavorable and rigid reimbursement contracts that presumed a deflationary pricing environment. Additionally, Defendants sought to disguise the effects of the Company's unprecedented and undisclosed exposure to systemic generic price inflation by repeatedly touting the positives of the Alliance Boots merger, including $1 billion in synergies, stronger contractual bargaining power provided by the ABC Distribution Agreement, and downplaying the significance of negative generic trends and reimbursement pressure.

114. For example, during the same call, when asked to "expand on the business expansion and new initiatives" which Defendants' claimed would "offset for the operating profit

tracking thus far a little bit below the long-term plan," Miquelon responded, "[o]n the cost side, I think you saw we had very good cost progress."

115. When one analyst inquired as to whether there was "specifically anything worth calling out in the quarter as far as generic price inflation goes," given that a competitor had "called this [generic price inflation] out as a headwind to them in the quarter," Wasson misrepresented that Walgreens was "very well positioned":

> WASSON: ***There's always some inflation in the industry***. In the past, we did see some unusual inflation on select molecules in this past quarter, which did give us a little bit of impact. It's hard to say whether that will be ongoing or not. ***We think we are very well positioned*** with Jeff and John Donovan's team in Switzerland, to make sure that we are working with both generic and branded pharmaceutical companies, to provide value and ***offset anything that may occur***. But we saw a little bit of unusual activity, but again, our folks in Bern are on top of it, and we want to work with these folks in a way that helps them create value, as well as the synergy opportunities we see.

116. Likewise, whenever analysts directly inquired about the effect of the "pharmacy reimbursement environment" on Walgreens, seeking clarity as to whether Defendants anticipated "things getting [] materially better or worse," Wasson misleadingly downplayed the reimbursement issue as normal industry activity, stating, "we always face ongoing reimbursement pressure, and certainly that hasn't changed and frankly won't change." Wasson further represented that Walgreens was "positioned better than anyone as far as procurement."

117. Finally, in order to buttress their statements that the FY16 earnings targets were achievable, Defendants deceptively touted that the synergies of the combined companies were tracking ahead of projections:

> It does give us confidence, actually even more so leading up to fiscal 2016 goals that [the synergy goal was ahead of projections] . . . . we feel for the fiscal year, that ***we're ahead of that target that we've given and we feel confident in $1 billion and we believe there's upside***.

118. Many analysts bought into Defendants' assertion that they had sufficient "bullets in the chamber" to meet the FY16 EBIT Target. For example, J.P. Morgan issued a December 20, 2013 report noting, "While the 1Q14 performance for the underlying business was below our expectations, and the company pointed to continued headwinds for 2Q14, we note that, ***more importantly, the company did reaffirm the combined 2016 goals*** despite the weaker underlying business trends, pointing to incremental opportunities that can offset that weakness."

119. Other analysts characterized Miquelon's assertion that Walgreens was trending a "bit below" the FY16 EBIT Target as a minor blip on the radar. For example, Suntrust Robinson Humphrey issued a report on December 23, 2013, concluding that Defendants had "hedged ever so slightly on [Walgreens'] ability to deliver on its longer term goal of an operating profit of $9B in fiscal 2016" but that "the factors seem temporary and, at this point, we do not see the events rising to 'thesis-changing' magnitude." In a January 3, 2014 report, Susquehanna concluded that "FY16 earning power remains attractive," and noted that "while management suggested the current run rate may be slightly below FY16 goals, it is important to recognize that a modest $250 mln haircut to the low-end of EBIT expectation of $9 bln would still equate to ~$5.00 in EPS."

120. In reality, as set forth above, Walgreens was already experiencing generic price inflation upwards of 1,000% on pharmaceuticals prescribed to treat relatively common ailments. Moreover, the Company had already identified an EBIT shortfall of $500 million to $1.1 billion below the FY16 EBIT Target due to the inability of its inflexible reimbursement contracts to offset the increasing pricing trends.

**I. Defendants Continue to Reaffirm FY16 EBIT Target in January & February 2014**

121. Notwithstanding Defendants' affirmative knowledge of the $500 million to $1.1 billion shortfall from the low/high end of the FY16 EBIT Target, Defendants continued to reaffirm the guidance and conceal its known problems into 2014.

122. After Walgreens' Analyst Q&A on January 9, 2014, J.P. Morgan reported that "[t]he company again ***reaffirmed*** the combined 2016 goals." Likewise, on January 15, 2014, the Company presented a slideshow at the J.P. Morgan Healthcare Conference, once again reiterating that the FY16 Target was on track, including EBIT of "***$9 to $9.5 billion***" and "synergy of $1 billion." In fact, during his presentation, Miquelon reaffirmed the FY16 EBIT Target, while noting the Company already had "identified a range of further opportunities…to mitigate" any risk to the $9 to $9.5 billion EBIT Target. Additionally, he touted the growth of Walgreens' Medicare Part D business without disclosing that the terms of these contracts, along with the Company's other reimbursement contracts, were forcing Walgreens to absorb all of the generic price inflation, significantly affecting current and future margins.

123. In February 2014, Walgreens hit the road for a series of investor meetings in the U.K. Rather than inform investors about the then-existing generic inflation and contract reimbursement pressures significantly affecting Walgreens' financial performance and the FY16 EBIT Target, Walgreens reaffirmed the Target and deceptively quelled investor concern about the impact of the generic price inflation trend on the Company. On February 7, 2014, for example, UBS hosted Walgreens for a group of investor meetings during which "WAG mgmt" stated that they "***remain[] committed to all of the FY16 financial targets*** that were originally laid out with the AB merger announcement, ***including adjusted EBIT of $9.0-9.5 bil.***"

124. Similarly, after meetings held with "the Alliance Boots and Walgreens management teams," on or around February 11, 2014, Deutsche Bank reported its belief that the Company was continuing to track toward its 2016 targets, confirming that it was "increasingly confident in Walgreens' ability to recognize its 2016 synergy and earnings targets." Notably, the following day that after "spen[ding] considerable time discussing generic drug procurement synergies," Deutsche Bank reported that it left the meeting "increasingly confident" that "both above and below the line synergies are likely underappreciated and underestimated by investors[,] . . . in Walgreens ability to recognize its 2016 synergy and earnings targets, and that ***longer term estimates could prove conservative***." Deutsche Bank further noted that "[s]hould many of the ideas discussed at [the] meetings go right, ***estimates could be too low*** by as much as $2 in EPS on a ~$5 number, implying significant positive revisions."

125. Shortly after these meetings, *The Wall Street Journal* published a post on its MarketWatch blog stating:

> ***[s]hares of Walgreen Co. jumped nearly 6% to an all-time high Tuesday*** [February 11th], but the cause for the stock move is somewhat of a mystery as there was no news on the drug retailing giant that hit the wires. Instead, analysts on Wall Street say they are hearing that ***Walgreens management spoke in bullish tones at an investor conference in London***…

## J. Defendants' Continued Failure to Disclose Material EBIT Shortfalls and Ongoing Negative Trends During the Class Period

### 1. March 2014

126. After the 2Q14 conference calls, analyst conferences, and investor meetings, Walgreens' ability to meet the FY16 EBIT Target continued to deteriorate. Miquelon admitted that "[b]y March 2014, it was becoming increasingly clear" to Walgreens "that the deflation in pricing of generic drugs that had been the trend over the last decade may have ***systematically*** reverted to an inflationary trend." Miquelon Complaint, ¶71. Miquelon further admitted that, "at

about this time, Walgreens' pricing and contracting group, which reported directly to Kermit Crawford, who in turn reported to Wasson, was having a very difficult time negotiating with a certain group of payors," which added additional "risk and uncertainty to" the FY16 EBIT Target.

127. As a result, and "primarily based on third party reimbursement negotiations (including Medicare Part D contracts)," Defendants determined that Walgreens had an additional FY16 EBIT shortfall of "***well in excess of $ 1 billion***." This additional $1+ billion on top of the $500 to $600 million already known in "late 2013" increased the aggregate total shortfall to $1.5 to $1.6 billion less than the low-end and ***$2 to $2.1 billion*** less than the high-end of the FY16 EBIT Target. Miquelon Complaint, ¶74.

128. On the first day of the Class Period, Defendants participated in an analyst conference to discuss the Company's 2Q14 results. During the call, Miquelon stated, in relevant part, that Walgreens was "currently tracking below the CAGR required to meet" the FY16 EBIT Target but that the Company had "identified a range of further opportunities, including benefits from our [ABC] relationship, incremental Alliance Boots synergies, business expansion and new initiatives and cost savings which can all help mitigate these risks."

129. Notwithstanding Miquelon's vague statement that the Company was tracking "below" the CAGR required to meet the FY16 EBIT Target, his comments during the March 24, 2014 conference call were accompanied by the same slide set forth above in ¶108, which unequivocally restated and affirmed the FY16 EBIT Target of "$9.0 - $9.5 Billion."

**2. April and May 2014**

130. On or about April 9, 2014, Miquelon shared an interim LRP update with Walgreens' Board of Directors and Wasson. At the same meeting, the Senior Vice President of Pricing and Contracting made a presentation to the Board regarding his view on third-party

reimbursement trends; and the co-Presidents of the ABC joint venture also made an extensive presentation on inflation and pricing trends in the generic drug market.

131. During the meeting, Miquelon confirmed that the combined companies likely would recognize $7.5 billion (or, indeed, much less) in EBIT in FY16. Miquelon further confirmed that the shortfall of more than $1.5 to $2.1 billion below the FY16 EBIT Target was primarily the result of inflation in the price of generic drugs and unfavorable reimbursement contracts.

132. Also at the April 9, 2014 Board Meeting, "activist investors confronted Walgreens' Investor Relations personnel," "and demanded that the Company proceed with the tax inversion," or, in other words, redomicile Walgreens in Switzerland to lower the Company's effective tax rate. Miquelon Complaint, ¶96.

133. Two days later, Wasson and Miquelon participated in a private meeting with key Walgreens shareholders, in Paris, France. At the meeting, which was attended by Goldman Sachs Partners and hedge funds JANA Partners LLC, Corvex Management L.P., and Och-Ziff Capital Management Group LLC, investors expressed their frustration for Walgreens' decision to eschew a tax inversion and indicated their desire that Alliance Boots' management team take on a greater role in the combined companies. News reports speculated as to whether Wasson was losing control of Walgreens.

134. Shortly after these run-ins with angry activist investors, Wasson began advocating for Walgreens to complete a tax inversion with Step 2 of the merger transaction. According to Miquelon, in May 2014, Wasson told Miquelon, "in substance, that Wasson was convinced that Walgreens must proceed with a tax inversion and that, if it did not, Wasson would be unable to keep his job because the activist investors would force him out." Miquelon Complaint, ¶97.

Miquelon further noted that "[b]y June 2014, Wasson had told Miquelon and others that he believed that an inversion was in the best interests of the Company because it was the only way he could keep his job." Miquelon Complaint, ¶98.

135. On April 22, 2014, Wasson met with Miquelon to offer him a new role in the combined company—specifically, President of Emerging Markets, Ventures and Global Strategy—which would put Miquelon in the position of being a "strong [CEO] successor candidate." *Id.*, ¶¶45-47. After considering the position for a few weeks, on May 30, 2014, Miquelon informed Wasson that he would decline the position (which he viewed as a demotion) and, as a result, would be leaving Walgreens after "fulfilling his commitment to complete Step 2 of the Alliance Boots transaction." *Id.*, ¶¶54-57.

**3. June - August 2014**

136. In the days following his meeting with Wasson, Miquelon and his team confirmed that Walgreens was tracking towards an even lower FY16 EBIT than the Company realized in March 2014. Indeed, due in part to increasingly difficult negotiations with Medicare Part D providers, which had been led by Kermit Crawford, President of Pharmacy, Health and Wellness, with significant involvement from Defendant Wasson, Miquelon determined that the combined companies likely would recognize only $7.2 to $7.5 billion in EBIT for FY16, or $1.8 to $2.3 billion lower than the FY16 EBIT Target repeatedly reaffirmed by Defendants. Miquelon shared the new EBIT target for FY16 with Wasson during an in-person working sessions on June 11 and 12 in New York.

137. Knowing that he had already rejected Wasson's offer of a new title and was leaving the Company, Miquelon no longer had anything to lose. As a result, based on the latest analysis showing that the EBIT shortfall for FY16 was $2.3 billion below the high-end of the range provided to investors, in early June 2014, Miquelon advocated for publicly withdrawing

the FY16 EBIT Target during the Company's next scheduled call on June 24, 2014. Wasson, who was still fighting to retain presumptive control of the combined companies after the merger, actively "pressured" Miquelon to raise the EPS estimate for the combined companies and "argued for delaying the previously scheduled earnings call" more than two weeks to July 10, 2014, "so the negative news regarding withdrawing the previously announced FY 2016 EBIT goal could be '***bundled***' with other, more positive developments relating to progress on Step 2 of the merger with Alliance Boots." Miquelon Complaint, ¶¶83, 103.

