# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated <br><br> Plaintiff, <br><br> v. <br><br> WALGREEN CO., GREGORY D. WASSON, and WADE MIQUELON, <br><br> Defendants. | Case No. 15-cv-3187 <br><br> Judge Sharon Johnson Coleman |

## MEMORANDUM OPINION AND ORDER

Industriens Pensionsforsikring A/S, acting as lead plaintiff on behalf of itself and all others similarly situated, brings this class action against the defendants Walgreen Co. ("Walgreens"), former Walgreens CEO Gregory D. Wasson, and former Walgreens CFO Wade Miquelon, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The defendants, in separate motions filed by Walgreens and Wasson [55] and by Miquelon [57], now move to dismiss Washtenaw's complaint for failure to state a claim. For the reasons set forth herein, those motions are granted in part and denied in part.

**Background**

The following is a general overview of the voluminous allegations contained in the amended complaint and its attachments, which are taken as true for the purposes of this motion.

Walgreens is a retail drugstore chain that sells prescription and non-prescription drugs. Prescription drugs represent Walgreens' largest class of products and are the lead driver of its revenue and profit. At the times relevant here Gregory D. Wasson was Walgreens' CEO and a director on the company's Board of Directors and Wade Miquelon was Walgreens' CFO.

The substantial majority of prescription drugs that Walgreens sold were generic versions of branded drugs ("generic drugs"). Because generic drugs cost less to produce than branded drugs, their sale generated a higher profit margin. That profit margin, however, was dependent on the difference between the cost to procure the generic drug and the reimbursement rate that Walgreens received for supplying a customer with the drug.

Drug prices varied widely depending on a number of factors including (1) whether the drug was branded or generic, (2) how many companies were producing the drug (if it was a generic), (3) the relative supply and demand for the drug, (4) adverse regulatory actions impacting the drug or its manufacturing facility, or (5) consolidations of drug manufacturers and their drug portfolios. Drug manufacturers also retained significant power to set their own prices. Historically, the competitive generic drug marketplace had caused a deflationary trend in drug prices. Between 2010 and 2013 that trend began to reverse as drug manufacturers began testing price inflation strategies for mature products. By 2013 and 2014 third party metrics reflected this inflationary trend and Walgreens' primary competitors had acknowledged that generic drug costs were increasing.

The vast majority of Walgreens' prescription drug sales were "third party sales" in which the purchaser paid a copay and a pharmacy benefit manager (PBM), private insurance company, or governmental entity reimbursed Walgreens for the remainder of the drug's cost. PBMs constituted the vast majority of the third party sales market. Walgreens' contracts with several major PBMs provided for fixed maximum rates of reimbursement for each drug over the term of the contract and contained no mechanism by which the maximum rates could be altered to respond to price variations. Thus, if generic drug prices increased Walgreens would be forced to absorb the additional costs of those drugs.

In 2011, Walgreens, under Wasson's leadership, walked away from contract negotiations with Express Scripts, one of the largest PBMs. The decision was costly; Walgreens' inability to fill

Express Scripts customer's prescriptions caused it to lose millions of customers to its rivals and caused its stock price to drop by over 25%. Although Walgreens and Express Scripts ultimately negotiated a new contract in July 2012, thereafter many investors began to question Wasson's management ability.

In June 2012, Walgreens announced that it was entering into a strategic transaction with international "pharmacy-led health and beauty group" Alliance Boots GmbH ("Alliance") to create the largest pharmacy company in the world. At the time, Alliance was led by CEO Stefano Pessina. During the first step of the deal, Walgreens acquired a 45% equity ownership stake in Alliance. As part of that transaction, Pessina acquired control of 8% of Walgreens common stock, making him Walgreens' largest shareholder. During the second step, which required shareholder approval, Walgreens was to acquire the remaining Alliance stock in exchange for cash and shares of Walgreens' stock. As part of this process, Walgreens announced a set of goals for FY 2016 reflecting the expected benefits of the new partnership, including generating $1 billion in combined synergies and between $9 and $9.5 billion in adjusted earnings before interest and taxes ("EBIT"). The EBIT goal was especially important to investors because it was the only metric gauging the potential profitability of the combined companies. From September 2012 through June 2013, the defendants continued to express optimism regarding the EBIT goal and to dismiss analysts' concerns regarding threats to that goal.

In late 2013, however, Walgreens' internal long range planning process revealed that the EBIT goal was tracking at under $8.5 billion.[1] Miquelon, in a verified complaint filed in a separate action ("the Miquelon complaint"), admitted that by the end of 2013 the company had identified the sources of that deficit as (1) the unprecedented level of generic drug price inflation that the industry

---

[1] Each year, Walgreens conducts a long range plan encompassing the next three fiscal years. The process of developing the long range plan begins in March and extends through the end of June, at which point the final results are submitted for the Board of Directors' approval at the annual board meeting. (Dkt. 47-1, ¶ 61).

was experiencing and (2) reimbursement contracts that failed to provide meaningful inflationary relief. Nonetheless, Walgreens restated the EBIT goal when it reported its first quarter results for 2014. During the conference call announcing the quarterly results, Miquelon admitted that Walgreens was tracking "a bit below" the EBIT goal, but asserted that the company was prepared to mitigate the risks to achieving the goal and that it had the right tools at its disposal to meet the target. During that call, Miquelon also reassured analysts that "[q]uarter by quarter we look at [the FY2016 goals], and say are these still realistic based upon all the risk and opportunities we have internally. If we ever feel that's not the case, we'll certainly tell you." By March 2014, the EBIT goal was tracking around $7.5 billion dollars, $2 billion less than the high end of the EBIT goal.[2]

The class period, which runs from March to June 2014, encompasses the announcement of Walgreens second quarter results and third quarter results and public statements made in the interim. During that time, the defendants continued to issue statements that allegedly downplayed the risk to the EBIT goal. Yet Miquelon's verified complaint established that by March 2014, when Walgreens issued its second quarter results, the company was aware of the systematic inflation of generic drug prices.

