# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | )<br>)<br>)<br>) Case No. 15-cv-3187<br>) |
| Plaintiffs, | ) Judge Sharon Johnson Coleman<br>) |
| v. | )<br>) |
| WALGREEN CO., GREGORY D. WASSON, and WADE MIQUELON, | )<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM OPINION AND ORDER

Industriens Pensionforsikring A/S, acting as lead plaintiff on behalf of itself and all others similarly situated, brings this class action against defendants Walgreen Co. ("Walgreens"), former Walgreens CEO Gregory D. Wasson, and former Walgreens CFO Wade Miquelon, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The plaintiffs now move for class certification. For the reasons set forth herein, that motion [114] is granted.

**Background**

The following is a general overview of those allegations relevant to the present motion. A more complete description of the allegations contained in the amended complaint may be found in this Court's September 30, 2016, ruling on the defendants' motions to dismiss.

Walgreens is a retail drugstore chain that sells prescription and non-prescription drugs. Prescription drugs represent Walgreens' largest class of products and are the lead driver of its revenue and profit. At the times relevant here Gregory D. Wasson was Walgreens' CEO and a director on the company's Board of Directors and Wade Miquelon was Walgreens' CFO.

The substantial majority of prescription drugs that Walgreens sold were generic drug versions of branded drugs, which generated a higher profit margin than branded drugs due to their

1

lower production costs. That profit margin, however, was dependent on the difference between the cost to procure the generic drug and the reimbursement rate that Walgreens received for supplying a customer with the drug. Historically, generic drug prices had followed a deflationary trend, but in 2014 that trend reversed. Walgreens' contracts with several major Pharmacy Benefit Managers ("PBMs") provided for fixed maximum rates of reimbursement for each drug over the term of the contract, based on the assumption that generic drug prices would continue to decline. If those prices instead rose, Walgreens would be forced to absorb the additional cost of those drugs beyond the contractually-capped rate of reimbursement.

In June 2012, Walgreens announced that it was entering into a strategic transaction with Alliance Boots GmbH ("Alliance"). As part of this process, Walgreens announced a set of goals for FY 2016 reflecting the expected benefits of the new partnership, including generating $1 billion in combined synergies and between $9 and $9.5 billion in adjusted earnings before interest and taxes ("EBIT"). The EBIT goal was especially important to investors because it was the only metric gauging the potential profitability of the combined companies.

In late 2013, Walgreens' internal long range planning process revealed that the EBIT goal was tracking at under $8.5 billion.[1] Miquelon, in a verified complaint filed in a separate action ("the Miquelon complaint"), admitted that by the end of 2013 the company had identified the sources of that deficit as (1) the unprecedented level of generic drug price inflation that the industry was experiencing and (2) reimbursement contracts that failed to provide meaningful inflationary relief. Nonetheless, Walgreens restated the EBIT goal when it reported its first quarter results for 2014. During the conference call announcing the quarterly results, Miquelon admitted that Walgreens was tracking "a bit below" the EBIT goal, but asserted that the company was prepared to mitigate the

---

[1] Each year, Walgreens conducts a long range plan encompassing the next three fiscal years. The process of developing the long range plan begins in March and extends through the end of June, at which point the final results are submitted for the Board of Directors' approval at the annual board meeting. (Dkt. 47-1, ¶ 61).

2

risks to achieving the goal and that it had the right tools at its disposal to meet the target. During that call, Miquelon also reassured analysts that "[q]uarter by quarter we look at [the FY2016 goals], and say are these still realistic based upon all the risk and opportunities we have internally. If we ever feel that's not the case, we'll certainly tell you." By March 2014, the EBIT goal was tracking around $7.5 billion dollars, $2 billion less than the high end of the EBIT goal.

The class period, which runs from March to August 2014, encompasses the announcement of Walgreens second quarter results and third quarter results and public statements made in the interim. During that time, the defendants continued to issue statements that allegedly downplayed the risk to the EBIT goal and failed to acknowledge the impact of systematic generic drug price inflation.