138. Moreover, "Wasson told [Miquelon] on many occasions" during the period leading to the June 24 earnings conference call, "'I need a 6, get me a 6,' meaning that Wasson was pressuring Miquelon to approve an EPS figure of at least $6.00 per share." *Id.*, ¶104. Miquelon attached a screenshot of a June 11, 2014 text message from Wasson to his complaint to support his assertion. *See* Miquelon Complaint, ¶¶104-106 and Ex. 14. In the message, Wasson told Miquelon to "push for a 6 somehow." *Id*. When Miquelon responded that he did not "think there is anyway we could ensure that. Getting a 5 is a miracle," Wasson was unfazed: "No choice. Need a 6. We'll find a way." *Id*.

139. Based on the FY16 EPS range ultimately disclosed by Walgreens at the end of the Class Period (which is based on a 1.63 multiplier to calculate EBIT), Wasson's request for $6.00 EPS would equate to $9.7 billion EBIT for FY16, or $200 million more than the high end of the FY16 EBIT Target.[4] Miquelon's "miracle" EPS number, $5.00, would equate to $8.1 billion in EBIT, or $900 million below the low end and $1.4 billion below the high end of the FY16 EBIT Target.

[4] Note that the mid-point of the $4.25 to $4.60 EPS is $4.42, which multiplied by 1.63, equals the $7.2 billion EBIT the Company disclosed in August. Assuming a proportional relationship, if that same multiplier of 1.63 is applied to Wasson's $6 EPS, it would equate to an EBIT of approximately $9.7 billion—higher than the top-end of the FY16 EBIT Target of $9-9.5 billion, and much higher than the $7.2-7.5 billion Miquelon discussed with Wasson and Pessina.

140. Miquelon, with the support of the Chair of Walgreens' Audit Committee, Janice Babiak, pushed back on Wasson's plan, telling him that Babiak "would not support delaying the earnings call." Miquelon Complaint, ¶85. Wasson was dismissive, demanding Miquelon tell Babiak "what we are doing," with respect to the earnings calls, instead of asking for permission to do so. *Id.*, ¶¶84-85. Despite Wasson's efforts to withhold material negative information so that it could be artificially "bundled" with more positive news, Walgreens held its earnings call on June 24, 2014. Defendants continued to mislead investors, however, by concealing the amount of the shortfall and their knowledge of the systematic issues causing it, since at least late 2013.

141. On June 24, 2014, Walgreens withdrew its FY16 Earnings Targets, including the FY16 EBIT Target. However, despite their knowledge that the Company currently expected to generate $7.2 to $7.5 billion in EBIT—a shortfall of $1.8 to $2.3 billion from the original FY16 EBIT Target—Defendants deliberately failed to disclose the new FY16 EBIT target. In explaining their decision to withdraw the FY16 earnings targets, Defendants attributed it to "Step 2 considerations," among other things. Incredibly, notwithstanding their internal (yet, undisclosed) recognition of "unprecedented" inflation in generic drug pricing in December 2013, and the fact that the price of generic drugs prescribed for common ailments had increased 1,000% to 6,000% (and in some cases, to over 17,000%) over a two year period beginning in 2012, Defendants misleadingly told investors that they were surprised by generic price inflation and did not "fully anticipate[]" the effects of the trend.

142. Defendants also failed to disclose the fact that the Company's current reimbursement contracts prevented it from achieving the FY16 EBIT Target. For example, while Wasson told investors that the Company was "focused on [its] contracting strategy to

account for increasing drug costs," and reassured investors that he could not "think of anyone that is better positioned than us to offset this because of what we are doing at Bern" with respect to the ABC Distribution Agreement, he failed to disclose that the Company's ***current*** contracts, some of which still had 1-2 years remaining, assumed a *deflationary* trend in generics pricing and provided no protection for Walgreens in the current environment of inflationary generic pricing.

143. Likewise, Wasson touted Walgreens' growing market share of Medicare Part D patients, noting "[w]e're absolutely winning in the Part D space," while failing to disclose that the lower co-pay and reimbursements the Company received as a preferred pharmacy was having a further detrimental effect on the Company's profit margins as a result of generic price inflation.

144. After the release of Walgreens' 3Q14 earnings, many analysts failed to appreciate the size of the FY16 EBIT shortfall and viewed Defendants' statements as signaling that they would be adopting more aggressive strategies. For example, on June 25, 2014, J.P. Morgan increased its price target for Walgreens' shares from $74 per share to $76 per share on the basis that:

> While the company withdrew the previously-discussed combined FY16 goals, management will provide updated targets on a separate call in 4-6 weeks, following the finalization of key decisions around the transaction timing and structure, the combined management team, ***additional synergy and cost reduction initiatives*** and the future capital structure. . . . Our rating on WAG is Overweight, and ***we remain positive on the longer term opportunities associated with the Alliance Boots transaction***….

145. After the June 24 conference call, Defendants Wasson and Miquelon participated in a call with an activist hedge fund investor during which "the activist investor chastised Miquelon for the decision to withdraw the EBIT goal number." Miquelon Complaint, ¶107. The investor further suggested that Pessina should be the one developing the Company's financial

goals, as he "and his team clearly see the huge potential upside and have a track record of 30,000 percent return over 20 years. Miquelon Complaint, Ex. 15. The investor told Miquelon that activist investors at JANA Partners and Corvex Capital "are coming after you" and would "stop at nothing to get you out of the way including getting personal dirt on you and embarrassing you publicly….I wouldn't be surprised if that wheel was in motion." *Id.*; Miquelon Complaint ¶¶107-108.

146. After the call, Miquelon confronted Wasson about the latter's "failure to come to Miquelon's defense on the call." Miquelon Complaint, ¶110. As a result of Wasson's "lack of support," Miquelon asked to push up the timetable for his departure from the Company. *Id.*

147. Ultimately, Walgreens announced Miquelon's retirement as its CFO on August 4, 2014. Two days later, Walgreens finally announced its new FY16 EBIT Target with a midpoint of $7.2 billion, ***$1.8 billion*** below the low-end and ***$2.3 billion*** below the high-end of the FY16 EBIT Target. This information, however, was buried at the bottom of a press release that focused on the fact that Walgreens and Alliance Boots had sped up the time frame for Step 2, which was to be completed by the end of 2014.

148. On July 1, 2014, Walgreens released its Form 10-Q for 3Q14. For the first time, Walgreens added the phrase "generic prescription drug inflation" to its list of "risk" disclosures and added a reference to "the impact of private and public third—party payers [sic] efforts to reduce prescription drug reimbursements." These known risks, of course, were known before and throughout the Class Period.

149. On July 24, 2014, the company announced that Crawford—Walgreens' President of Pharmacy, Health and Wellness, and the head of the group responsible for negotiating payer contracts—would retire effective December 31, 2014.

150. On August 1, 2014, Wasson told Miquelon the following: (i) he would like to move Miquelon's transition date from September 1 up to August 4, 2014; (ii) Miquelon should not attend an upcoming "road show" of investor meetings on August 5-8, 2014; (iii) Rick Hans, Walgreens' head of investor relations, would not be attending the road show meetings; and (iv) Wasson and Pessina had agreed on a plan to handle the road show. Miquelon believes that Wasson and Pessina's "plan" was "to use the road show to set Miquelon up as a 'fallguy,' turning his personal decision to leave the company into an opportunity to blame him—falsely—for the company's recently announced lowered earnings forecast and decision not to re-domicile the company overseas…." Plaintiff's Response to Defendant Walgreen Co.'s Motion to Dismiss the Amended Complaint, *Miquelon v. Walgreen Co.*, No. 14-CH-16825 at 7-8, 10 (Cir. Ct. Cook Co. Mar. 24, 2015).

151. On August 4, 2014, the company announced that Miquelon would be stepping down as CFO of the company and that Timothy McLevish would be taking his place. A release announcing the transition stated that Miquelon would be leaving "to pursue several new opportunities outside of the company," but provided no explanation about what those opportunities were. Miquelon Complaint, ¶119.

## V. <u>DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS</u>

### A. March 25, 2014 Misstatements and Omissions

152. On March 25, 2014, Walgreens issued a press release announcing its financial results for the three months ending February 28, 2014 ("2Q14") (the "March 25, 2014 Press Release"), which was also attached as an exhibit to a Form 8-K filed with the SEC on the same date.

153. In the March 25, 2014 Press Release, Defendant Wasson primed the market with bullish statements emphasizing the Company's "solid top-line growth" in the quarter "driven by

record quarterly sales and record second-quarter prescriptions filled." Wasson further represented that the Company expected "***the generic drug headwind that affected the first half will ease and turn around by the end of the year***."

154. With regard to the Alliance Boots synergy goal, which was part of the $9-$9.5 billion FY16 EBIT Target, the March 25, 2014 Press Release quoted Wasson as stating, the "joint synergy program with Alliance Boots is expected to ***exceed*** its second-year estimate."

155. The March 25, 2014 Press Release also stated that Walgreens "***saw strong growth in prescriptions filled for Medicare Part D patients***, which increased 16 percent in the second quarter compared with last year's quarter***, while the Company's Part D market share increased*** 0.8 percentage point in February compared with the same month a year ago."

156. On the same date, Defendants held a conference call to discuss and expand upon the Company's 2Q14 financial results (the "March 25, 2014 Conference Call"). In his prepared remarks, Miquelon stated, in relevant part:

> Taking a look at our adjusted gross margin trends this quarter's 140 basis point decrease was versus [a] 120 basis point increase a year ago. In essence, the benefit of the generic wave last year reversed itself this year. ***We expect this impact to continue to moderate*** in the third and fourth quarter and ***become a tailwind*** to some degree in the fourth quarter of fiscal 2014.

157. During the March 25, 2014 Conference Call, Miquelon also specifically addressed Walgreens' softening profit margins (which directly impacts EBIT), stating, "[w]hile we always experience some level of reimbursement pressure ***the most significant factor affecting the pharmacy margin was dramatically slower rate of new generic introductions year over year***."

158. With respect to the FY16 EBIT Target, Miquelon referenced statements made on the "last call" (December 20, 2013) that the Company was tracking "a bit below" the FY16 EBIT Target, but stated that the Company had identified further "opportunities" and "synergies" to "mitigate" the risks to the FY16 EBIT:

> [We] reviewed [the] fiscal-year 2016 goals internally and ***performance to date with respect to four of our five goals remains on track with or slightly ahead of our expectations***.
>
> * * *
>
> ***As stated on our last call*** our adjusted operating income goal of $9 billion to $9.5 billion is currently tracking below the CAGR required to meet this goal and below our initial expectations. We continue to recognize that there are risks to achieving this goal; ***however, we remain focused on delivering it***.
>
> ***And as I also stated we have identified a range of further opportunities including benefits from our AmerisourceBergen relationship, incremental Alliance Boots synergies, business expansion and new initiatives and cost savings which can all help mitigate these risks***. The asset optimization program that Greg described highlights our focus on efficiencies while the increase in our fiscal-year 2014 synergy estimate demonstrates that we are driving additional synergies with Alliance Boots and AmerisourceBergen.

159. Ultimately, Defendants' presentation slides for the March 25, 2014 Conference Call concluded that the "***FY2016 EBIT goal of $9-9.5 billion***" was intact:

| | FY 2016 Goals† |
|---|---|
| Revenue | >$130 Billion |
| Operating Income (GAAP) | $8.5 - $9.0 Billion |
| Adjusted Operating Income* | $9.0 - $9.5 Billion |
| Synergies | $1 Billion |
| Operating Cash Flow | ~$8 Billion |
| Net Debt** | ~$11 Billion |

160. Further, regarding the Company's drug procurement operations, Wasson noted that Defendants were "pleased with the performance of our global procurement organization. With the introduction of AmerisourceBergen we believe we will be the largest purchaser of pharmaceuticals worldwide."

161. Also during the March 25, 2014 Conference Call, Defendants touted the growth of Walgreens' Medicare Part D program. Wasson stated:

> Looking ahead ***our Medicare Part D program is accelerating our momentum in pharmacy***. In the quarter ***our Med D volume was up year-over-year with significant growth in new customers on top of strong performance in fiscal 2013***. Our Part D market share for the quarter increased 80 basis points compared to the same period last year.

162. On this subject, Miquelon later added, "***[o]ur pharmacy business is well positioned in patient segments which is . . . Part D customers . . . and we continue to drive real efficiencies in both our pharmacy operations and in procurement***."

163. On March 27, 2014, the Company filed its 2Q14 financial results with the SEC on Form 10-Q (the "2Q14 Form 10-Q"). The 2Q14 Form 10-Q was signed by Defendant Miquelon. Additionally, Defendants Wasson and Miquelon signed certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002 stating, in relevant part, "***this report does not contain any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The 2Q14 Form 10-Q also stated in relevant part, the Company's "***[r]etail pharmacy margins were negatively impacted by a significant reduction in the number of brand to generic drug conversions*** and lower market driven reimbursements."