On April 9, 2014, Miquelon shared an interim long range planning update with Walgreens' Board of Directors suggesting that Walgreens would realize $7.5 billion in EBIT in 2016. Also in April, activist investors began to push aggressively for Walgreens to execute a tax inversion (by moving the company overseas) and expressed a desire that the Alliance management team take on a greater leadership role in the combined companies, sparking speculation that Wasson was losing control of Walgreens. In May, Wasson told Miquelon that if Walgreens did not proceed with the tax

---

[2] The defendants challenge this figure, asserting that Miquelon's previously mentioned verified complaint does not reflect that the defendants were aware the EBIT goal was tracking in this range during March 2014. Exhibits to a complaint, however, do not control over allegations made within the complaint when, as here, the document does not itself form the basis for the allegation. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998). Accordingly, where the complaint in this action and the Miquelon complaint conflict, the former must govern.

inversion he believed that the activist investors would force him out of his position. Around that time, Wasson also met with Miquelon to offer him a new position within the combined company. Miquelon declined the new position, and elected to leave Walgreens after Step 2 of the Alliance transaction was complete.

By June 2014, Miquelon had finalized his estimate and conclusively determined that the EBIT goal was tracking at $7.2 to $7.5 billion. Miquelon informed Wasson of the scope of the shortfall in mid-June and advocated for publically withdrawing the EBIT goal during the next quarterly call on June 24th. Wasson argued that the scheduled earnings call should be delayed—so that the withdrawal of the EBIT goal could be bundled with favorable news—and pressured Miquelon to raise the earnings-per-share estimate well-beyond that which could be supported by the EBIT tracking numbers.

On June 24, 2014, Walgreens issued its third quarter report and withdrew its FY 2016 earnings targets, attributing the decision to "Step 2 considerations" and "current business performance." Walgreens, however, did not disclose the extent of the EBIT shortfall until August 6, 2014 when Walgreens confirmed that the expected 2016 EBIT was projected to be around $7.2 billion. The disclosure of this shortfall caused Walgreens stock to plummet over 14% in a single day. In subsequent appearances in support of Step 2, Wasson and Pessina attributed the "unexpected" shortfall to bad forecasting, lax controls in the financial department, and poor communication between departments. Their statements cast Miquelon as being responsible for these errors and implied that he had been pressured to leave due to the purported forecasting error. Miquelon subsequently filed the previously referenced verified complaint, suing Walgreens for breach of contract, defamation, and tortious interference with prospective economic advantage.

On August 6, Walgreens announced that it was exercising its option to purchase the remaining 55% of Alliance Boots, thus completing Step 2 of the Walgreens–Alliance Boots

transaction. Walgreens' September 2014 announcement of its fourth quarter results explicitly acknowledged, for the first time, the detrimental impact that reimbursement pressures and generic drug price inflation were having on its profit margins. Several months later Wasson resigned and Pessina replaced him as the CEO of Walgreens.

**Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. When considering dismissal of a complaint, the court accepts all well pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Rule 9(b), however, requires plaintiffs to plead with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b). Particularity in pleading fraud, including securities fraud, means alleging the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). S.E.C. Rule 10b-5 implements this provision by making it illegal to make any untrue statement of a material fact or to fail to state a material fact necessary in order to prevent statements made from being misleading in light of the circumstances under which they were made. 17 C.F.R. § 240.10b-5(b). Accordingly, in order to plead that the defendants made material misrepresentations or omissions in violation of section 10(b) and rule 10b-5, the plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). The Private Securities Litigation Reform Act (PSLRA) requires that the complaint specify each statement alleged to be misleading and the reason or reasons why that statement is misleading. 15 US.C. § 78u-4(b)(1).

The PSLRA, moreover, contains a safe harbor provision that heightens the pleading requirements for forward looking statements. 15 U.S.C. § 78u-5(c). A plaintiff alleging that a forward-looking statement contains a misrepresentation or omission must establish a strong inference that the forward-looking statement was made with actual knowledge by the speaker that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B). In order to establish a "strong inference," the pleadings must demonstrate that a reasonable person would deem the inference of scienter to be at least as compelling as any opposing inference that one could draw from the facts alleged. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Additionally, a defendant cannot be liable for any forward-looking statement that is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially. 15 U.S.C. § 78u-5(c)(1)(A)(i).

The plaintiff also alleges that the defendants violated Section 20(a) of the Securities Exchange Act. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constitution the violation or cause of action.

15 U.S.C. § 78t(a). In order to allege a section 20(a) claim, the plaintiff must therefore allege (1) a primary securities violation; (2) that the individual defendant exercised general control over the individual or organization that committed the violation; and (3) that the individual defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir. 1992); *Zurich Capital Markets, Inc. v. Coglianese*, 388 F. Supp. 2d 847, 866 (N.D. Ill. 2004) (St. Eve, J.).