On June 24, 2014, Walgreens issued its third quarter report and withdrew its FY 2016 earnings targets, attributing the decision to "Step 2 considerations" and "current business performance." Walgreens also made reference to experiencing generic drug price inflation and reimbursement pressures, although its statements could be taken as downplaying the actual significance of those trends. On August 6, 2014, Walgreens disclosed the extent of the resulting EBIT shortfall, attributing it primarily to "rapid and pronounced generic drug cost inflation" and unfavorable contract terms. The August 6th disclosures caused Walgreens stock to plummet over 14% in a single day and gave rise to the present litigation.

Although the plaintiffs initially sought to pursue a number of claims, their claims were narrowed by a motion to dismiss and now concern a period from March 25 to August 6, 2014, during which the defendants purportedly concealed or failed to fully disclose the impact of generic drug price inflation and reimbursement pressures. Following the Court's ruling on the motion to

3

dismiss, the Court bifurcated discovery on the defendants' motion, and the present motion for class certification followed.[2]

**Legal Standard**

In order to be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives set forth in Rule 23(b). *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) requires that a proposed class meet requirements of numerosity, typicality, commonality, and adequacy of representation. *Id.* When certification is sought under Rule 23(b)(3), the proponents of the class must also show that questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members and, relatedly, that a class action is superior to other available methods of resolving the controversy. *Id.*

Rule 23 does not set forth a "mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). When factual disputes bear on matters vital to certification, the Court must receive evidence and resolve those disputes prior to certifying the class. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Certification is proper only if, after rigorous analysis, the Court is satisfied that Rule 23's prerequisites have been met. *Comcast Corp.*, 569 U.S. at 33. The Seventh Circuit, however, has repeatedly reiterated that the focus of class certification must be on Rule 23 and that class certification proceedings cannot be allowed to turn into a preemptive determination of the merits. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015). Rule 23's requirements, moreover, have historically been liberally construed in favor of

---

[2] The Court notes that, in support of bifurcating discovery, the defendants argued that the merits were not relevant to class-certification and that statements made after June 24 were not relevant to class certification. The defendants' arguments call the accuracy of both of these arguments into question and a raise a serious question whether, if the present motion is denied, it would be appropriate to reopen merits-based discovery so that the plaintiffs may be adequately prepared to respond to the defendants' arguments.

4

maintaining securities fraud class actions. *See generally King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25–26 (7th Cir. 1975).

**Discussion**

The plaintiffs have elected to seek class certification under Rule 23(b)(3). In order for this Court to find that class certification is appropriate under rule 23(b)(3), the plaintiffs must establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The defendants contend that the plaintiffs cannot satisfy Rule 23(b)(3) because they have not shown that damages can be calculated on a class wide basis consistent with the theory of liability. This is the case, the defendants argue, both because they fully disclosed the truth in the middle of the class period on June 24, 2014, and because any variation in stock price on August 6, 2014, resulted from confounding information which was also disclosed on that date. Thus, applying *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), the defendants contend that the plaintiffs cannot establish that class certification is appropriate.

*Comcast* requires that a plaintiff seeking class certification must be able to establish that damages can be reliably measured in a manner that is consistent with the plaintiff's theory of liability. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) ("[T]he method of determining damages must match the plaintiff's theory of liability and be sufficiently reliable."); *Fox v. Riverview Realty Partners*, No. 12 C 9350, 2014 WL 1613022, at *5 (N.D. Ill. Apr. 22, 2014) (Kennelly, J.) (quoting *Comcast*, 569 U.S. at 35) (internal quotation marks omitted) ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged [theory of loss causation]."); *but see In re Groupon, Inc. Sec. Litig.*, No. 12 CV 2450, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014) (Norgle, J.) ("recognizing *Comcast* to be "inapposite in a

securities fraud class action."). Here, the plaintiffs have proposed, albeit succinctly, to calculate damages using the out-of-pocket method, a commonly used method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale. *Cf. Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 934–35 (N.D. Ill. 2010) (Guzman, J.) (discussing the application of this method of damages calculation). This method of calculating damages is consistent with the plaintiffs' theory of liability (i.e. that false representations artificially inflated the value of Walgreens' shares, and that when the truth was revealed on August 6 the stock lost value, causing harm to the plaintiffs) and is generally regarded as reliable. *See In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251 (N.D. Cal. 2013) (holding that the proposed use of an event study to calculate damages is sufficient to establish that common questions of damages predominate).