164. Following the conference call, analysts repeated Defendants' positive statements regarding the Company's performance and long-term outlook. On March 26, 2014, for example, J.P. Morgan increased its price target from $67 to $74 after the March 25, 2014 Press Release and Conference Call, noting:

> ***The previously discussed combined 2016 targets remain intact***. As discussed last quarter, the company is tracking below the CAGR required to meet the adjusted

> operating income goal of $9-$9.5 billion and below initial expectations, and while the company recognizes that there are risks to achieving this goal, ***they have identified a range of further opportunities to help mitigate these risks.***

165. The report further stated that, although Walgreens' 2Q14 results were impacted by several factors including "fewer new generics," "***management expects*** many of these factors to cycle in the coming quarters driving improved performance" and "[l]ooking ahead, ***the company expects*** the negative impact from generics to continue to moderate in 3Q and to ***turn positive in 4Q***."

166. Other analysts issued reports on March 25, 2014, echoing Defendants' statements and commenting on purported margin improvement due to generic drugs and the importance and materiality of the Company's post-merger FY16 Earnings Target:

- Cowen & Co. issued a report on March 25, 2014, latching onto Defendants' bullish statements that emphasized Alliance Boots trends and generic drug outlook: "[g]iven rising synergy expectations for AB combined with the ***tailwind of new generics*** going forward, we see the outlook improving from here. . . . On the pharmacy side, ***management expects margins to benefit from generics*** in the tail end of FY14…." The report also emphasized the importance of the Alliance Boots guidance: "Importantly, we believe the ***focus remains*** on the WAG/AB/ABC partnership with WAG/AB synergies ***tracking nicely ahead*** of schedule."

- A March 25, 2014 Jefferies report confirmed that investors were focused heavily on the FY16 earnings targets for the post-merger Company: "[w]ith ***investors focused on proforma F2016 EPS of WAG+Alliance Boots***, the market will likely look through the weak quarter and focus on the positive synergy news." Regarding generics, the Jeffries report relayed Defendants' positive statements that generics could provide potential upside: "The margin drag related to generics ***should moderate*** as we move through 2H14. In fact, there is potential for a modest ***tailwind*** depending upon the timing of several new introductions into the market. . . . As this helps build confidence that Walgreens will ***beat the $1B synergy goal laid out by F2016***, we believe WAG shares may again ignore the EPS miss on these results."

- Additionally, Leerink reported: "[w]e remain positive on WAG, with ***margin improvements*** expected in F2H:14 as the generic launch calendar begins to improve, and F2015 ***should benefit*** from the transition of WAG's distribution volume to ABC (OP) and ***incremental Alliance Boots synergies***."

- Likewise, William Blair reported, "***[m]anagement expects*** new generic introductions to be a tailwind in [4Q14]."

- UBS further noted that "***WAG*** essentially suggested that F2Q14 should mark the ***trough on generic-related profit comps and related gross margin trends*** y-o-y as major new launches are anticipated over the next few quarters."

167. On April 1, 2014, analysts at Susquehanna noted the importance and materiality of the Company's post-merger FY16 Earnings Target to investors: "***sentiment has shifted decidedly to the company's longer-term earning potential*** (when combined with Alliance Boots), in our view, and as [a] result we anticipate investors will be unconcerned with March's calendar drive softness."

168. The statements set forth above in ¶¶153-163, were materially false and/or misleading and omitted material facts, and were contradicted by adverse information and trends known to Defendants. In particular, the FY16 EBIT Target of $9 to $9.5 billion was knowingly false, had no reasonable basis and was contradicted by material adverse facts actually known to Defendants but concealed from investors, including the following:

(a) By late 2013, the Company already had identified a shortfall of $500 to $600 million of the FY16 EBIT Target, which was over ***$1 billion*** below the high-end of the range represented to investors and had nearly doubled from the $300 million shortfall identified in July 2013. Defendants also knew that the largest source of the EBIT shortfall was "the ***unprecedented*** level of inflation in the price of generic drugs" and Walgreens' failure to structure its contracts with payers to provide meaningful inflationary relief—both of which negatively impacted Walgreens' profit margins and EBIT. With respect to the latter point, moreover, Defendants knew that Walgreens' reimbursement contracts assumed a *deflationary* pricing trend for generic drugs and included no protections for the Company in the event of generic price inflation.

(b) Between late 2013 and April 9, 2014, the Company had accumulated "***well in excess of $1 billion***" in additional risk to the FY16 EBIT Target based on the *same* fundamental company-specific issues known in 2013; namely, continued generic drug price inflation and unfavorable third-party reimbursement contracts. This additional $1 billion on top of the $500-600 million known in late 2013, reduced the Company's FY16 EBIT Target to approximately $7.5 billion or less—a full ***$2+ billion*** lower than the top-end of the FY16 EBIT range provided

to investors. Additionally, Defendants knew "by March 2014" that the unprecedented inflation in generic drug prices had become "systematic."

(c) In addition to the sheer amount and magnitude of the known shortfall, Defendants concealed that the *pace* of the shortfall was increasing exponentially, notwithstanding purported "synergies" and "opportunities" touted by Defendants. The $300-$800 million FY16 EBIT shortfall identified in July 2013 that increased roughly 100% to upwards of $600 million below the low-end by late 2013, subsequently grew another 300% to $1.5 to $1.6 billion, and ***$2 to $2.1 billion*** below the high-end of the EBIT range represented to investors. Averaging this increase, the shortfall had grown by over $300 million in each calendar month of 2014 (January through March).

169. Defendants' representations that, even though they were merely tracking "below" the CAGR required for the FY16 EBIT Target—which they had previously characterized as only a "bit" below and "a little bit soft"—they still "remain[ed] focused on delivering it" and had "identified a range of opportunities" to "mitigate the risks," were misleading for the same reasons. Defendants' statements concerning the alleged "opportunities" as well as overall positive statements concerning the Company's pharmacy results were materially misleading because Defendants failed to disclose both the effect of generic inflation on the Company's margins and the fact that these opportunities and positive results were insufficient to counteract the massive $1.5 to $2.1 billion FY16 EBIT shortfall.

170. Defendants further concealed the primary reasons for, and source of, the multi-billion dollar FY16 EBIT shortfall—namely, the negative effect of generic price inflation—and that they were unable to pass on any of the price increases to consumers or third party payers based on their unfavorable reimbursement contracts. Indeed, Defendants knew that the "primary impact" or "significant factor" affecting the Company's softening margins was not "generic drug waves" or "fewer new generics" but, rather the "systematic" and "unprecedented" level of generic drug price inflation combined with the effects of (i) the Company's reimbursement contracts (the terms for which were not disclosed) that presumed generic prices would decrease

and failed to include any protections for Walgreens if inflation occurred; and (ii) in the case of the Company's Medicare Part D contracts, required it to accept lower co-pays from customers and even lower reimbursements than typically were paid to preferred pharmacies.

171. Moreover, the statements that the Company "expects margins to benefit from generics" and that Walgreens' ability to "offset" margin pressure and the purported "tailwind" regarding generics, were misleading because they failed to disclose that generic inflation was already "unprecedented" and "systematic." Likewise, Defendants' representation that Walgreens would "exceed" its Alliance Boots synergy goal (a component of the overall FY16 EBIT Target) was misleading by omission because it concealed the fact that synergies were dwarfed by the massive $1.6 to $2.1 billion FY16 EBIT shortfall already known to Defendants. Additionally, Defendants' overwhelmingly positive remarks concerning the Company's growing Medicare Part D business were materially misleading because Defendants failed to disclose the fact that, in order to garner increased Medicare Part D market share, Walgreens had agreed to lower co-pays and reimbursements than typically agreed to by preferred pharmacies, which also impacted the FY16 EBIT shortfall.

**B. April 17, 2014 Conference Call**

172. On April 17, 2014, J.P. Morgan hosted an investor conference call with Defendant Wasson. J.P. Morgan issued a report on April 21, 2014 memorializing Wasson's statements, during the April 17 call (the "April 21, 2014 J.P. Morgan Report). According to the report, one of the "key takeaways from the call" was that "***[m]anagement indicated that it is extremely confident the $1 billion synergy target is achievable and pointed to additional opportunity beyond that based on opportunities they have identified***."

173. Additionally, with respect to reimbursement pressure, the J.P. Morgan Report stated that "***management noted that it is seeing nothing unusual at this point***" and

"***management cited multiple opportunities***" to offset general reimbursement headwinds, including, "***[o]ngoing increases in generic utilization [which] can drive improving margins***" and "working more closely with manufacturers." The April 21, 2014 J.P. Morgan Report confirmed that the "overall tone" of the April 17 call with Wasson was "positive." In fact, J.P. Morgan noted that "[i]mportantly, the call served to reinforce our bullish view on the outlook for WAG."

174. The statements set forth above in ¶¶172-173 were materially misleading, omitted material facts, and were contradicted by adverse information and trends known to Defendants, including the fact that the Company already had identified but failed to disclose a massive FY16 EBIT shortfall of at least ***$1.5 to $1.6 billion*** from the low-end and ***$2 to $2.1 billion*** from the high-end of the range represented to investors. Defendants also knew, but failed to disclose, that the massive FY16 EBIT shortfall was attributable to the *same* fundamental company-specific issues known since at least late 2013, including the "unprecedented" price inflation of generic drugs, which had become "systematic" by March 2014 and was compounded by unfavorable reimbursement contracts. Accordingly, the representations that the Company "***is seeing nothing unusual at this point***" regarding reimbursement and that Walgreens' management identified "multiple opportunities" to offset general reimbursement headwinds, including, "[o]ngoing increases in ***generic utilization*** [which] can drive improving margins" were misleading and concealed the true facts known to Defendants.

175. Additionally, the statements that Wasson was "extremely confident" in the FY16 $1 billion Alliance Boots synergy target (a component of the overall FY16 EBIT Target) and had identified "additional opportunity beyond that," was misleading by omission because it misled investors to believe that the $9 to 9.5 billion EBIT Target, which included the Alliance Boots

synergies, was still on track.

**C. April 30, 2014 Barclays Conference**

176. On April 30, 2014, Walgreens' Head of Investor Relations, Rick Hans, appeared at the Barclays Retail and Consumer Discretionary Conference on behalf of Walgreens (the "April 30, 2014 Barclays Conference"). In response to a direct question about the impact of generics on the Company's profit margins, Walgreens stated:

> This year, we've had kind of a dearth of new generics. So, that has caused a big mismatch, ***it's kind of that peak to trough that we've talked about with relative to the introduction of new generics and that had an impact on the margin***.
>
> * * *
>
> So, a year ago in the first half of the year, we had about [130 basis point] lift in the margin, primarily due to generics. ***This year in the first half, we had [135 basis point] drop in the margin, again primarily due to generics, but also due to some stuff we've been doing on the front end with regards to promotion***.

177. With respect to the FY16 EBIT Target, Walgreens stated:

> But, as far as the -- how this relates to our goals for FY16, it's a little complicated in that. We had a -- ***we had embedded in those goals some benefits from a different distribution model***, and I won't go into it, but we had a different distribution model in mind. So that now came out, ***now with AmerisourceBergen which we think was better than the old model, gets plugged in, some of that is not new to the EBIT goal is my point***. Do you follow my thinking on this? ***So, some of it is incremental, but some of it is actually embedded in our goals*** . . . I mean, we really don't want to get into really spelling out exactly what the synergies are. I think the numbers will flow through cost of goods and everyone will see it just in our performance.

178. Following the April 30, 2014 Barclays Conference, analysts digested and incorporated Defendants' positive statements into their guidance. For example, on May 14, 2014, Cowen & Co. stated:

> the outlook for WAG is improving, as . . . 2) ***pharmacy margins benefit from generics in the tail end of FY14***; . . . 4) ***WAG realizes better than expected synergies from AB***, which is expected to deliver $375-425M in synergies in FY14 up from a range $350-400M. ***As we move through the trough in the generic cycle*** and past the weak flu season***, we expect the fundamental outlook for the company begin to improve, particularly as we head into 2H of FY14 when the***

***generic wave begins to cycle upwards***.

179. The statements set forth above in ¶¶176-178 were materially misleading, omitted material facts, and were contradicted by adverse information and trends known to Defendants. Indeed, the Company's declining gross margins were not simply due to the "trough" in "introduction of new generics" and "front end" promotions, but rather the "unprecedented" price inflation in generic drugs which was "systematic" by March 2014, and was compounded by Walgreens' unfavorable reimbursement contracts. By continuing to omit the severe and systematic generic price inflation while exclusively attributing the Company's margin pressure to generic volume and other factors, Defendants created a false impression of the true facts known to the Company.