**Discussion**

<u>March 2014 Statements</u>

On March 25, 2014 Walgreens issued its second quarter report and Wasson and Miquelon held a conference call with investors to present the report and to answer questions about it. During that call, Miquelon stated:

> [We] reviewed [the] fiscal-year 2016 goals internally and performance to date with respect to four of our five goals remains on track with or slightly ahead of our expectations.
>
>                 \*\*\*
>
> As stated on our last call our adjusted operating income goal of $9 billion to $9.5 billion is currently tracking below the CAGR required to meet this goal and below our initial expectations. We continue to recognize that there are risks to achieving this goal; however, we remain focused on delivering it.
>
> And as I also stated we have identified a range of further opportunities including benefits from our AmerisourceBergen relationship, incremental Alliance Boots synergies, business expansion and new initiatives and cost savings which can all help mitigate these risks. The asset optimization program that Greg described highlights our focus on efficiencies while the increase in our fiscal-year 2014 synergy estimate demonstrates that we are driving additional synergies with Alliance Boots and AmerisourceBergen.

(Dkt. 47 ¶ 158). Additionally, a slide accompanying the defendants' presentation listed the five previously announced FY2016 goals, including the EBIT goal of $9 to $9.5 billion. The plaintiff contends that these statements are false and misleading because they reaffirm the 2016 EBIT goal, despite the defendants' knowledge that that goal was tracking at least $1.5 billion below target. The plaintiff alleges that by late 2013 Walgreens had identified a shortfall of $500–$600 million with respect to the EBIT target and that, by April 2014, the company had accumulated an additional $1 billion in risk to the EBIT target. The plaintiff further alleges that the defendants knew that the largest source of the EBIT shortfall was the systematic reversion to an inflationary generic drug price trend.

As an initial matter, this Court rejects the characterization of these statements as a reaffirmation of the goal. Although the defendants did state what the EBIT goal was and renew their commitment to attempt to attain that goal, they also expressly acknowledged that they were not currently on track to attain it. Thus, their statements were not misleading about the current status of the goal. Moreover, the defendants' statements were not actionable based on the theory that the EBIT goal might be unobtainable because the plaintiff has not plausibly alleged that the goal was in fact unobtainable. *Cf. Lindelow v. Hill,* No. 00 C 3727, 2001 WL 830956, at *4 (N.D. Ill. July 20, 2001) (Holderman, J.) (recognizing statements of "strategy" and "goals" to be actionable where the defendants knew or recklessly ignored the fact that the stated goals were unobtainable). And the plaintiff has not alleged facts establishing that the defendant's future looking statement that they "remained committed" to achieving the EBIT goal was false or misleading. The defendants also were not obligated to provide additional information or internal forecasts about the extent of the shortfall once it was disclosed. *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir 1989) (recognizing that firms have no obligation to reveal in-house estimates that are in the process of consideration and revision); *see also City of Livonia Emps.' Ret. Sys. and Local 295/Local 851 v. Boeing*

*Co.,* 711 F.3d 754, 759 (7th Cir. 2013) ("There is no duty of total corporate transparency—no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in 'real time,' forming a running commentary, a baring of the corporate innards, day and night.").

The plaintiff also contends that the above statement was misleading because it acknowledged efforts to mitigate the risk to the 2016 EBIT goal but failed to recognize that those efforts would be insufficient to counteract the severe scope of the EBIT shortfall. Here, however, the defendants' statement was that there were measures to "mitigate" the risk, not to "eliminate" it. *See* Black's Law Dictionary 1154 (10th ed. 2014) (defining "mitigate" as "[t]o make less severe or intense; to make less harmful, unpleasant, or seriously bad."). Thus, in order for their statement to be false or misleading the plaintiff must allege facts demonstrating that the defendants' measures were unable to in any way reduce the EBIT shortfall. The plaintiff has alleged no facts suggesting this to be the case. Additionally, because this is a forward-looking statement, the plaintiff must also allege facts creating a strong inference that the defendants had actual knowledge of the falsity of their statements. Here, the plaintiff has made no such allegation, and therefore fails to state a claim.

During the conference call, Miquelon addressed Walgreens' softening profit margins, stating "[w]hile we always experience some level of reimbursement pressure the most significant factor affecting the pharmacy margin was dramatically slower rate [sic.] of new generic introductions year over year." (Dkt. 47 ¶ 157). Walgreens second quarter form 10-Q similarly stated that "[r]etail pharmacy margins were negatively impacted by a significant reduction in the number of brand to generic drug conversions and lower market driven reimbursements." (Dkt. 47 ¶ 163). The plaintiff contends that these statements were misleading because they misattributed the EBIT shortfall to the lack of new generic drug conversions instead of generic drug price inflation and unfavorable contract terms.

These statements are adequately alleged to be false or misleading. Miquelon's statement that "we always experience some level of reimbursement pressure" portrayed the reimbursement pressures that Walgreens felt as routine. But the plaintiff has plausibly alleged that those reimbursement pressures, caused by unprecedented, systematic generic drug price inflation and detrimentally structured contracts, were anything but routine and were already recognized to be the primary cause behind the EBIT shortfall. Thus, the representation that reimbursement pressures were routine and that the primary factor impacting pharmacy margins was the reduction in brand-to-generic drug conversions is sufficiently alleged to be false or misleading. *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 386 (S.D.N.Y. 2012) (recognizing that although there is no "duty to disclose any and all related material whenever a company speaks on a given topic", a duty to disclose arises "when silence would make other statements misleading or false") (internal quotations omitted); *see City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *20 (N.D. Ill. Feb. 13, 2013) (St. Eve, J.) (recognizing that statements denying systematic regulatory compliance issues were actionable where the compliance problems that the defendant had experienced were plausibly alleged to be systematic in nature); *see also Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014) (recognizing that, because an executive put the source of a company's success at issue, the failure to disclose the true source of the revenue could give rise to liability under section 10(b)).