The defendants appear to contend that in order to attain class certification the plaintiffs must establish that their damages calculation will fully account for the impact of other intermediate disclosures and confounding information. The defendants, however, have failed to identify any legal authority requiring this burdensome showing at this stage in the proceeding. Indeed, although the defendants attempt to paint their questions regarding potential confounding or ameliorative statements as one of damages, in actuality those are questions of loss causation or materiality. Loss causation describes the causal connection between the material representation and the loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344–45, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In order to establish loss causation, a plaintiff must prove that the alleged misstatement was a substantial cause of the plaintiff's loss. *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015). Loss causation, however, need not be proved at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015). The questions of loss causation raised here, moreover, are common to the class

6

and therefore capable of common resolution. *Ludlow*, 800 F.3d at 687 (citing *Amgen, Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 470, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013)). As the Seventh Circuit has previously observed, "It is possible to certify a class under Rule 23(b)(3) even though all statements turn out to have only trivial effects on stock prices. Certification is appropriate, but the class will lose on the merits." *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).

Defendants' arguments to the contrary notwithstanding, *Comcast* does not provide that damages must be measurable in a way that measures only those changes in value attributable to the plaintiffs' theory of liability. Instead, it requires only that the commonality of the damages calculation be considered in conducting the predominance inquiry.[3] *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407–408 (2d Cir. 2015); *see also Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (recognizing that in order to certify a class, the damages methodology must be sound and produce commonality of damages). Here, the defendants argue that there is not sufficient detail about how damages will be calculated in light of potentially confounding information disclosed during the class period. The impact of the additional information disclosed during the class period, however, is common to the class, and therefore does not call into question whether damages can be calculated on a class wide basis. *Fox*, 2014 WL 1613022 at *5; *see also Ludlow v. BP, p.l.c.*, 800 F.2d 674, 683 (5th Cir. 2015) ("In short, in order to certify a class [after Comcast], the damages methodology must be 'sound' and must 'produce commonality of damages.'"). This Court therefore concludes that the plaintiffs have established the commonality of the proposed damages calculation and that it does not improperly depend on dismissed theories of liability.

---

[3] In *Comcast*, the plaintiffs had originally alleged four separate theories of anti-trust harm, three of which were dismissed from the case. At class certification, the plaintiffs' method of calculating damages included all four theories of potential liability, with the relative impact of each theory of liability varying geographically. In light of the size and geographic scope of the class, the Court concluded that damages could not be calculated class-wide and that the proposed class could not be certified under Rule 23(b)(3).

7

The defendants further contend that the plaintiffs cannot satisfy Rule 23(b)(3) because they cannot show that common questions of reliance predominate throughout the proposed class period. The Supreme Court has recognized that a class-wide rebuttable presumption of reliance may be based on the "fraud-on-the-market" theory, which assumes that, because the market price of shares traded on well-developed markets reflects all publically available information, an investor relies on public misstatements whenever she buys or sells stock at the market price. *Basic Inc. v. Levinson*, 485 U.S. 224, 244, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In order to establish the applicability of the fraud on the market theory, four prerequisites must be proven: (1) the alleged misrepresentations must be publically known; (2) they must have been material; (3) the stock must have traded in an efficient market; and (4) the plaintiffs must have traded the stock between when the misrepresentation was made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2412–14, 189 L.Ed.2d 339 (2014). The Supreme Court has explicitly stated that, with the exception of materiality, these prerequisites must be established prior to class certification. *Id.* at 2412; *see also Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 473, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013) (recognizing the requirement that the fraud-on-the-market theory's trade-timing predicate be established before class certification). The Supreme Court, however, has also expressly recognized that a defendant's argument that the fraud-on-the-market presumption should not apply beyond a certain date because the truth was revealed to the market on that date is a question of the merits that could not be resolved at class certification. *Amgen*, 568 U.S. at 482. Numerous courts have agreed that a "truth on the market" defense cannot be used to rebut the presumption of reliance at the class-certification stage. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 595 (N.D. Ill. 2009) (St. Eve, J.) (holding that arguments that an intermediate statement revealed the truth and undermined the presumption of reliance after that date was a question on the merits that did not impact the predominance inquiry); *see also In re Bridgepoint Educ.,*