180. Moreover, the Company's suggestion that its FY16 targets and synergies with Alliance Boots could even prove conservative and "everyone will see it just in our performance" because Walgreens "plugged in" a new ABC-centric "distribution model" into the targets which purportedly "***was better than the old model***," intentionally omitted the fact that the Company already had identified a massive FY16 EBIT Target shortfall of at least ***$1.5 to $1.6 billion*** from the low-end and ***$2 to $2.1 billion*** from the high-end of the range, which could not be reversed by a new ABC distribution model. As Defendants had long established that Walgreens' synergy goals were directly tied to its FY16 EBIT Target, by continuing to tout those synergies as exceeding expectations, Defendants misled to investors to believe that the $9 to $9.5 billion FY16 EBIT Target was still on track.

**D. May 16, 2014 Conference Call**

181. On May 16, 2014, Defendants Wasson and Miquelon participated in Morgan Stanley's "management conference call series." Morgan Stanley issued a same-day report memorializing the call which highlighted Defendants' misleading representations regarding

"Generic Price Inflation," stating "***WAG has not seen any unusual activity***, ***but purchasing JV leaves it in better shape than peers to cope with generic price increases***."

182. The representation set forth in the paragraph above was materially false and/or misleading, omitted material facts, and was contradicted by adverse information and trends known to the Company. As alleged herein, contrary to Defendants' statement that they had not seen "any unusual activity" with respect to generic drug price inflation, Defendants knew that the Company was already tracking at least ***$1.5 to $2.1 billion*** below the FY16 EBIT Target due primarily to "unprecedented" and "systematic" generic drug price inflation that was both highly "unusual" and specifically known since 2013. Defendants also knew that the Company was unable to pass along these price increases to third party payers because Walgreens' unfavorable contracts did not provide for meaningful inflationary relief.

183. Defendants further concealed that, rather than being "in better shape than peers to cope with generic price increases," Walgreens' multi-year contracts presumed generic price deflation over the period, and did not include any protections for the Company in case the industry experienced generic price inflation during the term of the contract. Indeed, this placed the Company in a far ***worse*** position than its peers to cope with generic price increases.

184. Defendants likewise knew that the undisclosed "unprecedented" and "systematic" generic drug price inflation could not be counteracted by Walgreens' "purchasing JV" because any benefits from the JV would not kick in until FY15 and would only maintain the Company's current profit margins, given the negative effects of generic price inflation and Walgreens' unfavorable reimbursement contracts.

**E. June 24, 2014 Misstatements and Omissions**

185. On June 24, 2014, Defendants Walgreens and Miquelon issued a press release announcing the Company's financial results for the three months ending May 31, 2014 ("3Q14")

(the "June 24, 2014 Press Release"). Touting the growth of their pharmacy segment, the Company reported that it "***saw strong growth in prescriptions filled for Medicare Part D patients***, which increased 11.6 percent in the third quarter compared with last year's quarter, while ***the company's Part D market share increased*** 60 basis points in May compared with the same month a year ago."

186. The June 24, 2014 Press Release, further revealed that:

> ***[a]s a result of the many step two considerations and current business performance, the company is withdrawing its fiscal year 2016 goals that were previously announced in 2012***. ***Specifically, once key decisions have been made on the above matters, Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August***. At that time, the company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal year 2016.

187. On the same date, Defendants held a conference call to discuss the Company's 3Q14 financial results (the "June 24, 2014 Conference Call"). Defendant Wasson opened the call by announcing that, in 3Q14, the Company "continued to see improving top-line growth with increased daily living sales and strong performance in both prescriptions filled and our pharmacy market share." Wasson noted that the Company's positive performance was driven by "***deliberate strategic decisions to win with high-value seniors through preferred relationships with Medicare Part D plans***. . . ."

188. Turning to factors adversely affecting the industry, Wasson stated that Walgreens has "seen an increase in reimbursement pressure as well as a shift from historical patterns of deflation in generic drug cost to inflation," and, to address these concerns, the Company was "focused on [its] contracting strategy to account for increasing drug costs." Additionally, Wasson stated that, with the Company's "global procurement organization in Bern, Switzerland[,] ***we also are well positioned to offset the impact***" from generic price inflation.

189. Wasson concluded his prepared remarks reiterating that Walgreens was withdrawing its FY16 Earnings Targets. Wasson further explained:

> ***On our combined synergy goals I noted earlier, we are tracking ahead of that goal*** and we expect to exceed the $1 billion amount by the end of fiscal 2016. As noted above, ***some of the opportunities we are pursuing are below the operating income line on the income statement and decisions about those will be reflected in our new goals and metrics***.

190. Following Wasson's remarks, Miquelon addressed the Company's 3Q14 margins. Touting the Company's increased prescription sales, Miquelon noted that "***[t]his performance reflects the fundamentals of our underlying business, the ongoing progress in winning new Medicare Part D customers***, an increase of 90-day at Retail scripts and the return of Express Scripts customers."

191. With respect to the Company's margins, Miquelon noted that:

> ***Purchasing synergies in the pharmacy and front end did partially offset this margin pressure***. Front-end margin increased in the quarter benefiting from mix and promotional adjustments. ***And we still expect the rate of generic drug introductions to increase in the fourth quarter to the point that it should not be a drag on margin year over year***.

192. Additionally, Miquelon stated, "[t]he tough year-over-year generic impact margin comparison has continued to dissipate throughout fiscal year 2014 and expected to turn positive in the fourth quarter of 2014 given the increase in generic impact on pharmacy sales comps expected in that period." Like Wasson, Miquelon closed his prepared remarks by reiterating the Company's withdrawal of the FY16 Earnings Targets, stating:

> ***As a result of the many Step 2 considerations in current business performance we are withdrawing the fiscal year 2016 goals that were previously announced in 2012***. Once key decisions have been made on the above matters Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August. Many of the areas under consideration are interdependent and ***so we believe that the prudent course is to share the scope of our decisions and related financial objectives and metrics together all at that time.***

> In summary, our strategies remain sound in the fundamentals of our business in particular with respect to top-line growth has continued to strengthen. ***While we have gross profit reimbursement pressure in the traditional pharmacy, as mentioned, we also have significant opportunities to drive additional cost efficiency and also turn the front end of our business into a very meaningful profit pillar***.
>
> Our Alliance Boots and AmerisourceBergen partnerships also continue to go well. And we are beginning to move beyond the cost-only synergy phase to one where we are starting to share and exploit organizational capabilities to strengthen our core business and find new levers to create value for shareholders.

193. After their prepared remarks, Defendants responded to analysts questions regarding the withdrawal of the FY16 EBIT Target. For example, in response to a question from George Hill, a Deutsche Bank analyst, about "how far off [the original expected] range" the new EBIT target would be, Wasson responded that Walgreens was "working on a whole host of things to try to continue to drive value. . . . We are going to be looking at different goals and metrics both above the line and below the line."

194. Miquelon added to Wasson's response as follows:

> Yes, I think that's right. I think we are still aggressively driving all the [EBITDA] opportunities but as Greg said we have opportunities below the line as well in terms of how we think about structure, cap structure, refinancing and the like. And so we are making sure at this point in time that we look at everything interdependently as a web of choices and we maximize value as best we can.

195. Similarly, in response to the analyst's next question about reducing internal costs, Wasson stated that, Walgreens is "working on accelerating optimization efforts across the entire organization," noting that the Company had "***actually identified and actually realized a lot of opportunity currently***."

196. When asked by John Heinbockel, an analyst for Guggenheim Securities, about the Company's "big picture" with respect to profits, Wasson responded:

> . . . . I don't necessarily think that we should assume that the US business cannot continue to grow on profitability. I think the work that Alex and Mark and team are doing on the front end of the business we think we actually had tremendous

> opportunity to grow EBIT in operating margin on the front end of the business.
>
> We are beginning to get more confidence than just that. And I think that is obviously going to help us with the overall business. I think in the pharmacy business the good thing is that we are growing top line for the first time consistently in a long time with some of those strategic decisions I talked about.
>
> ***We are absolutely winning in the Part D space***. . . .
>
> We do have obviously the pharmacy margin pressure that we talked about. But I think Kermit and team and he can maybe allude to a little bit how we think we'll go at that.
>
> ***We think with our contracting strategy going forward with the generic inflation that we are seeing versus historical deflation we're going to start taking that into consideration in our contracting***. He is going at cost-of-fill reduction with a vengeance.
>
> And I think with Bern and Jeff Berkowitz and John out in Bern, ***we are positioned better than anyone to be able to get at cost***. As far as the cost opportunities, I think there is a little of both. I think that there is opportunity to get at cost, to your point, that's more maybe more cyclical.

197. In addition, regarding Defendants' proactivity with respect to the Company's declining profit margins, Ricky Goldwasser, a Morgan Stanley analyst, inquired, "just trying to understand what could've been done already versus the opportunity going forward." To this, Wasson responded:

> Now with that said, we also think that as we look at the current Walgreen business and opportunities, in addition with the merger of the two that there are going to be even greater opportunities and different ways of looking at that. So we are absolutely focused on the core business. We have made significant reductions.
>
> Some of that has been absorbed, as I said, because of the pressure on the margin. We are identifying additional opportunities and we are going to combine those with the opportunities we have at Step 2.

198. With respect to generic inflation, Steven Valiquette, an analyst for UBS, inquired as to *how much* of and *when* generic inflation impacted the Company's margins. Wasson responded by stating:

> ...I think certainly generic inflation kind of runs through a lot of this, meaning that it shows up in the contracts.
>
> Certainly we are thinking about deflation and ***now*** we are seeing some inflation. We are also just playing COGS. We are certainly doing everything we can do with Bern to offset that.
>
> But I think in the work of magnitude I think probably generic inflation is specifically and probably more important because ***we didn't quite anticipate it***. ***A lot of the other strategic decisions we certainly anticipated. We know exactly what our contract arrangements with some of the commercial plans are, we know what our Part D preferred physicians cost us as far as gross margin.***
>
> ***This was really snuck up on the industry and us***. And now I do think, as I said, ***I can't think of anyone that is better positioned than us to offset this because of what we are doing at Bern***. . . .

199. Kermit Crawford followed up on Wasson's response with additional commentary on the generic inflation element, adding "[***g]eneric inflation was higher than we expected compared to the normal deflation that we planned for*** and we saw the full impact of that in the third quarter versus the second quarter." *Id*. at 16.

200. Miquelon was subsequently asked by Goldman Sachs analyst, Robert Jones, whether any of the profit margin pressures indicated any unanticipated "structural change." In response, Miquelon stated that "***the thing that probably wasn't fully anticipated probably was just what we have seen in some inflation on drugs***."

201. Likewise, Wasson engaged in the following colloquy with Lisa Gill, analyst for J.P. Morgan:

> LISA GILL: And I know you have already talked a lot about the reimbursement buckets, etc., and around generics but the one thing that I am still a little bit confused about is just you should be one of the largest global generic purchasers.
>
> Is it that the timing of Bern hasn't kicked in yet? . . . Given the fact that you are already starting to see some of the synergies I am just trying to understand what is happening around procurement and the timing aspect of how you are buying from Bern.

> DEFENDANT WASSON: ...I wouldn't say that it's been delayed. I think Bern we are pleased with and we are out of the gates pretty quickly and on track.
>
> ***I think it's those subset of molecules that have kind of popped up in this inflationary environment that we are caught the entire industry, I think, a little off guard. I would say ourselves as well***.
>
> We are now all over it with the combined Walgreen team and Bern team focused on those molecules. I do think that -- and there's a lot of moving parts there as Wade alluded to earlier. There's the cost increase, the corresponding AWP is not keeping up with the cost increase.
>
> There's a whole lot of things that we are looking at. But I will say back to the structural issue, I think the good thing is we are aware of it, we are on it. We know how to go at it and I think we are as well positioned as anyone to get after it.
>
> ***But it was something that we didn't expect***. We're working through it and I think we are well positioned to cover it and correct for it.

202. Near the end of the call, Edward Kelly, analyst for Credit Suisse asked whether Defendants were "optimistic that the below-the-line considerations may potentially offset the shortfall on the [2016] EBIT, or even more than offset the shortfall on the [2016] EBIT." In response, Wasson stated:

> I'm hesitant to go there. I think, as I said, we just have too many moving parts right now that we are working through. ***There is potential, obviously, and that's what we are looking through from all of those how they come together***.

203. Miquelon echoed Wasson's response, stating, "Yes, ***there's a lot of opportunity*** but I think the key is making the right choices so they all interplay with each other for the best long-term value creation for shareholders. And we are looking at everything."

204. Defendants' attempt to downplay the withdrawal of FY16 Earnings Targets and their continued concealment of the magnitude of the FY16 EBIT shortfall ($2+ billion from the high-end of the range) while bundling it with positive news had the intended effect. J.P. Morgan, for instance, noted that only "***[a] slight reduction*** in combined 2016 guidance is expected" and

that analyst surveys were expecting, on average, a new target of $8.65 billion. J.P. Morgan Analyst Report, Jul. 17, 2014, at 1-2. J.P. Morgan also parroted Defendants' positive statements, stating that "[m]anagement plans to take additional action to offset ongoing gross margin pressure" and "[m]anagement believes it is very well positioned to offset the margin pressure" (citing numerous purported mitigating steps planned by the Company). J.P. Morgan Analyst Report, Jun. 25, 2014, at 2. Cowen & Co. observed that "the bogey is probably $8-$8.5B in operating profit (we estimate $8B in FY16). Anything north of $8.5B will be viewed very favorably and ***anything less than $8B will raise further concerns***." Cowen & Co. Analyst Report, Aug. 5, 2014, at 2.