This Court is not persuaded otherwise by the defendants' assertion that generic drug price inflation was a well-known and universally recognized market trend that they therefore had no obligation to disclose. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) ("The securities laws do not require firms to 'disclose' information that is already in the public domain."); *Garden City Empls.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *5 (N.D. Ill. Mar. 29, 2012) (Dow, J.) ("Defendants do not commit securities fraud by failing to specifically alert

investors to the general conditions of certain segments of the market."). Ordinarily, the defendants' are correct that they would not be required to alert investors to the existence of price inflation in particular sectors of the marketplace. Here, however, the defendants are not alleged to have failed to disclose relevant market information. Rather, they are alleged to have misrepresented that they were only experiencing routine reimbursement pressures and that the primary factor impacting pharmacy margins was the reduction in brand-to-generic conversions. These misrepresentations created a duty to disclose the existence of generic drug price inflation where none would have otherwise existed. Moreover, the defendants' argument completely ignores the plaintiff's allegation that the impact of the generic drug price inflation was uniquely magnified as a result of the terms of Walgreens' reimbursement contracts and that its detrimental impact was therefore specific to Walgreens.

The plaintiff further alleges that three additional statements are false and misleading because they failed to disclose that generic drug price inflation was already "unprecedented" and "systematic." In the press release issued on March 25, 2014, Wasson emphasized Walgreens' "solid top-line growth" in the quarter "driven by record quarterly sales and record second-quarter prescriptions filled." (Dkt. 47 ¶ 153). This past-looking statement, however, is unrelated to generic drug price inflation and therefore created no obligation to disclose the existence of that trend.

Wasson also represented that Walgreens expected that "the generic drug headwind that affected the first half will ease and turn around by the end of the year." (*Id.*). During the March 25, 2014 conference call, Miquelon similarly stated that:

> Taking a look at our adjusted gross margin trends this quarter's 140 basis point decrease was versus [a] 120 basis point increase a year ago. In essence, the benefit of the generic wave last year reversed itself this year. We expect this impact to continue to moderate in the third and fourth quarter and become a tailwind to some degree in the fourth quarter of fiscal 2014.

(*Id.* ¶ 156). As previously stated, these future-looking statements require that the plaintiff allege facts creating a strong inference that the defendants had actual knowledge of the falsity of their statements. Here, the plaintiff put forth facts showing that by the end of 2013 generic drug inflation was a recognized trend market-wide and that Miquelon had come to realize that the inflation might be systematic in nature. The plaintiff further alleges that Walgreens was entangled in unfavorable contracts that offered it no meaningful relief from increasing generic drug prices. Taken collectively, the plaintiff's allegations are adequate to establish a strong inference of actual knowledge of falsity with respect to the defendants' statements that the generic drug headwind would turn into a tailwind in 2014.

The defendants, however, contend that this statement is subject to the second prong of the PSLRA's safe harbor provision because it was accompanied by meaningful cautionary statements. Specifically, the defendants point to Walgreens' FY13 10-K form, which listed thirty-eight separate business-specific risk factors and provided a brief descriptive account of how those factors could impact Walgreens' business. Cautionary language is meaningful if it "puts an investor on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (Castillo, J.) (internal quotation marks omitted) (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). Cautionary language therefore must be more than a boilerplate warning, and must be tailored to the risks that accompany the particular projections. *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 732 (7th Cir. 2004). Cautionary language, however, need not delve into minutiae in order to identify the risk at issue. *Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 875 (N.D. Ill. 2011) (Castillo, J.). Here, Walgreens disclosed the risk that "[c]hanges in pharmaceutical manufacturers' pricing . . . could also

significantly reduce our profitability."[3] (Dkt. 56-6). The defendants thus adequately disclosed the risk that generic drug price inflation would undermine their predictions that the current headwind would become a tailwind later in 2014. Accordingly, the defendants' cautionary statements were adequate and their future-looking statements predicting that the generic drug headwind would turn around were not actionable.

The March 2014 press release additionally quoted Wasson as stating, with regards to the Alliance Boots synergy goal, that the "joint synergy program with Alliance Boots is expected to exceed its second-year estimate." (Dkt. 47 ¶ 154). The plaintiff contends that this statement is misleading because the representation that Walgreens would "exceed" its Alliance Boots synergy goal concealed the fact that the synergies were dwarfed by the "massive" EBIT shortfall (the expected synergies from the merger formed part of the basis for the EBIT goal). The fact that there was a "massive" EBIT shortfall, however, does not render the defendants' statement about synergies untrue, and no reasonable investor would misinterpret the defendants' unrelated statements as denying or minimizing the existence of an EBIT shortfall in light of the defendants' express acknowledgement that there was a shortfall.

Similarly, the plaintiff contends that two additional statements are misleading because they do not disclose the concessions (in the form of lower co-pays and reimbursements than typically agreed to by preferred pharmacies) that Walgreens made to attain the additional Medicare Part D market share. The press release issued on March 25, 2014 stated that Walgreens "saw strong growth in prescriptions filled for Medicare Part D patients, which increased 16 percent in the second quarter compared with last year's quarter, while the Company's Part D market share increased 0.8 percentage point in February compared with the same month a year ago." (Dkt. 47 ¶ 155).

---

[3] A court may take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment. *Palay v. United States,* 349 F.3d 418, 425 n. 5 (7th Cir. 2003).