8

*Inc. Sec. Litig.*, No. 12-cv-1737 JM (JLB), 2015 WL 224631, at *7 (S.D. Cal. Jan. 15, 2015) (citing *Conn. Ret. Plans and Trust Funds v. Amgen, Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd* 568 U.S. at 480) ("[A] truth-on-the-market defense cannot be used to rebut the presumption of reliance at the class-certification stage because the defense 'is a method of refuting an alleged representation's materiality,' and it is well established that 'a plaintiff need not prove materiality at the class certification stage to invoke the presumption.'"); *In re Virtus Investment Partners, Inc. Sec. Litig.*, No. 15 CV 1249, 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017) (recognizing that truth-on-the-market defenses are "inappropriate on a motion for class certification."). Accordingly, this Court interprets the trade-timing prerequisite as requiring only that a plaintiff establish that they traded between the alleged misleading statements and the alleged corrective disclosures. Here, it is undisputed that the plaintiff class did so. The defendants' arguments, although relevant to rebutting the fraud-on-the-market presumption when this case is heard on its merits, therefore cannot be decided at this juncture.[4] Accordingly, this Court concludes that common questions of law and fact predominate in this action.

In order for Rule 23(b)(3) to be satisfied, the Court must also consider whether a class action is superior to other available methods of resolving the controversy. In doing so, the Court may consider the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation that has already begun; the desirability of concentrating the litigation in a particular forum, and the difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). Here, it is undisputed that the class action mechanism is superior to available alternatives and, in light of the nature of the plaintiffs' claims, the class action mechanism is clearly the fairest and most efficient means by which the plaintiffs' claims against the defendants can be adjudicated. *See Roth v. Aon Corp.*, 238 F.R.D. 603, 608 (N.D. Ill. 2006) (Norgle, J.) (quoting *Brosious*

---

[4] To the extent the Court has reviewed the defendants' limited evidence regarding this merits-related issue, the Court has found it to be unpersuasive.

*v. Children's Place Retail Stores*, 189 F.R.D. 138, 147 (D.N.J. 1999)) (recognizing that class actions are often the superior way to resolve securities fraud suits in light of the difficulty in prosecuting such claims on an individual basis). Accordingly, the Court concludes that the plaintiffs have satisfied the requirements of Federal Rule of Civil Procedure 23(b)(3).

Although the defendants concede that the plaintiffs satisfy the numerosity and commonality requirements of Rule 23(a), they further contend that the plaintiffs cannot satisfy Rule 23(a)'s requirements because Industriens is not a typical or adequate class representative. Under Rule 23(a)(3), a class representative's claim must by typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). A class representative's injuries need not be identical to those of the class, but they must arise from the same common events, practices, or conduct and must be based on the same legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Typicality is based on the plaintiff's legal theory and the defendant's conduct, and does not depend on the particularized defenses that the defendant may have against certain class members. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996). Rule 23(a)(4) further requires that the lead plaintiff and class counsel's representation of the class must be adequate to fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). In order to establish this, class representatives must show that (1) their claims are not antagonistic to or in conflict with those of the proposed class, (2) they have sufficient interest in the outcome of the case, and (3) experienced, competent counsel represent them. *Silversman v. Motorola, Inc.*, 259 F.R.D. 163, 173 (N.D. Ill. 2009) (St. Eve, J.).

Here, the defendants assert that, because Industriens cannot establish trade timing, it cannot establish the typicality of its claims or the adequacy of its representation of the class. As previously noted, *Amgen* recognizes that arguments challenging trade-timing are relevant to the typicality and adequacy inquiries required by Rule 23(a). *Amgen*, however, requires only an initial showing of trade-timing, and this Court has determined that such a showing has been made. Although the

defendants' arguments regarding trade-timing raise a valid concern which will likely need to be revisited once the merits of that issue are decided, this Court perceives no evidence presently before it capable of establishing that Industriens does not satisfy the typicality or adequacy requirements. The Court accordingly holds that the plaintiffs have demonstrated that class certification is warranted under Federal Rule of Civil Procedure 23.

**Conclusion**

For the foregoing reasons, the plaintiffs' motion for class certification [114] is granted.

SO ORDERED.

SHARON JOHNSON COLEMAN
United States District Court Judge

DATED: 3/29/2018