205. On the same day as the conference call, Guggenheim reported that "[i]n light of the many longer-term benefits of the merger, including additional acquisition activity, well over $1B in annual synergies, a tax rate that could fall well below 30%, and, most importantly, exposure to emerging growth markets, this withdrawal does not particularly bother us." Likewise, Deutsche Bank reported that their "F2016 adjusted operating income forecast is $8.2 billion" but they believed that "the midpoint of the revised guidance ***will likely be above our current forecast***, especially if procurement synergies continue to run ahead of expectations and the operating expense synergy target is detailed." Deutsche Bank Analyst Report, Jul. 22, 2014, at 13.

206. On June 25, 2014, Barclays observed that "some of these pressures should have been anticipated" and noted that "over the ***past 24-36 months*** [*i.e.*, July 2011 and 2012], MediSpan data has shown a consistent increase in the number and dollar value of generic products experiencing price increases, independent of input shortages." Thus, Barclays

concluded, "[w]e find it somewhat surprising that Walgreens had not anticipated there increases and had not taken steps to help offset the pressures, perhaps by negotiating pre-emptively."

207. The statements set forth above in ¶¶185-203 were materially false and/or misleading, omitted material facts, and was contradicted by adverse information and trends known to the Company. Contrary to Defendants representations, Walgreens did not withdraw the FY16 EBIT Target as a result of the "many Step 2 considerations," but rather because they knew the projections had no reasonable basis in fact, and instead were (i) concealing the true reasons for the shortfall (generic inflation and their contractual limitations) and (ii) deliberately manipulating the timing and content of the disclosure of adverse facts in an effort to blunt the impact of the negative news. In fact, Defendants' knowledge of the massive shortfall was the primary impetus to accelerate the "Step 2 considerations," so as to bundle the "good" news of the acceleration with the "bad" news of the decision to withdraw the FY16 EBIT Target.

208. The above statements were materially false and misleading when made. Defendants misled investors as to the size of the FY16 EBIT shortfall by merely referring to it as "some softness" and then asserting that (i) Alliance Boots was purportedly "winning against the rest of the market" and doing things to "offset" its portion of the FY16 EBIT shortfall, and (ii) Walgreens had "tremendous opportunity to grow EBIT" in the U.S.-side of the business. In reality, Defendants had known since "late 2013" that the EBIT shortfall was $500 to $600 million on the low-end and $1 billion on the high-end of the FY16 EBIT Target. They also knew that "in excess of $1 billion" in additional risk accumulated between late 2013 and April 9, 2014, for a total shortfall of $1.6 to $2.1 billion below the FY16 EBIT Target. Moreover, Defendants knew or recklessly disregarded that Walgreens had already determined Walgreens was tracking toward a FY16 EBIT of approximately ***$7.2 to $7.5 billion***, an astonishing ***$1.8 to $2.3 billion***

below the FY16 EBIT Target, despite other purported "opportunities" and Alliance Boots synergies.

209. In fact, Defendants had no reasonable basis to believe and did not in fact believe that there was obvious "potential" to make up the undisclosed EBIT shortfall or that they were "well positioned" to offset the miss, as the shortfall was actually $2 to $2.3 billion below the top-end of the FY16 range provided to investors. Moreover, by touting the Company's synergies and other "opportunities," Defendants misled investors to believe that the shortfall would not be far off from the original $9-$9.5 billion Target. Likewise, statements concerning these opportunities as well as overall positive statements concerning the Company's efforts to cut costs were materially misleading because Defendants failed to disclose both the effect of generic inflation on the Company's margins and the fact that these opportunities and positive results were insufficient to counteract a massive FY16 EBIT shortfall.

210. Additionally, Defendants' representations that the generic drug price inflation issue was "unanticipated" or "unexpected," were blatantly false. As set forth above in ¶¶107, the Company had already identified the generic drug inflation trend as "unprecedented" in late 2013 and knew that it was the primary source of the $500 million to $1.1 billion shortfall known at that time. Defendants also knew that the inflation had clearly become "systematic" by March 2014.

211. Indeed, contrary to Defendants' statements that their procurement synergies were "well positioned to offset the impact" of generic price inflation and that "we are positioned better than anyone to be able to get at cost," Defendants knew that the ABC Distribution Agreement would not benefit the Company's margins until FY15 and then would only be sufficient to maintain these margins at the current rate given Walgreens inability to pass on the increased

price for generics to third party payers.

212. Further, Defendants' overwhelmingly positive remarks concerning the Company's growing Medicare Part D business were materially misleading because Defendants failed to disclose the fact that in order to garner increased Medicare Part D market share, Walgreens had agreed to lower co-pays and reimbursements than typically agreed to by preferred pharmacies.

**F. Defendants Failed to Comply With Item 303 of Regulation S-K By Failing to Disclose Material Known Trends in 2Q14 Form 10-Q**

213. SEC Regulation S-K requires that every Form 10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K. The SEC describes the purposes of MD&A in Financial Reporting Release 36 ("FRR 36"):

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

This requirement was reaffirmed in SEC Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, (Dec. 1999).

214. Item 303 of SEC Regulation S-K together with SEC Staff Accounting Bulletin No. 101 required Defendants to disclose in the MD&A section of its quarterly filings:

> any known ***trends or uncertainties*** that ***have had*** or that the registrant ***reasonably expects will have*** a material favorable or unfavorable impact on net sales or revenues or ***income*** from continuing operations. If the registrant knows of events that will cause ***a material change in the relationship between costs and revenues*** (such as ***known future increases in costs of…materials or price increases*** or inventory adjustments), the change in the relationship ***shall be disclosed***.

17 C.F.R. § 229.303 ("Regulation S-K" and/or "Item 303").

215. The SEC has clarified what constitutes a "trend" that gives rise to Item 303's duty to disclose:

> [R]equired disclosure regarding the future impact of presently known trends, events or uncertainties…may involve some prediction or projection. The distinction between the two rests with the nature of the prediction required. Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: [a] reduction in the registrant's product prices; erosion in the registrant's market share…or the likely non-renewal of a material contract.

*See* SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Release No. 33-6835 (May 18, 1989).

216. The 2Q14 Form 10-Q omitted material information regarding material trends and uncertainties that Defendants were required to disclose pursuant to Regulation S-K, Item 303. Thus, Defendants knowingly and/or recklessly failed to comply with Regulation S-K by failing to disclose that, prior to the issuance of the 2Q14 Form 10-Q, the Company was already (i) experiencing an "***unprecedented*** level of inflation in the price of generic drugs" which had "***systematically*** reverted to an inflationary trend"; and (ii) experiencing significant reimbursement pressure because its third party contracts presumed a *deflationary* trend in generic drug prices and did not include provisions to protect the Company from systematic inflation. As a result of these material, undisclosed adverse trends, Walgreens already had identified an FY16 EBIT shortfall of $500 to $600 million, which was over $1 billion below the high-end of the FY16 EBIT Target, and between late 2013 and April 9, 2014, and had accumulated "well in excess of $1 billion" in additional risk to the FY16 EBIT Target.

217. In light of Defendants' extensive knowledge of the foregoing, Defendants had a

duty to disclose the currently known pervasive, adverse industry trends in the 2Q14 Form 10-Q. Indeed, fluctuating "product prices" (*i.e.*, generic inflation) is explicitly enumerated by the SEC as a paradigmatic example of trends that registrants are *required* to disclose pursuant to Item 303. *See* SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures. Therefore, in light of the foregoing, in addition to the facts alleged in detail in Sections IV and V, *supra*, Defendants failed to comply with Regulation S-K by omitting these trends, events, transactions, commitments or uncertainties that were known to Defendants and were reasonably likely to have a material effect on the registrant's financial condition or results of operations.

## VI. THE RELEVANT TRUTH EMERGES

218. On August 5, 2014, SkyNews published an article titled, "Walgreens Shuns Inversion in £5bn Boots Deal," wherein it reported "exclusively" that Walgreens would not be re-domiciling to a country with a lower corporate tax rate—a so-called "tax inversion"—as part of its merger with Alliance Boots. *The Wall Street Journal* published an article on the same day stating: "Walgreen shares fell more than 4% to $69.12 after Sky News reported an inversion wouldn't be part of the acquisition. The stock was up 89 cents in after-hours trading."

219. At 6:00 a.m. EDT the following morning, before the market opened, Walgreens issued a press release (the "August 6, 2014 Press Release") and held a related conference call at 8:00 a.m. EDT (the "August 6, 2014 Conference Call"). Following six pages of positive news regarding the acceleration of Step 2 of the merger, the August 6, 2014 Press Release ultimately disclosed that Walgreens' new FY16 EPS target was within a range of $4.25 to $4.60. During the August 6, 2014 Conference Call, Defendants similarly confirmed that original FY16 EBIT Target of $9 to $9.5 billion was unattainable and the true target had a "***range with a midpoint around $7.2 billion***."

220. In response to the adverse news, Walgreens stock plummeted over 14% in a single day—from a close of $69.12 per share on August 5, 2014, to $59.21 on August 6, 2014, on extraordinary trading volume of over 84 million shares. Analysts' reaction was swift and severe. During the August 6, 2014 Conference Call, virtually every analyst question sought clarity as to the revised FY16 EBIT Target of $7.5 billion, calling the EBIT shortfall "basically a negative revision of more than 20%" and noting that it was "quite a bit lower than the previous range." Another analyst on the call flatly stated that it was "pretty shocking that there is such a limited visibility and control over the business."

221. On the same day, UBS Research issued a report entitled "The Final Answer on 'The Decision' Unexpectedly Includes Base Business Talkdown," confirming that the significant unexpected news was the FY16 shortfall:

> [E]verything that is being communicated by WAG mgmt. today would have been acceptable by investors relative to yesterday's closing stock price except for one variable: ***the new FY16 EPS guidance...the unfortunate news today is that the standalone WAG profit run rates are unexpectedly being revised down, which we believe is why the stock is witnessing a sharp negative reaction today***.

222. After the call, additional analysts issued the following reports:

- In an August 6, 2014, report, Credit Suisse, stated, "After more than a year of positive investor meetings and earnings calls where management hinted at the large potential of a combined WAG/AB, management ***shocked*** investors when its ***new fiscal '16 targets fell well short of elevated expectations and prior guidance***. Fiscal '16 EBIT is now expected to be almost 20% lower than the guidance provided when the deal was initially announced (despite a new cost savings program of $1 billion by fiscal '17 and higher synergies) and ***the new EPS target of $4.25- 4.60 fell well short of the market's expectation (we believe many investors were thinking $6***+). Organic EBIT is expected to be essentially flat over the next few years for the combined entity. In addition, the much anticipated tax inversion strategy was ruled out as an option and the new $3 billion share repurchase also fell short of what many thought possible. While the company primarily blamed unexpected reimbursement rate pressure and drug inflation, ***it seems clear that there are deeper issues and that the company mismanaged investor expectations***. We have lowered our target price to $57 (discounting back a low-to-mid teens multiple on fiscal '16 earnings) and continue to recommend investors avoid the stock.

- In an August 6, 2014, report, Deutsche Bank described the new guidance "***at best could be considered extremely disappointing***" as it was "***a far cry***" from the original guidance, which "would imply an earnings erosion at the underlying business that we are at a loss to explain."

- Susquehanna issued a report on August 11, 2014, concluding that the new targets were "***outrageous***," and reported that "Walgreen's updated initial FY16 guidance for the combined company ***proved exceptionally disappointing and*** reflected ***roughly a 30% reduction in the core, underlying business*** prior to adjusting for new, incremental cost reduction opportunities." The report further noted that "[***t]he magnitude of revision and the short duration over which it materialized are purely astounding***, in our view, and while two executive level managers appear to have lost their jobs as a result, we believe it is not unreasonable to believe further aggressive changes need to be made. ***We are concerned the dysfunction may have run deeper than suspected***.

223. Additionally, Cowen & Co. observed in an August 7, 2014, report that Defendants had had enough information to disclose and manage the issues:

> Management's focus on the call around increased reimbursement pressures and generic inflation ***is a bit confusing to us, given this is not a new issue and shouldn't come as such a surprise.*** We speculate the real issue is likely the fact that in WAG's attempt to gain market share in Part D it priced aggressively to get into preferred Part D retail networks (narrow networks) under the assumption its acquisition cost for generics would be declining to offset the aggressive pricing. But when faced with some generic inflation, the company was probably left with little room to maneuver since acquisition costs are largely based on spot pricing, while reimbursement from network contracts are locked in for around three years.
>
> * * *
>
> In our discussions with other pharma supply chain companies, it was noted that ***everyone has known about the issues of generic inflation, though overall the environment was deflationary, and the issues with Medicare Part D network contracts. We note other players in the space have been able to more than compensate for these issues***.