Similarly, during the conference call Wasson touted the growth of Walgreens' Medicare Part D program:

> Looking ahead our Medicare Part D program is accelerating our momentum in pharmacy. In the quarter our Med D volume was up year-over-year with significant growth in new customers on top of strong performance in fiscal 2013. Our Part D market share for the quarter increased 80 basis points compared to the same period last year.

(*Id.* ¶ 161). Miquelon further added that "[o]ur pharmacy business is well positioned in patient segments which is . . . Part D customers . . . and we continue to drive real efficiencies in both our pharmacy operations and in procurement." (*Id.* ¶ 162). No reasonable investor, however, would be misled by those statements because they do not address the issue of compensation or provide any reason to believe that Walgreens had not made pricing concessions in order to obtain its increased market share. These statements meant what they said; nothing more, nothing less. *Constr. Workers Pension Fund—Lake Cnty. and Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 655 (N.D. Ill. 2015) (Ellis, J.).

April and May 2014

In April and May 2014 the plaintiff alleges that, between issuing the March and June quarterly reports, the defendants made multiple false and misleading statements to analysts that were subsequently reported to investors.

The plaintiff's allegations arise from a report issued by J.P. Morgan describing a conference call with Wasson, statements that Walgreens' head of investor relations made at a Barclay's conference and subsequent reports on those statements, and a Morgan Stanley report on a conference call with Wasson and Miquelon. Under Rule 10b-5, however, a statement may only be "made" by the "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). "Without control, a person or entity can merely

suggest what to say, not 'make' a statement in its own right." *Id.* Accordingly, the defendants contend that they cannot be held liable for statements conveyed through analysts' reports.

A statement must be attributable to a defendant in order to constitute a statement made by that defendant. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015); *see also Janus*, 564 U.S. at 142 ("[I]n the ordinary case, attribution within a statement . . . is strong evidence that a statement was made by – and only by – the party to whom it is attributed."). Thus, statements contained in analysts' reports are only actionable when they are attributed to a particular speaker. *See Fulton Cnty. Empls.' Ret. Sys. v. MGIC Inv. Corp.*, No. 8 C 458, 2010 WL 601364, at *6 (E.D. Wis. Feb. 18, 2010) (rejecting a claim against the defendant based on a statement that mostly "consist[ed] of conclusions that the analysts drew after meeting with [the CEO], rather than direct quotes from [the CEO]" because the statement could not be attributed to the CEO or the company), *affirmed* 675 F.3d 1047 (7th Cir. 2012).

On April 17, 2014, J.P. Morgan hosted a conference call with Wasson. J.P. Morgan's report on the call stated that "[m]anagement indicated that it is extremely confident the $1 billion synergy target is achievable and pointed to additional opportunity beyond that based on opportunities they have identified." (Dkt. 47, ¶ 172). It further reported that, as to reimbursement pressure, "management noted that it is seeing nothing unusual at this point" and that management "cited multiple opportunities" to offset general reimbursement headwinds, including "[o]ngoing increases in generic utilization [which] can drive improving margins" and "working more closely with manufacturers." (*Id.*, ¶ 173). Although these statements do not explicitly identify Wasson as the speaker, they clearly are attributed to him and can therefore be treated as his statements for purposes of the PSLRA.

Plaintiff contends that Wasson's statements to J.P. Morgan are actionable because they misled investors by expressing confidence regarding the synergy target without disclosing the EBIT

shortfall. As previously discussed, however, this allegation is not actionable because such optimism would not lead a reasonable investor to conclude that the EBIT goal was on track, especially in light of the defendants' prior statements to the contrary. The plaintiff further contends that these same statements were misleading because they misrepresented that there was "nothing unusual at this point" with respect to reimbursement pressures. The statements are actionable in this respect, because the plaintiff has alleged that Wasson was aware of systematic generic drug price inflation at the time of his statements. Wasson's statement that nothing unusual was occurring with respect to reimbursement pressures has therefore been plausibly alleged to be false or misleading.

On April 30, 2014, Walgreens' Head of Investor Relations, Rick Hans, appeared at the Barclays Retail and Consumer Discretionary Conference on behalf of Walgreens. Asked a question about the impact of generics on Walgreens' profit margins, Hans stated:

> This year, we've had kind of a dearth of new generics. So, that has caused a big mismatch, it's kind of that peak to trough that we've talked about with relative to the introduction of new generics and that had an impact on the margin.
>
> ***
>
> So, a year ago in the first half of the year, we had about [130 basis point] lift in the margin, primarily due to generics. This year in the first half, we had [135 basis point] drop in the margin, again primarily due to generics, but also due to some stuff we've been doing on the front end with regards to promotion.

(Dkt. 47, ¶ 176). Hans also addressed the EBIT goal, stating:

> But as far as the – how this relates to our goals for FY16, it's a little complicated in that. We had a – we had embedded in those goals some benefits from a different distribution model, and I won't go into it, but we had a different distribution model in mind. So that now came out, now with AmerisourceBergen which we think was better than the old model, gets plugged in, some of that is not new to the EBIT goal is my point. Do you follow my thinking on this? So, some of it is incremental, but some of it is actually embedded in our goals . . . I mean, we don't really want to get into really spelling out exactly what the synergies are. I think the numbers will flow through cost of goods and everyone will see it just in our performance.

(Dkt. 47, ¶ 177).  The plaintiff contends that these statements were false or misleading because they attributed declining gross margins to the introduction of new generics and not to generic drug price inflation and promoted improved synergies while intentionally failing to disclose the scope of the EBIT shortfall.  The plaintiff, however, has made no allegations concerning Hans' state of mind at the time that he appeared at the Barclays conference as is required to state a claim under section 10(b).  *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157.  Accordingly, the plaintiff's allegations with respect to Hans fail to state a claim on which relief may be granted.