Cowen further noted that "management should have been correcting questioners and been clearer what was assumed in the FY16 target."

## VII. RELEVANT POST-CLASS PERIOD DEVELOPMENTS

### A. Wasson and Pessina Attempt to Scapegoat Miquelon and Continue to Mislead Investors About the Reasons for the $2+ Billion Shortfall

224. Between August 5, 2014 and August 8, 2014, Defendants Wasson and Pessina went on a "road show," meeting with "approximately twelve major investor groups." Miquelon Complaint, ¶¶121. During these "road show" meetings, Defendant Wasson and Pessina blamed Miquelon for the $1.8 to $2.3 billion shortfall in the FY16 EBIT Target, citing bad forecasting, lax controls within Miquelon's finance department, and poor communication between the finance department and the pharmacy department led by Crawford, who had announced his decision to retire from the Company in July 2014.

225. On August 19 and September 30, 2014, *The Wall Street Journal* published articles on its website which relied on confidential sources and unnamed Walgreens directors and investors. The articles reiterated the story Wasson and Pessina told investors during the road show meetings two weeks earlier, and reported that Miquelon was "pressured to leave" and that Miquelon and Crawford had both been forced to resign, due to a "billion-dollar forecasting error" that "shock[ed] the Board."

226. Though the article presented Wasson's and Pessina's version of the events leading to the $1.8 to $2.3 billion shortfall in the FY16 EBIT Target, notably, the author was skeptical of Wasson and Pessina's claim that Walgreens had been surprised by generic price inflation. Indeed, the article reported that Walgreens' "major rival - CVS Caremark Corp.'s retail arm - ***said price increases on generic drugs weren't unexpected***. CVS didn't indicate any effect on earnings or forecasts from such changes."

227. On October 16, 2014, based on the alleged falsity of the foregoing articles, Defendant Miquelon sued Walgreens for defamation and other claims in the Circuit Court of

Cook County, Chancery Division (the Miquelon Complaint). As set forth above, Miquelon admitted facts concerning the Company's and Wasson's knowledge of FY16 EBIT shortfalls and pressure on Walgreens due to generic price inflation and inflexible reimbursement contracts. *See, e.g.*, ¶¶107, 126-127, 130-131, 136, *supra*. Walgreens immediately moved to seal the Miquelon Complaint, asserting that it purportedly contained "confidential" information. In his brief opposing the redaction of the Miquelon Complaint, Miquelon asserted that "***[p]otential violations of securities laws are not confidential information.***" Plaintiff's Opposition To Defendant Walgreen Co.'s Emergency Motion For Protective Order And To Partially Seal Plaintiff's Complaint at 7, *Miquelon v. Walgreen Co*., No. 14-CH-16825 (Cir. Ct. Cook Co. Oct. 21, 2014).

**B. Defendants Admit Reimbursement Contracts Were Insufficient to Protect the Company From Generic Price Inflation During the Class Period**

228. On August 22, 2014, Barclays issued a report noting that Walgreens "has said it will try to renegotiate reimbursement contracts, ***since the existing ones do not have the language that adequately protects them form the current conditions*** [generic price inflation]." One month later, on September 22, 2014, Barclays issued a second report, lowering its target price for Walgreens common stock by $24 or 26% to $68 per share, based on a thorough analysis of the Company's August 6 disclosures, as well as additional information Walgreens provided to Barclays after the end of the Class Period. Barclays based its analysis of the FY16 EBIT shortfall on Walgreens' breakdown of the miss (as reported to Barclays), as follows: "75% of the total decline or $1.875 billion was due to the pharmacy business, of which two-thirds of the decline or $1.250 billion was due to 'reimbursement pressures' and the remaining one-third of the decline or $625 million was due to "Part D contracting accounts."

229. With respect to Defendants' explanation concerning the failure to factor in generic price inflation into the FY16 EBIT Target prior to June 2014, Barclays stated, "[i]t is putting it lightly to say that we are extremely surprised that Walgreens, who up until this year contracted directly with manufacturers, could fail to recognize such a fundamental and widely discussed change in the market environment as the move from deflation to inflation." Barclays further noted that it found "it highly surprising that management was not aware of the underlying inflationary trend, and we cannot point to a single factor that would have caused them to wake up to this trend in June or July of 2014."

230. Thereafter, Walgreens issued its 4Q14 results on September 30, 2014. During a same-day conference call, Defendant Wasson admitted that "[i]n the fourth quarter, [Walgreens] continued to face headwinds to our pharmacy margin from ongoing pressure from reimbursement and generic drug inflation." According to Wasson, the Company was "address[ing] the pressure on [its] pharmacy margin" by focusing on a "contracting strategy to evolve our payer contracts to the realities of an inflationary versus deflationary market."

231. During the same call, the Company's newly appointed CFO, Tim McLevish stated, in relevant part:

> The primary drivers for the pharmacy margin decrease were ***increased third-party reimbursement pressure***, partly due to contract step-downs; increased Medicare Part D business mix . . . ; ***pronounced generic drug inflation*** on a subset of generic drugs; and the mix of specialty drugs.
>
> * * *
>
> Let me say a few additional words about generic drug inflation. The dynamics under which generic drug and manufacturers can avail themselves of pricing actions has not changed. They're able to raise prices when demand outpaces supply. These drug supplies can be impacted by a number of mechanisms, including regulatory actions by the FDA, resulting in the shutdowns of both API and finished dosage floor manufacturing plants; generic drug manufacturer consolidation and portfolio harmonization; API manufacturer consolidation; and

> FDA backlog on approvals; as well as a shrinking pipeline of first-to-market generic blockbuster launches.
>
> ***Our current environment is experiencing all of these mechanisms***, and as a result, the average inflation in our basket of generic drugs is mid-single digit, as measured on a comparable drug price basis. This change is caused by very large price increases in a small percent of molecules. Because these supply constraints and other factors are continuing, we expect that generic drug inflation will be with us for a while.
>
> In the meantime, we are working diligently to minimize the impact of this inflation by . . . ***evolving our payer contracts to reflect the realities of an inflationary versus a deflationary market***…

232. Jeff Berkowitz, Co-President of Walgreens Boots Alliance Development further admitted that, "as the generic inflation dynamic has unfolded over the course of the past 12 months [*i.e.*, September 2013], we have been developing contracting strategies to adjust it more proactively. ***We started to incorporate*** protections into our agreements that adjusted the inflation dynamic that we're seeing."

233. After the call, several analysts issued reports highlighting the Company's admissions concerning the inflexibility and short-sightedness of its reimbursement contracts. On September 30, 2014, BB&T Capital Markets issued a report stating, "Walgreen's commercial contracts, which typically have two to three year terms, ***have been based on assumed generic drug deflation***." The following day, Barclays issued a report providing further analysis:

> Walgreens is attempting to move multi-year contracts negotiated based on deflationary assumptions to market reimbursement rates and seeking to adjust terms to include mechanisms that protect the company against inflationary pressures. We believe that the majority of such contracts run for an average of 2-3 years and that the agreements with Express Scripts, Caremark and Optum will renew as we progress through 2015 (our model assumes 60% of Walgreen's book is contracted based on -2% deflation and that 33% of the book renews prior to FY16). While Walgreens believes its new pricing strategy will minimize the impact of inflation moving forward, ***the company does not expect to recapture profits lost under contracts that assumed deflation***.

On October 1, 2014, SunTrust Robinson Humphrey noted that "WAG has been adding protective verbiage in its contracts, as they come up for renewal, to help combat the generic inflation. However, ***we note that this process will take some time (possibly 3 years)***."

**C. Walgreens Becomes Walgreens Boots Alliance**

234. On August 6, 2014, Walgreens announced that it was exercising its option to purchase the remaining 55% of Alliance Boots, thereby completely Step 2 of the Walgreens-Alliance Boots Transaction. As originally contemplated, the Company had six months starting in February 2015 to consider whether to complete Step 2 of the merger (the "Option Period").

235. During a Walgreens' Board meeting on July 9, 2014, the Company's management recommended accelerating the Option Period so that Walgreens could recognize "the benefits of completing the transaction as quickly as possible," including, *inter alia*, "allowing synergy pull-forward and strategic flexibility to respond more quickly to industry developments" and "removing uncertainty in the investor and analyst community." Defendants held further conversations about acceleration of the Option Period with the Walgreens' Board on July 21, 2014. One week later, on July 28, 2014, Walgreens received the first draft of an amendment to the merger agreement, which provided for acceleration of the Option Period to August 2014, and simultaneously exercised the option to purchase the remaining outstanding shares of Alliance Boots.

236. One week later (and one day after Miquelon's resignation was announced), Wasson informed the Board that Walgreens had completed negotiations with Alliance Boots and formally presented the agreement to accelerate the Option Period and simultaneously execute Step 2 of the merger. The Board unanimously approved the agreement, allowing Walgreens to announce the accelerated completion of the Walgreens-Alliance Boots Transaction the next day, August 6, 2014.

237. One month later, on September 8, 2014, Walgreens announced that activist investor, Jana Partners, would receive two seats on the Company's Board. During the Class Period, Jana had been a vocal proponent of executing a tax inversion and re-domiciling Walgreens to Switzerland.

238. On September 16, 2014, the Company filed a registration statement on SEC Form S-4 related to Step 2 of the merger with Alliance Boots. Walgreens subsequently filed amended registration statements with the SEC on Form S-4/A on October 29, 2014 and November 11, 2014, and a prospectus supplement on Form 424B3 on November 24, 2014, which went effective the same day.

239. Despite its prior statements that Wasson would remain the CEO following Step 2 of the Alliance Boots merger, December 10, 2014, the Company issued a press release announcing Wasson's immediate resignation, and the appointment of Pessina as the acting CEO.

240. Walgreens' shareholders voted to approve Step 2 of the merger on December 29, 2014, which effectively led to Walgreens' acquisition of the remaining 55% of KKR and Pessina-owned Alliance Boots. As a result, Pessina's ownership of Walgreens increased from 8% to 15-20% of the combined company (a gain of $9-$12 billion), and KKR tripled its initial 2007 LBO investment in Alliance Boots to roughly $7 billion.

241. On July 9, 2015, Walgreens Boots Alliance named Pessina permanent CEO.

## VIII. <u>ADDITIONAL FACTS PROBATIVE OF SCIENTER</u>

242. As alleged in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants Walgreens, Wasson, and Miquelon knew or recklessly disregarded that the statements identified above were materially false and misleading when made and/or omitted material facts necessary to make those statements not misleading.

243. Defendants Walgreens, Wasson, and Miquelon acted with scienter in that they: (i)

knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading when made and omitted material facts; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in, and had ultimate authority for, the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. Defendants Walgreens, Wasson, and Miquelon, by virtue of their knowledge and receipt of information reflecting the true facts regarding, *inter alia*, the FY16 EBIT shortfall, the materially adverse effect of generic price inflation and reimbursement pressure on the Company and its current and future profit margins, and their control over, and receipt or modification of, Defendants' materially false and misleading statements and omissions, actively participated in the fraudulent course of conduct alleged herein.

### A. Defendants' Senior-Level Positions, Responsibilities, and Access to Adverse Information Concerning the FY16 EBIT Target, Generic Inflation and the Company's Reimbursement Contracts Support a Strong Inference of Scienter

244. At all relevant times, Wasson and Miquelon were Walgreens' CEO and CFO, respectively—the most senior officers at the Company with ultimate responsibility for directing and managing the Company's financial performance, public statements, and business affairs. In these roles, Defendants Wasson and Miquelon were required not only to keep themselves informed of the Company's day-to-day business and operations, but also to keep Walgreens' non-management directors apprised of the state of the Company's business and operations, including the status of the FY16 EBIT Target, and the effects of generic price inflation and inflexible, unfavorable reimbursement contracts on Walgreens and its progress toward meeting the FY16 EBIT Target. To that end, Miquelon has acknowledged that both he and Wasson

participated in setting, monitoring, and updating the FY16 EBIT Target and were "intimately involved" in a related LRP process. *See, e.g.*, ¶¶107, 126-127, 130-131, 136, 138-139, *supra*. Miquelon admitted that he worked "hand in hand" with Wasson in developing the FY16 financial targets. Miquelon Complaint, ¶9.

245. Because of their high-level positions at Walgreens, Wasson and Miquelon controlled the contents of, and had ultimate authority over, the Company's public statements and omissions during the Class Period. Each was provided with, or had access to, copies of the documents or were aware of oral statements alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

246. Because of their respective positions and access to material non-public information concerning the Company, each knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and deceptively inaccurate. As a result, Defendants Wasson and Miquelon had ultimate authority for the accuracy of Walgreens' corporate statements, and are therefore responsible and liable for the representations contained therein or omitted therefrom.