Finally, on May 16, 2014, Wasson and Miquelon participated in Morgan Stanley's "management conference call series."  In its report on the call, Morgan Stanley stated that "WAG has not seen any unusual activity, but purchasing JV leaves it in better shape than peers to cope with generic price increases."  (*Id.*, ¶ 181).  Because this statement does not identify the speaker or describe a statement that one of the defendants actually made, it is insufficiently pled.  *See Fulton Cty. Employees' Retirement Sys.,* 2010 WL 601364, at *6.

June 2014

On June 24, 2014, Walgreens released its third quarter report and Wasson and Miquelon held a conference call with investors to discuss the results and to answer any questions.  The press release that Walgreens' issued stated that:

> As a result of the many step two considerations and current business performance, the company is withdrawing its fiscal year 2016 goals that were previously announced in 2012.  Specifically, once key decisions have been made on the above matters, Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August.  At that time, the company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal year 2016.

(Dkt. 47, ¶ 186).  Wasson also addressed the withdrawal of the EBIT target, explaining :

Let me speak directly to 2 of the prior goals. Regarding our adjusted operating income goal of $9 billion to $9.5 billion, on previous calls, we noted we were tracking below the CAGR required to meet the goal. We now no longer expect to reach that goal. On our combined synergy goals I noted earlier, we are tracking ahead of that goal and we expect to exceed the $1 billion amount by the end of fiscal 2016. As noted above, some of the opportunities we are pursuing are below the operating income line on the income statement and decisions about those will be reflected in our new goals and metrics.

(*Id.*, ¶ 189; Dkt. 47-1).[4] Miquelon, in his remarks, further stated that "[t]he tough year-over-year generic impact margin comparison has continued to dissipate throughout fiscal year 2014 and expected [sic.] to turn positive in the fourth quarter of 2014 given the increase in generic impact on pharmacy sales comps expected in that period." (Dkt. 47, ¶ 192). Miquelon closed by reiterating that:

As a result of the many Step 2 considerations in current business performance we are withdrawing the fiscal year 2016 goals that were previously announced in 2012. Once key decisions have been made on the above matters Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August. Many of the areas under consideration are interdependent and so we believe that the prudent course is to share the scope of our decisions and related financial objectives and metrics together all at that time.

In summary, our strategies remain sound in the fundamentals of our business in particular with respect to top-line growth has continued to strengthen. While we have gross profit reimbursement pressure in the traditional pharmacy, as mentioned, we also have significant opportunities to drive additional cost efficiency and also turn the front end of our business into a very meaningful profit pillar.

Our Alliance Boots and AmerisourceBergen partnerships also continue to go well. And we are beginning to move beyond the cost-only synergy phase to one where we are starting to share and exploit organizational capabilities to strengthen our core business and find new levers to create value for shareholders.

---

[4] This Court notes that the plaintiff's complaint selectively edited Wasson's remarks to leave out his express statement that Walgreens no longer expected to reach the EBIT goal. Accordingly, this Court fills in the missing portion of the statements from the Miquelon Complaint, which the plaintiff has incorporated into its own complaint and which is therefore properly before this Court. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012).

(*Id.*, ¶ 192).  The plaintiff contends that these statements were false and misleading because Walgreens did not withdraw the EBIT target as a result of the "many Step 2 considerations" but instead as a result of the EBIT shortfall, concealed the scope of the EBIT shortfall, and waited to withdraw the EBIT goal until the announcement could be coupled with good news.  The defendants, in turn, contend that these statements were not false or misleading because they explicitly state that the withdrawal was the result of "Step two considerations" *and* "current business performance" and because the plaintiff has not made specific allegations that Step two considerations did not cause the goals' withdrawal.

It is undisputed that the EBIT goals' withdrawal resulted, at least in part, from the defendants' "current business performance," a factor that the defendants disclosed.[5]  During the conference call Wasson expressly stated that Walgreens no longer expected to reach the 2016 EBIT goal.  Although the defendants' decision to attribute the withdrawal to Step 2 considerations *and* business performance might have obscured the reasons for the withdrawal to some extent, it could not have obscured the fact that Walgreens was expressly abandoning the EBIT goal.  Thus, the defendants' statements regarding their reasons for withdrawing the EBIT goal have not been plausible alleged to be false or misleading with respect to the EBIT goal.

The plaintiff also contends that the defendants made a number of false and misleading statements that, although they disclosed the existence of the EBIT shortfall, failed to address its extent and misleadingly downplayed that extent by implying that there was meaningful potential to make up, mitigate, or offset that shortfall.  During his statement on June 24, 2014, for instance, Miquelon noted that:

> Purchasing synergies in the pharmacy and front end did partially
> offset this margin pressure.  Front-end margin increased in the
> quarter benefiting from mix and promotional adjustments.  And we

---

[5] The plaintiff also appears to concede that the 2016 goals needed to be withdrawn and updated in light of the acceleration of the Walgreens—Alliance Boots transaction.

> still expect the rate of generic drug introductions to increase in the
> fourth quarter to the point that it should not be a drag on margin
> year over year.

(Dkt. 47, ¶ 191). After their prepared remarks, the defendants answered questions from analysts.