247. Additionally, prior to and during the Class Period, Defendants Wasson and Miquelon repeatedly held themselves out to investors and the market as the persons most knowledgeable about Walgreens' financial condition, earnings performance and business operations. In particular, with respect to the FY16 EBIT Target, which, as set forth above in Sections IV.D and E, was extremely material to investors' understanding and appreciation of the benefits of the Walgreens-Alliance Boots Transaction and the future earnings growth of the

Company, Defendants repeatedly assured investors that they were monitoring Walgreens' EBIT progress and would timely and accurately report any changes to the FY16 EBIT Target.

248. Despite these reassurances, Defendants Wasson and Miquelon, among others, actively tracked the EBIT shortfall and therefore knew or were deliberately reckless in not knowing the amount and nature of the EBIT shortfall each time they chose to speak about, and reaffirmed, the FY16 EBIT Target before and during the Class Period.

249. Additionally, Berkowitz (Walgreens) and Donovan (Alliance Boots), the persons directly responsible for generic drug procurement and co-Presidents of Walgreens' joint venture with Alliance Boots, reported directly to Wasson. Likewise, the individual responsible for all third party payer reimbursement contracts, Crawford, also reported directly to Wasson. According to Miquelon, Wasson had "significant involvement" in Walgreens' Medicare Part D negotiations, which were led by Crawford. As a result, Wasson knew by late April/early May that these negotiations "were not going well." Miquelon Complaint, ¶78. Further on at least one occasion during the Class Period, Berkowitz and Donovan, as well as the Senior Vice President of Pricing and Contracting (who reported to Crawford), gave detailed presentations to Wasson and Miquelon, among others, concerning "inflation and pricing trends in the generic drug market" and "third party reimbursement trends," respectively. Miquelon Complaint, ¶75.

250. Moreover, given that sale of branded and generic drugs represented upwards of 60% of the Company's total sales, and of these sales, virtually 100% were subject to a third party payer contract which set the total reimbursement Walgreens could receive, Defendants Wasson and Miquelon knew, or were deliberately reckless in not knowing, the material adverse trends or facts impacting those critical areas of Walgreens' business, including: (i) the terms of these agreements, including, *e.g.*, that they assumed a ***deflationary*** generic price trend and contained

no protections for Walgreens during periods of generic price inflation; (ii) the effect of these terms on Walgreens' profit margins, including the impact of Medicare Part D contracts, which represented upwards of 25% of Walgreens' total prescriptions, and provided for discounted co-pays and even lower levels of reimbursement; and (iii) any efforts to negotiate new or additional contracts or terms allowing for additional reimbursement.

**B. Wasson's Actions Created a Deliberately Reckless "Tone at the Top"**

251. The "tone at the top" is a key concept for determining whether a company has a control environment sufficient to prevent fraudulent acts. Indeed, according to an October 1987 report by the Treadway Commission, an entity responsible for the advent of the standards underlying the certifications signed and issued by every CEO and CFO pursuant to the Sarbanes-Oxley Act of 2002, "[t]he tone set by top management—the corporate environment or culture within which financial reporting occurs—is the most important factor contributing to the integrity of the financial reporting process. Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur."

252. Here, the "tone" coming from the "top," *i.e.*, Walgreens' highest ranking officer (Wasson), was one of a self-interested executive who encouraged deliberate earnings management and pressured others to attain targets not supported by evidence, with little consideration as to whether these targets were achievable or in the best interests of the Company.

253. Wasson's Reckless Self-interest. While the Company publicly pitched the Walgreens-Alliance Boots Transaction as transformative, Wasson was concerned that he would lose control of the Company he had helmed since 2008. Seeking to recover from the Express Scripts debacle in 2012, which saw analysts and investors alike question his ability to run Walgreens, Wasson desperately needed to demonstrate success with the Walgreens Alliance

Boots Transaction, in order to convince investors that he should remain CEO of the combined company. As a result, Wasson engaged in deliberately reckless acts regarding critical issues out of fear of losing his job.

254. For example, Miquelon confirmed that during the spring of 2014, "activist" investors such as JANA Partners were privately demanding Walgreens complete a tax inversion as part of the Walgreens-Alliance Boots Transaction to lower the Company's effective tax rate. Despite the fact that the tax inversion, as proposed by Alliance Boots, did not meet the Internal Revenue Service requirements and provided little financial benefit compared to the risks and public/regulatory scrutiny inherent in the plan, Wasson confided in him in May 2014, "in substance, that Wasson was convinced that Walgreens must proceed with a tax inversion and that, if it did not, Wasson would be unable to keep his job," and again in June 2014, that Wasson "believed that an inversion was in the best interests of the Company because it was the only way he could keep his job." According to Miquelon, "Wasson privately pressured Miquelon to agree" to a tax inversion. Miquelon Complaint, ¶¶94-98.

255. <u>Wasson Recklessly Pressured Others To Reach Targets He Knew to Be Impossible</u>. As set forth in ¶¶138-140, Wasson deliberately pressured Miquelon and others to meet financial targets that were knowingly unachievable based on the Company's financial results to date and its multi-billion FY16 EBIT shortfall identified prior to the Class Period. For example, Miquelon has admitted that he was pressured to raise the EPS target for the combined company during the Class Period. According to Miquelon, and as alleged herein, "Wasson told Miquelon on many occasions: 'I need a 6, get me a 6,'" meaning $6.00 in EPS, "despite the lower figure Miquelon had determined was best supported by the evidence and plans." Miquelon Complaint, ¶104. On one occasion, when Miquelon responded to these pressures that getting

even $5.00 in EPS would be a "miracle," Wasson told Miquelon, "No choice. Need a 6. We'll find a way." Miquelon Complaint, Ex. 14. Notably, as discussed above, $6.00 in EPS was equivalent to $9.7 billion in EBIT, or $200 million more than the high end of the FY 16 EBIT Target, at a time when the Company had a $1.8 to $2.3 billion EBIT shortfall for FY16. Wasson recklessly disregarded known facts and pushed for this target despite his actual knowledge of a multi-billion shortfall in FY16 EBIT, "unprecedented" and "systematic" generic drug inflation and problematic reimbursement contracts.

256. Condoned Deceptive "Bundling" Tactics. In early June 2014, when Miquelon raised the prospect of publicly withdrawing the FY16 EBIT Target and replacing it with a new range of $7.2 to $7.5 billion during the upcoming June 24, 2014 Conference Call, Wasson proposed delaying the call two weeks so that Walgreens could proactively "bundle" negative news (withdrawing the FY16 EBIT Target) with positive developments in Step 2 of the merger, including, the potential that the Company might complete a tax inversion. When Miquelon and the Chairwoman of the Audit Committee, Janice Babiak, pushed back, Wasson was dismissive, ordering Miquelon to "***tell Jan[ice Babiak] what we are doing***." Miquelon Complaint, ¶¶83-85. While Wasson's reckless directives were not fully adopted, as the Company maintained the June 24 date and withdrew the FY16 targets, his "bundling" scheme was a success—Defendants concealed and delayed the known $1.8 to $2.3 billion EBIT shortfall until more than one month later, at which time they misleadingly "bundled" it with a 6-page press release of positive news about Step 2 pf the Walgreens-Alliance Boots Transaction.

### C. Suspiciously Timed Resignations Support a Strong Inference of Scienter

257. Abrupt resignations and terminations of key insiders also support a strong inference of scienter. Here, all of the executives responsible for the FY16 EBIT Target and the Company's unfavorable reimbursement contracts, including Wasson and Miquelon, abruptly

resigned, leaving the leadership of the combined company to former Boots Alliance CEO and major investor, Pessina.

258. Defendant Miquelon. According to his complaint, Miquelon informed Wasson of his decision to retire as Walgreens CFO on May 30, 2014, approximately two months after he had identified an additional EBIT shortfall "well in excess of $1 billion" for FY16, and around the same time that Miquelon and his team confirmed that the FY16 EBIT Target was tracking $1.8 to $2.3 billion below target. Miquelon was slated to remain at Walgreens in some capacity for approximately 18 months to see the Company through Step 2 of the merger. However, after losing the backing of Wasson during a particularly aggressive meeting with activist investors on June 24, Miquelon sought to speed up the process, pushing the announcement of his retirement to August 4, 2014—two days before the new FY16 EBIT Target was revealed.

259. Defendant Wasson. Despite his efforts to appease activist investors and Walgreens shareholders, on December 10, 2014, a few weeks before the close of the merger, Walgreens announced Wasson's retirement after 35 years with the Company and six years as CEO, and that it had appointed Pessina as acting CEO. This represented an abrupt reversal from Walgreens' August 2014 representation that Wasson would be named CEO of Walgreens Boots Alliance. Press reports cited "company insiders" as saying that "a powerful group of institutional investors . . . would not approve the Walgreen-Boots union until Wasson was gone." Brigid Sweeney, "How Greg Wasson Lost Control of Walgreen," CRAIN'S CHICAGO BUSINESS, Dec. 11, 2014, at 2.

260. Other Executives and Key Employees. Crawford, who was responsible for all of Walgreens' reimbursement contracts, among other things, announced his retirement from Walgreens in July 2014. After the merger with Alliance Boots, Crawford's position was taken

over by executive Richard Ashworth. On or about November 30, 2014, Hans, Walgreens' Director of Investor Relations, internally announced his retirement from Walgreens. In a January 16, 2015 Press Release, the newly merged company announced that Thomas Sabatino, Walgreens' general counsel, had also retired.

### D. Defendant Miquelon's Judicial Admissions Support a Strong Inference of Scienter

261. As set forth herein, the Miquelon Complaint contains numerous judicial admissions by Defendant Miquelon concerning his and the Company's knowledge or deliberately reckless disregard of material undisclosed information, which rendered Defendants' statements before and during the Class Period materially misleading. As alleged above, Miquelon further admitted to providing this same material undisclosed information to Wasson, among others. Moreover, Miquelon signed a "Verification" of the Miquelon Complaint pursuant to Illinois state law, certifying, among other things, that "the statements contained in this Verified Complaint are true and correct[.]"

## IX. LOSS CAUSATION

262. As alleged herein, Defendants' false statements, material omissions and fraudulent course of conduct directly and proximately caused Walgreens common stock to trade at artificially inflated prices during the Class Period. Specifically, Defendants' representations and omissions regarding, *inter alia*, the FY16 EBIT Target, the impact of generic drug price inflation and unfavorable reimbursement contracts on the Company's performance, margins and FY16 targets, and the financial benefits of the Walgreens-Alliance Boots Transaction, caused and/or maintained the artificial inflation in Walgreens stock price during the Class Period. Relying on the integrity of the market price for Walgreens common stock and public information relating to Walgreens, Lead Plaintiff and other Class members purchased or otherwise acquired

Walgreens common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Walgreens common stock during the Class Period at artificially inflated prices, Lead Plaintiff and the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

263. Defendants' false and misleading statements, material omissions and course of conduct had their intended effect, directly and proximately causing Walgreens common stock to trade at artificially inflated prices during the Class Period, including as high as $76.39 per share on June 19, 2014. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Walgreens common stock served to maintain the price of Walgreens common stock at an artificially inflated level. The following chart from a October 28, 2014 Deutsche Bank report illustrates the cause and effect of Defendants' misrepresentations and omissions on Walgreens' stock price:

Figure 4: Walgreens shares did not seem to reflect negative revisions being considered



264. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their shares of Walgreens stock at the artificially inflated prices at which they traded. It was entirely foreseeable to the Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Walgreens common stock.

265. The artificial inflation in Walgreens common stock prices was removed through at least one corrective disclosure on August 6, 2014, which revealed the relevant truth regarding adverse facts and/or known risks previously concealed and/or obscured by Defendants' material misstatements and omissions, including, *inter alia*: (i) the existence and true magnitude of the FY16 EBIT Target shortfall and the lack of promised benefits from the merger with Alliance Boots; (ii) Walgreens' systemic problems with generic price inflation, and inflexible and unfavorable reimbursement contracts; and (iii) the further materialization of concealed risks relating to those material issues.

266. As a direct and proximate result of the substantial revelation of previously misrepresented and concealed information relating to Defendants' misstatements and omissions, the price of Walgreens common stock declined by $9.91 per share, or 14%, from a close of $69.12 on the prior trading day (August 5, 2014), to close at $59.21 per share on August 6, on extraordinarily heavy trading volume (more than 84 million shares). As set forth above in ¶¶221-224, numerous analysts issued reports expressing surprise over the new information revealed on August 6, 2014, including a $2+ billion EBIT shortfall. These disclosures, more fully described above in ¶¶220, removed artificial inflation from the price of Walgreens' publicly traded common stock, causing economic injury to Lead Plaintiff and other members of the Class. This artificial inflation was removed from Walgreens' stock price.