George Hill, a Deutsche Bank analyst, asked how far off the original expected range the new EBIT

target would be. Wasson responded that Walgreens was "working on a whole host of things to try

to continue to drive value . . . . We are going to be looking at different goals and metrics both above

the line and below the line." (*Id.*, ¶ 193). Miquelon added:

> Yes, I think that's right. I think we are still aggressively driving all the
> [EBIT] opportunities but as Greg said we have opportunities below
> the line as well in terms of how we thing about structure, cap
> structure, refinancing and the like. And so we are making sure at this
> point in time that we look at everything interdependently as a web of
> choices and we maximize value as best we can.

(*Id.*, ¶ 194). When asked about the "big picture" with respect to profits, Wasson responded:

> . . . . I don't necessarily think that we should assume that the US
> business cannot continue to grow on profitability. I think the work
> that Alex and Mark and team are doing on the front end of the
> business we think we actually had tremendous opportunity to grow
> EBIT in operating margin on the front end of the business.
>
> We are beginning to get more confidence than just that. And I think
> that is obviously going to help us with the overall business. I think in
> the pharmacy business the good thing is that we are growing top line
> for the first time consistently in a long time with some of those
> strategic decisions I talked about.
>
> We are absolutely winning in the Part D space . . . .
>
> We do have obviously the pharmacy margin pressure that we talked
> about. But I think Kermit and team and he can maybe allude to a
> little bit how we think we'll go at that.
>
> We think with our contracting strategy going forward with the
> generic inflation that we are seeing versus historical deflation we're
> going to start taking that into consideration in our contracting. He is
> going at cost-of-fill reduction with a vengeance.
>
> And I think with Bern and Jeff Berkowitz and John out in Bern, we
> are positioned better than anyone to be able to get at cost. As far as

the cost opportunities, I think there is a little of both. I think that there is opportunity to get at cost, to your point, that's more maybe more cyclical.

(*Id.*, ¶ 196). In response to a question about what could have been done already about the declining profit margins versus the opportunity going forward, Wasson responded:

Now with that said, we also think that as we look at the current Walgreen business and opportunities, in addition with the merger of the two that there are going to be even greater opportunities and different ways of looking at that. So we are absolutely focused on the core business. We have made significant reductions.

Some of that has been absorbed, as I said, because of the pressure on the margin. We are identifying additional opportunities and we are going to combine those with the opportunities we have at Step 2.

(*Id.*, ¶ 197).

Near the end of the call, a Credit Suisse analyst asked whether the defendants were "optimistic that the below-the-line considerations may potentially offset the shortfall on the [2016] EBIT, or even more than offset the shortfall on the [2016] EBIT." (*Id.*, ¶ 202) In response, Wasson stated "I'm hesitant to go there. I think, as I said, we just have too many moving parts right now that we are working through. There is potential, obviously, and that's what we are looking through from all of those how they come together." (*Id.*). Miquelon echoed that response, stating "Yes, there's a lot of opportunity but I think the key is making the right choices so they all interplay with each other for the best long-term value creation for shareholders. And we are looking at everything." (*Id.*, ¶ 203).

The tone of these statements is resoundingly optimistic, which is perhaps in seeming conflict with the substantial EBIT shortfall alleged. The majority of the optimistic statements, however, concerned profit margins, synergies, or other metrics, not the EBIT goal itself. Those statements have not been plausibly alleged to be false or misleading because, as discussed above, they would not influence a reasonable investor's assumptions regarding the scope of the EBIT shortfall. This is

especially so here because Wasson expressly stated that Walgreens no longer expected to meet the EBIT goal, thus signaling that even these anticipated positive outcomes were unlikely to eliminate the shortfall. Similarly, the defendants' statements concerning their ability to "grow" EBIT are not actionable because the plaintiff has not alleged facts establishing that the defendants had actual knowledge that they would be unable to increase their EBIT (this Court notes that increasing EBIT, absent more, does not reflect on whether or not the EBIT goal would be met). The plaintiff, furthermore, has not alleged facts to establish that Wasson's representation to the Credit Suisse analyst that "there is potential, obviously" for below-the-line considerations to offset the EBIT shortfall was in and of itself false or misleading.

The plaintiff also contends that the defendants' falsely represented that the generic drug price inflation issue was "unanticipated" or "unexpected." For instance, when asked when and to what extent generic inflation had impacted Walgreens' margins, Wasson answered that:

> . . . I think certainly generic inflation kind of runs through a lot of this, meaning that it shows up in the contracts.
>
> Certainly we are thinking about deflation and now we are seeing some inflation. We are also just playing COGS. We are certainly doing everything we can with Bern to offset that.
>
> But I think in the work of magnitude I think probably generic inflation is specifically and probably more important because we did not quite anticipate it. A lot of the other strategic decisions we certainly anticipated. We know exactly what our contract arrangements with some of the commercial plans are, we know what our Part D preferred physicians cost us as far as gross margin.
>
> This was really snuck up on the industry and us. And now I do think, as I said, I can't think of anyone that is better positioned than us to offset this because of what we are doing at Bern . . . .

(*Id.*, ¶ 198). Kermit Crawford followed up, adding "[g]eneric inflation was higher than we expected compared to the normal deflation that we planned for and we saw the full impact of that in the third quarter versus the second quarter." (*Id.*, ¶ 199). A Goldman Sachs analyst subsequently asked

whether any of the profit margin pressures indicated unanticipated "structural change." Miquelon answered that "the thing that probably wasn't fully anticipated probably was just what we have seen in some inflation on drugs." (*Id.*, ¶ 200).