267. It was foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Walgreens common stock to decline, as the inflation caused by Defendants' earlier materially false and misleading statements and omissions of material fact was removed from the stock price. Moreover, the timing and magnitude of Walgreens' stock price decline negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or other Company-specific facts unrelated to the Defendants' fraudulent conduct.

268. Accordingly, Defendants' misrepresentations, omissions and fraudulent course of conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Walgreens common stock during the Class Period.

269. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members directly resulted from Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.

270. As a result of the previously misrepresented and concealed material information and undisclosed risk revealed on August 6, 2014, and the corresponding substantial decline in the price of Walgreens common stock when the market learned of the information, Lead Plaintiff and other Class members have suffered economic loss.

## X. LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

271. At all relevant times, the market for Walgreens common stock was an open and efficient market for the following reasons, among others:

a) Walgreens' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient electronic stock market;

b) As a registered and regulated issuer of securities, Walgreens filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c) Walgreens regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d) Walgreens was followed by securities analysts employed by major brokerage frims who wrote reports that were publicly available and entered the public marketplace;

e) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Walgreens stock; and

f) Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Walgreens stock between the time that the Defendants made the material misrepresentations and omissions and the time that the relevant truth was revealed, during which time the price of Walgreens stock was artificially inflated by Defendants' misrepresentations and omissions.

272. As a result of the foregoing, the market for Walgreens common stock promptly digested current information regarding Walgreens from all publicly available sources, and the prices of Walgreens' stock reflected such information. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Walgreens common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the other members of the Class purchased Walgreens' stock relying upon the integrity of the market price of Walgreens common stock and other market information relating to Walgreens.

273. Under these circumstances, all purchasers of Walgreens common stock during the Class Period suffered similar injuries through their purchases at artificially inflated prices, and a presumption of reliance applies.

274. Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Walgreens common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Lead Plaintiff and the other members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

275. The PSLRA's statutory safe harbor and/or bespeaks caution doctrine generally applicable to forward-looking statements ("FLS") do not apply to the misrepresentations and omissions alleged herein.

276. The materially false and/or misleading statements and omissions alleged herein: (i) were not FLS; (ii) contained present and historical factual statements; (iii) were not appropriately identified as "forward-looking statements" when made; and/or (iv) were not accompanied by meaningful cautionary language. For example, certain misrepresentations were and/or contained historical and present-tense statements about the *current* state of Walgreens' business and/or its progress and *current* ability to meet financial targets. The amount of the FY16 EBIT Target shortfall, the reasons for it, and the Company's inability to mitigate it, were

actually known by or were available to Defendants at the time of their statements, but were deliberately concealed from investors.

277. To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, each such statement was not accompanied by specific, meaningful cautionary language identifying important factors that could cause actual results to differ materially from FLS. Specifically, Defendants failed to include any similar, specific and meaningful risk warnings identifying important factors that could cause actual results to differ materially from the FY16 EBIT Target, prior to making the false and misleading statements. Rather, Defendants' risk warnings in the Company's 2013 Form 10-K and Form 10-Qs for 1Q14 and 2Q14 failed to include ***any*** such specific warnings regarding known "unprecedented" or "systematic" generic price inflation and Walgreens' unfavorable reimbursement contracts, both of which were currently impacting the Company's performance and the FY16 targets represented to investors. In fact, the risk warnings in those filings were virtually identical to the generalized boilerplate warnings included in their financial statements *prior to* the discovery in July 2013 of the $300 million FY16 EBIT shortfall and "unprecedented" generic price inflation.

278. Additionally, Walgreens' belated modification of the risk disclosures in its Form 10-Q for 3Q14 to include risk warnings concerning generic price inflation on July 1, 2014, only occurred *after* withdrawing the FY16 earnings targets on June 24, 2014. On August 6, 2014, at the end of the Class Period, when the FY16 EBIT Target was lowered from $9 to $9.5 billion to $7.2 billion, Defendants belatedly disclosed that the primary reason for the shortfall was generic price inflation and reimbursement pressure due to their contracts. During a September 30, 2014 conference call, more than a month after the Class Period ended, Walgreens provided a chart

that, without disclosing the amount, illustrated that generic price inflation and reimbursement pressure were the largest items responsible for the shortfall in the FY16 EBIT goal.

279. Months after the Class Period ended, on October 20, 2014, Walgreens filed its fiscal year 2014 Annual Report on Form 10-K. Consistent with the above-described belated disclosures, Walgreens identified as a risk that "Generic drug inflation could have a significant adverse effect on our profitability." In this regard, Walgreens finally noted that "[w]e experienced a shift from historical patterns of deflation in generic drug costs to inflation in fiscal 2014" (which spanned the period from September 1, 2013 to August 31, 2014). Further, Walgreens added that:

> Our existing reimbursement arrangements with payers generally provide us with only limited protection against cost increases in our generic drug procurement costs. We are seeking to address this through changes in our contracting strategies and negotiations with our vendors and payers. We cannot assure you that we will be able to mitigate the impact of increased inventory acquisition costs, in whole or in part. Failure to fully offset any such increased prices and costs or to modify our activities to mitigate the impact could have a significant adverse effect on our gross profit margins.

280. In a separate risk disclosure in the same 2014 Form 10-K, Walgreens noted that "a shift in the mix of pharmacy prescription volume toward programs offering lower reimbursement rates could adversely affect our profitability." In this regard, it noted that "[w]e experienced a shift in pharmacy mix toward 90-day at retail in fiscal 2014 and expect that trend to continue in fiscal 2015." Additionally, Walgreens disclosed, for the first time, that because "we decided to accept lower reimbursement rates in order to secure preferred relationships with Medicare Part D plans serving senior patients with significant pharmacy needs . . . our Medicare Part D reimbursement rates will decrease in calendar year 2015."

281. In the Form 10-Q filed on December 30, 2014, Walgreens noted that "[i]n fiscal 2014 and the first quarter of fiscal 2015, we experienced cost increases on a subset of generic

drugs that historically experience deflation, some of which were significant. We expect this generic inflation to continue throughout fiscal 2015." Walgreens added the same boilerplate language regarding lower Medicare Part D reimbursement rates.

282. The foregoing risk warnings were not included in Walgreens' risk disclosures prior to or during the Class Period. Notably, they were not included in the Form 10-K filed on or about October 21, 2013, or in Walgreens' quarterly statements on Forms 10-Q filed on or about December 27, 2013 and March 27, 2014. The 2013 Form 10-K and Form 10-Qs filed by Walgreens were required to contain the risk warnings relevant to the March, April, and June 2014 false and misleading Class Period statements, but they did not. For example, on the March 25, 2014 conference call, Walgreens' head of investor relations, Rick Hans, began by stating "[p]lease see our *latest* Forms 10-K and 10-Q and subsequent filings for a discussion of risk factors as they relate to forward-looking statements." As of this conference call, the "latest" filing was the December 27, 2013 Form 10-Q, which utterly failed to provide any disclosure regarding the known risks to Walgreens' performance and the FY16 shortfall, including generic price inflation and reimbursement issues, all of which were currently known risks impacting the Company.

283. Moreover, Walgreens' generalized statutory safe harbor warnings, to the extent there were any, were boilerplate and did not change to reflect changes in the economic and business conditions under which Walgreens operated. Defendants' risk warnings did not include the known and important risks facing Walgreens at the time of their Class Period statements regarding the FY16 EBIT Target.

284. For example, despite the fact that Defendants knew, by late 2013, that the Company was tracking at least $500-600 million below the low-end of the FY16 EBIT Target

due to the "unprecedented" generic price inflation then-present in the industry, and Walgreens' inability to offset these price increases due to Defendants' lack of third party reimbursement contracts that provided meaningful relief in an inflationary market, Defendants did not disclose these risks in their December 27, 2013 Form 10-Q or reduce their FY16 earnings targets. Similarly, Defendants failed to reduce the FY16 EBIT Target or provide a meaningful risk warning in the 2Q14 Form 10-Q, despite severe changes and materially adverse business conditions, including the above risks and the fact that by March 2014, (i) it had become "increasingly clear" that the deflation in generic pricing over the last decade had reverted to a "systematic" inflationary trend and Defendants were having a difficult time negotiating with certain payers; and (ii) Defendants knew or were reckless in not knowing that the FY16 EBIT Target had accumulated a shortfall in excess of $1 billion between late 2013 and April 9, 2014.

285. Alternatively, Defendants are liable for any false and/or misleading FLS because, as set forth in Section V above, at the time each of those FLS was made, Defendants knew that the FLS was false, or had no reasonable basis, or was contradicted by adverse facts known to Defendants, and therefore was false or misleading, and the FLS was authorized and/or approved by an executive officer of Walgreens who knew the FLS was false or misleading when made.

## XII. CLASS ACTION ALLEGATIONS

286. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all those who purchased Walgreens common stock during the Class Period. Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

287. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. At the end of the Class Period, approximately 953 million shares of Walgreens common stock were outstanding and actively traded on the NASDAQ. The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Walgreens or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

288. Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

289. Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all of the other Class members' claims arise from, and their losses were caused by, the same false and misleading representations and omissions made by, or chargeable to, Defendants. Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

290. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows

of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

291. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to members of the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether Defendants' statements and omissions issued during the Class Period were materially false and misleading;

c) whether and to what extent the market price of Walgreens common stock was artificially inflated and/or distorted before and/or during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

d) whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter; and

e) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## XIII. CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Walgreens, Wasson and Miquelon

292. Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, is asserted by Lead Plaintiff on behalf of itself and all other Class members against Defendants Walgreens, Wasson and Miquelon.

293. During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to

make materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Walgreens common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase Walgreens common stock at artificially inflated prices that did not reflect their true value. In furtherance of their unlawful course of conduct, the Individual Defendants took actions set forth herein.

294. While in possession of material adverse, non-public information, the Individual Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange:

a. employed devices, schemes, and artifices to defraud;

b. made false and misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock, including Lead Plaintiff and the Class members, in an effort to maintain artificially high market prices for Walgreens common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

295. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

296. By virtue of their high-level positions at the Company during the Class Period, the Individual Defendants were authorized to make public statements, and made public statements

during the Class Period on Walgreens' behalf. The Individual Defendants were privy to and participated in the creation, development, and issuance of the materially false and misleading statements and omissions alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

297. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports to the investing public, Defendants had a duty to disclose information required to update and/or correct their prior statements and/or omissions, and to update any statements or omissions that had become false and misleading as a result of intervening events. Defendants also had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01 et seq.) and Regulation S-K (17 C.F.R. Section 229.10 et seq.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Defendants Wasson and Miquelon also had duties under the Sarbanes-Oxley Act of 2002 to ensure that Walgreens' Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

298. Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them. Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of

concealing the truth with respect to Walgreens' operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

299. The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated or maintained artificial inflation already in the market price of Walgreens common stock during the Class Period. In ignorance of the fact that the market prices of Walgreens common stock was artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the absence of material adverse information that was recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Walgreens common stock during the Class Period at artificially inflated prices. As the relevant truth eventually emerged, the price of Walgreens common stock substantially declined.

300. At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the relevant truth with respect to Walgreens' financial results, operations, business, and prospectus, which was concealed by Defendants, Lead Plaintiff and the other members of the Class would not have done so at artificially inflated prices that they paid.

301. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

302. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

303. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by Lead Plaintiff on behalf of itself and all other Class members.

304. During the Class Period, each of the Individual Defendants was a senior executive officer and/or director of the Company. As such, each of these Defendants was privy to confidential and proprietary information concerning Walgreens, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

305. Defendant Wasson was the Company's CEO from 2008 until December 2014. Defendant Miquelon was the Company's CFO from 2008 until August 2014. As such, the Individual Defendants had regular access to non-public information about Walgreens' business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

306. The Individual Defendants acted as controlling persons of Walgreens within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power and authority to influence and control, and did influence

and control, directly or indirectly, the day-to-day decision-making of the Company, including Walgreens' wrongful conduct in violation of the Exchange Act complained of herein.

307. Each Individual Defendant was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability and ultimate authority to prevent the issuance of the statements or cause the statements to be corrected.

308. In particular, each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

309. As set forth above, Defendant Walgreens violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of the Individual Defendants' status as controlling persons, and their respective participation in the underlying violation of Section 10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment, including:

A. Determining this action to be a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff's counsel as Lead and Liaison Counsel for the Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C. Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

D. Awarding such other and further relief as may be just and proper.

## XV. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated: August 17, 2015

Respectfully Submitted,

**KESSLER TOPAZ MELTZER & CHECK LLP**

*/s/ Eli R. Greenstein*
Eli R. Greenstein (IL Bar #90785879)
Jennifer L. Joost (*Pro Hac Vice*)
Rupa Nath Cook (*Pro Hac Vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
egreenstein@ktmc.com
jjoost@ktmc.com
rcook@ktmc.com

*and*

Mark B. DeSanto (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087

Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mdesanto@ktmc.com

*Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
James E. Barz (IL Bar #6255605)
Frank A. Richter (IL Bar #631001)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4674
Facsimile: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

*Liaison Counsel for the Class*