The plaintiff contends that these statements are false because the defendants knew of unprecedented generic drug price inflation in 2013. The defendants' statements, however, do not identify when they were surprised. The plaintiff appears to assume, with no basis in the statements, that they describe the events of the last quarter, (aka "we were surprised during the last three months by this trend"). Because no language in the statements so limits their term, however, the defendants plausibly could have been stating that generic drug price inflation was unexpected a year ago, or, even more likely, that it was unexpected when the EBIT goal was set in 2012. Moreover, the plaintiff has not plausibly alleged how these misrepresentations of the defendants' past knowledge were connected with the purchase or sale of a security or that they induced reliance by investors. Accordingly, plaintiff has failed to state an actionable claim with respect to these statements.

The plaintiff also alleges that the defendants' statements that their "procurement synergies" would offset the impact of generic price inflation and that "we are positioned better than anyone to be able to get at cost" were false. The plaintiff claims that the defendants knew that the ABC distribution agreement would not benefit Walgreens until FY2015 and then would only be sufficient to maintain the margins at their current rate due to Walgreens' inability to pass increased generic drug costs on to third parties. The statements that the plaintiff challenges, however, do not state when the ABC distribution agreement would benefit Walgreens or that it would allow Walgreens to increase its profit margins. Rather, they said only that the ABC agreement would offset price inflation and that Walgreens is the best positioned to respond to drug cost increases. Because the

plaintiff has not alleged facts establishing that either of these statements as false or misleading, these statements are not actionable.

Finally, the plaintiff alleges that, like in May, the defendants' positive remarks about Walgreens' growing Medicare Part D business were materially misleading because Walgreens had to make pricing concessions in order to garner increased Medicare Part D market share. As previously noted, however, it is not false and misleading to note that market share increased without disclosing that that increase was brought about through price concessions. *See Allscripts*, 778 F. sup. 2d at 878 (finding that a defendant's statement was not misleading because "in its actual context a reasonable investor would not arrive at the conclusion Plaintiff proposes").

## S-K 303(a) Violations

The plaintiff further contends that the defendants failed to comply with Item 303 of Regulation S-K by failing to disclose material known trends in their second quarter 2014 form 10-Q. Within this district, however, it has been recognized that S-K 303(a) does not give rise to a private right of action under Rule 10b. *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001) (Moran, J.), *see also Kriendler v. Chemical Waste Mgmt., Inc.*, 877 F. Supp. 1140, 1157 (N.D. Ill. 1995) (Castillo, J.) (adopting the rule that violations of SK-303 cannot be imported as a surrogate for analysis under section 10(b) and rule 10b-5). Because the plaintiffs' amended complaint does not allege that the statements contained in the Form 10-Q are independently actionable under section 10(b) or rule 10b-5, this claim must fail.

## Scienter

The defendants next argue that plaintiff has failed to adequately allege scienter with respect to Wasson and Miquelon. Scienter is defined as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). In order to survive a motion to

dismiss, all of the facts alleged, taken collectively, must give rise to a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In determining whether the alleged facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences. *Id.* at 323. A complaint can survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Id.*

Here, the alleged false or misleading statements that this Court has found to be adequately pled with respect to falsity concern the existence and nature of generic drug price inflation and reimbursement pressures. The allegations reflect that drug sales constituted the majority of Walgreens' sales, and that the bulk of drug sales involved generic drugs. The allegations also reflect that almost all drug sales were subject to a third-party-payer contract which set a cap on the amount of reimbursement that Walgreens could receive. Wasson and Miquelon were regularly informed of inflation and pricing trends in the generic drug market and third party reimbursement trends, both of which had a substantial impact on Walgreens profits. Additionally, Miquelon admitted that Walgreens' management was aware of generic drug price inflation by the class period.

Although the plaintiff makes lengthy allegations as to motive, none of those allegations apply to, or even appear to address, those limited issues remaining. It would be counterintuitive for the defendants to seek to hide the impact of generic drug price inflation on Walgreens when both parties appear to agree that generic drug price inflation was a recognized market trend. Nor do the plaintiff's myriad allegations of self-interest and corporate intrigue seem applicable when, as here, the defendants openly disclosed far more damaging information such as that Walgreens was targeted to miss the EBIT goal.

Absence of motive, however, is not fatal to allegations of scienter. *Id.* at 325. The relevant question is only whether, "when the allegations are accepted as true and taken collectively, would a

reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. Here, in light of the allegations establishing the defendants' knowledge that generic drug price inflation was a systematic trend and that Walgreens' contracts contained reimbursement-caps that would cut into profits if drug prices increased, the inference of scienter is at least as strong as any reasonable opposing inference. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").

## Remaining Issues

The defendants do not challenge whether the plaintiff has sufficiently alleged the remaining prongs of the Rule 10b-5 analysis. Nor does Wasson challenge the allegations underlying the plaintiff's Section 20(a) claims. Miquelon, however, contends that he cannot be held liable under section 20(a) because as CFO he reported directly to Wasson and therefore did not control Wasson or any of his alleged misstatements. Section 20(a) of the Act provides that every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extend as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constitution the violation or cause of action. 15 U.S.C. § 78t(a). Accordingly, this Court agrees that Miquelon cannot be liable under section 20(a) for statements that Wasson made directly. Miquelon, however, may nonetheless be liable under section 20(a) for statements issued by Walgreens or subordinate employees that Miquelon supervised. *Id.*

## Conclusion

For the foregoing reasons, the defendants' motions to dismiss are denied with respect to the alleged statements set forth in paragraphs 157, 163, and 173 of the amended complaint, and granted as to all other claims.

SO ORDERED.

_____

Sharon Johnson Coleman
United States District Court Judge

DATED: September 30, 2016