# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) Case No. 15-cv-3187 |
| Plaintiffs, | ) ) Judge Sharon Johnson Coleman |
| v. | ) ) ) |
| WALGREEN CO., GREGORY D. WASSON, and WADE MIQUELON, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

Industriens Pensionforsikring, A/S, as lead plaintiff,[1] brings this shareholder class action lawsuit against defendants Walgreen Co. ("Walgreens"), former Walgreens Chief Executive Officer ("CEO") Gregory D. Wasson, and former Walgreens Chief Financial Officer ("CFO") Wade Miquelon for violations of the Securities Exchange Act of 1934. Defendants have moved to dismiss plaintiff's first amended class action complaint under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants in part and denies in part defendants' motion.

**Background**

Walgreens is a retail drugstore chain, which sells prescription and non-prescription drugs. Prescription drugs represent Walgreens' largest class of products and are the lead driver of its revenue and profit. The majority of prescription drugs sold by Walgreens are generic drugs. Generic drugs generate a higher profit margin than branded drugs due to their lower production costs. That profit margin is dependent on the difference between the cost to procure the generic drug and the reimbursement rate Walgreens receives for supplying a customer with the drug.

---

[1] **The Court granted** Industriens Pensionforsikring, A/S motion for appointment as lead plaintiff on June 16, 2015. The Court will refer to Industriens Pensionforsikring, A/S as plaintiff throughout this ruling.

Historically, generic drug prices have followed a deflationary trend, but starting in 2014 that trend reversed. At that time, Walgreens had contracted with several major Pharmacy Benefit Managers ("PBMs") to provide fixed maximum rates of reimbursement for each drug over the term of the contract based on the assumption that generic drug prices would continue to decline. If those prices rose, Walgreens would be forced to absorb the additional cost of those drugs beyond the contractually-capped rate of reimbursement.

To give context to plaintiff's securities fraud claims, Walgreens announced that it was entering into a merger with Alliance Boots GmbH ("Alliance") in June 2012. As part of this transaction, Walgreens set forth long-range goals for fiscal year 2016 ("FY16") reflecting the expected benefits of the new partnership, including generating $1 billion in combined synergies and between $9 and $9.5 billion in adjusted earnings before interest and taxes ("EBIT"). In late 2013, Walgreens' internal long-range planning process revealed that the FY16 EBIT goal was tracking under $8.5 billion. Miquelon, in a state court complaint filed in a separate lawsuit, admitted that by the end of 2013, Walgreens had identified the sources of that deficit as: (1) the unprecedented level of generic drug price inflation; and (2) reimbursement contracts that failed to provide meaningful inflationary relief. Walgreens nonetheless restated the FY16 EBIT goal of $9 to $9.5 billion when it reported its first quarter results in 2014. By March 2014, defendants determined that Walgreens had a FY16 earnings shortfall of well over $1 billion. This additional shortfall, along with the $500 to $600 million shortfall the company knew about in late 2013, increased the aggregate shortfall to $2 billion less than the high end of the FY16 EBIT goal.

The class period, which runs from March to August 2014, encompasses the announcement of Walgreens second quarter and third quarter results, as well as public statements made in the interim. At that time, defendants continued to make statements that downplayed the risk of not achieving the FY16 EBIT goal. Miquelon's state court complaint, however, states that by March

2

2014 when Walgreens issued its second quarter results, the company was well aware of the systematic inflation of generic drug prices.

In April 2014, Miquelon shared an interim long-range planning update with Walgreens' Board of Directors that stated Walgreens would realize $7.5 billion in EBIT in 2016. Also in April, activist investors began to push aggressively for Walgreens to execute a tax inversion (by moving the company overseas) and expressed a desire that the Alliance management team take on a greater leadership role in the combined companies leading to speculation that Wasson was losing control of the company. In May 2014, Wasson told Miquelon that if Walgreens did not proceed with the tax inversion, he believed that the activist investors would force him out of his position.

Miquelon finalized his estimate by June 2014 and determined that the FY16 EBIT goal was tracking at $7.2 to $7.5 billion. Miquelon informed Wasson of the scope of the shortfall in mid-June and advocated for publicly withdrawing the FY16 EBIT goal during the next quarterly call on June 24. Wasson wanted to delay the scheduled earnings announcement so that the withdrawal of the EBIT goal could be bundled with the favorable news concerning the merger with Alliance, including that Walgreens might complete a tax inversion resulting in a significantly lower corporate tax rate.

Walgreens held an earnings conference call on June 24 withdrawing its FY16 earnings target attributing the decision to "Step 2 considerations" and "current business performance." Although Walgreens withdrew its FY16 earnings target, it did not disclose that the shortfall would be $1.8 to $2.3 billion less than the original target. Walgreens also mentioned generic drug price inflation and reimbursement pressures at the conference call, although its statements could be taken as downplaying the actual significance of those trends.

On August 6, 2014, Walgreens held an investor call regarding the merger with Alliance. During the call, Walgreens disclosed the actual extent of the resulting earnings shortfall announcing the new FY16 EBIT target as $7.2 billion—well below the original estimated $9 to $9.5 billion goal.

Walgreens attributed this shortfall to "rapid and pronounced generic drug cost inflation" and unfavorable contract terms with PBMs. After this August 6 disclosure, Walgreens stock dropped 14.3% in a single day. This litigation followed.

Plaintiff initially sought to pursue a number of claims, which the Court narrowed in its September 2016 motion to dismiss ruling. Although the Court presumes familiarity with its ruling, a short recap is in order. The alleged misrepresentations that survived Walgreens' initial motion to dismiss concern statements where defendants purportedly concealed or failed to fully disclose the impact of generic drug price inflation and reimbursement pressures. More specifically, plaintiff sufficiently alleged the following non-forward looking statements under Rule 9(b)'s particularity requirements: (1) Miquelon's statement during a March 25, 2014, investor conference call about the second quarter report that "the most significant factor affecting the pharmacy margin was dramatically slower rate of new generic introductions year over year;" (2) Walgreens statement made in its March 27, 2014 Form 10-Q filed with the Securities and Exchange Commission ("SEC") that "[r]etail pharmacy margins were negatively impacted by a significant reduction in the number of brand to generic drug conversions and lower market driven reimbursements;" and (3) Wasson's April 17, 2014 conference call with J.P. Morgan in which the resulting report stated "management noted that it is seeing nothing unusual at this point" with respect to reimbursement pressures. Plaintiff's allegations concerning the forward-looking statements related to the FY16 EBIT goal of $9.0 to $9.5 million did not survive defendants' initial motion to dismiss.

On September 28, 2018, the SEC issued an administrative cease-and-desist order against Walgreens, Wasson, and Miquelon under § 17(a)(2) of the Securities Act of 1933. The SEC found defendants "acted negligently in failing to adequately disclose to investors the material increase in risk to the company's ability to achieve the FY16 EBIT Goal." Without admitting or denying the findings, Walgreens, Wasson, and Miquelon consented to the entry of the SEC cease-and-desist

order. The SEC also required Walgreens to pay a $34.5 million penalty, and Wasson and Miquelon to each pay a $160,000 penalty.

**Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). When considering dismissal of a complaint, the Court accepts all well pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam); *Trujillo v. Rockledge Furniture LLC*, 926 F.3d 395, 397 (7th Cir. 2019). To survive a motion to dismiss, plaintiff must "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Rule 9(b) requires plaintiffs to plead with particularity the circumstances constituting fraud. *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019); Fed. R. Civ. P. 9(b). Particularity in pleading fraud, including securities fraud, means describing the who, what, when, where, and how of the fraud. *Cornielsen*, 916 F.3d at 598; *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

**Discussion**

To adequately plead defendants made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5 of the '34 Act, plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor

5

as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted). Scienter is defined as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

The Private Securities Litigation Reform Act ("PSLRA") requires that the complaint specify each statement alleged to be misleading and the reason or reasons why it is misleading. *Cornielsen*, 916 F.3d at 599; 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that plaintiffs plead with particularity facts giving rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a "strong inference" of scienter, the allegations must be more than merely plausible, they must be as compelling as any opposing inference of non-fraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Further, the PSLRA contains a safe harbor provision that heightens the pleading requirements for forward-looking statements. 15 U.S.C. § 78u-5(c); 17 C.F.R. § 230.175. A plaintiff alleging that a forward-looking statement contains a misrepresentation or omission must establish a "strong inference" that the statement was made with actual knowledge by the speaker that the statement was false or misleading. *City of Livonia Emp. Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013); 15 U.S.C. § 78u-5(c)(1)(B).

**Forward-Looking Statements**

<u>March 25, 2014, Second Quarter Report</u>

In the first amended complaint, plaintiff has re-alleged certain FY16 EBIT goal-related statements and added new ones. To start, plaintiff re-alleges that on March 25, 2014, Walgreens issued its second quarter report and press release. That same day, Wasson and Miquelon held a conference call with investors to present the report and answer questions. With respect to the FY16

6

EBIT goal, Miquelon stated that Walgreens was currently tracking below the Compound Annual Growth Rate ("CAGR") needed to achieve the goal, yet Walgreens' presentation slides for the March 25 conference call unequivocally stated the FY16 EBIT goal remained at $9.0 to $9.5 billion. Also, Miquelon stated: "We continue to recognize that there are risks to achieving this goal; however, we remain focused on delivering it." Plaintiff asserts that these statements, in tandem with the slides, were false and misleading because by March 25 defendants knew that the FY16 EBIT goal was tracking at least $1 billion below target.

In the September 2016 motion to dismiss ruling, the Court concluded that these statements were not actionable because plaintiff did not sufficiently allege that the $9.0 to $9.5 billion goal was not attainable. To clarify, statements about earnings forecasts or goals "may be actionable if they are made with the knowledge that they are incorrect or are otherwise without [a] reasonable basis." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1039 (7th Cir. 1996); *see also In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996) ("companies making forward-looking statements are afforded a safe harbor: plaintiffs must allege 'specific facts which illustrate that [the company's] predictions lacked a reasonable basis.'") (citation omitted). Under this standard, courts in this district have concluded that a plaintiff sufficiently alleges a forward-looking claim when defendants disclose goals that they know are not attainable. *See Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at *4 (N.D. Ill. July 20, 2001) (Holderman, J.)

Plaintiff has cured its earlier pleading deficiencies by providing additional allegations raising a strong inference that by March 2014 defendants knew that the $9.0 to $9.5 billion earnings goal was not attainable. For example, in a December 17, 2013, email to Miquelon, the Vice President of Global Finance stated in reference to the earnings shortfall: "I can see that we're trying to have adequate upside to offset the risk shown on the slide," but "[b]ased on what I see, we don't have support to imply this range of value is reasonable." Similarly, when discussing the trend in generic

7

price increases, Miquelon informed Wasson (and others) that the "trend may not continue, but as the Finance team has modeled it out if it does[,] we will have a hurdle nearly impossible to climb" in an email dated December 4, 2013.[2] Other internal emails support this inference, including a June 7, 2013, email regarding talking points for Miquelon where the Senior Director in Financial Planning and Analysis explained that asking Walgreens' businesses to close a $400-$500 million gap in the long-range plan "will lead to unattainable goal setting."

Plaintiff provides other communications and allegations from early 2014 through the beginning of the class period starting in March 2014 that underscore Miquelon's and Wasson's knowledge that by early March 2014, the FY16 EBIT goal of $9.0 to $9.5 billion did not have a reasonable basis and was not attainable. (R. 198, First Am. Compl. ¶¶ 123-26, 130, 146-47, 150.) Such allegations include that Walgreens prepared a long-range plan "refresh" in January and February 2014, which provided management with the forecast of FY16 EBIT at $8.4 billion. Under these allegations, plaintiff has adequately alleged particular facts to show that defendants should not be protected by the safe harbor provision for these March 25 forward-looking statements.

May 15, 2014, Goldman Sachs Analyst Report

Next, plaintiff adds new goal-related allegations focusing on defendants' statements and omissions made in May 2014. On May 15, Miquelon made statements during investor meetings hosted by Goldman Sachs. That same day, Goldman Sachs issued a report "Takeaways from Day 1 of meetings with management," which stated, "[o]f the five targets all are tacking on/ahead of plan with the exception being the adj. EBIT goal of at least $9.0bn as core growth has lagged. That said, [Walgreens] did not back away from this target." Plaintiff also highlights a May 23 Goldman Sachs

---

[2] Although this December 2013 email is not mentioned in the first amended complaint, "nothing prevents a plaintiff opposing dismissal from elaborating on the complaint or even attaching materials to an opposition brief illustrating the facts the plaintiff expects to be able to prove." *Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

8

report that provided additional information discussed with Miquelon at the May 15 meeting. The report stated in pertinent part:

> During our meetings, Wade Miquelon, CFO, highlighted that [Walgreens] is tracking on or ahead of plan for each of its five FY16 financial targets with the lone exception of adj. EBIT. That said, management believes this target remains achievable and sees further upside beyond FY16 by leveraging a global footprint, expanding in growth markets, and bringing [Alliance's] best practices to the US.

As explained, plaintiff has sufficiently alleged that by March 2014 defendants knew the $9.0 to $9.5 billion earnings goal did not have a reasonable basis and was not attainable. Defendants nevertheless argue that they cannot be held liable for the May 2014 statements written by third-party analysts because defendants did not have the ultimate authority over the content of the analysts' reports. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."); *see also Lorenzo v. SEC*, 139 S.Ct. 1094, 1096 (2019) (same). As the Supreme Court teaches, "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus,* 564 U.S. at 142. Nonetheless, "[n]othing in *Janus* undid the long-standing rule that '[a] corporation is liable for statements by employees who have apparent authority to make them.'" *Glickenhaus & Co. v. Household Int'l, Inc.,* 787 F.3d 408, 426 (7th Cir. 2015) (citation omitted); *see also In re Smith Barney Transfer Agent Litig.*, 884 F.Supp.2d 152, 164 (S.D.N.Y. 2012) ("*Janus* did not change the longstanding rule that corporate officials are liable for misstatements to which they give their imprimatur.").

The context in which Goldman Sachs analysts reported Miquelon's statements was the May 15 investor meeting hosted by Goldman Sachs. The May 15 report stated that at the meeting with Miquelon, Miquelon highlighted the FY16 targets, including the EBIT goal. The May 15 report was

9

entitled "Takeaways from Day 1 of meetings with management" and stated that "[Walgreens] did not back away from this target." Without any attribution to Miquelon, these statements are the author's "takeaways" or conclusions from the meeting. And, the statement that "Walgreens" did not back away from the FY16 EBIT target is too broad to create any inference that this statement should be attributed to Miquelon.

On the other hand, the May 23 report specifically identified Miquelon as the speaker by stating "Wade Miquelon, CFO, highlighted" and then immediately stated that "management believed the FY16 EBIT target remains achievable." Because the Goldman Sachs report specifically attributed this statement to Miquelon, this May 2014 statement is actionable.

**Generic drug inflation/reimbursement pressures**

Plaintiff also brings additional claims related to defendants' allegedly false and misleading statements that concealed or failed to fully disclose the impact of generic drug price inflation and reimbursement pressures. Because these statements are not forward-looking, but instead discuss historical and present facts that are not contingent on any future event, they are not protected by the PSLRA's safe harbor provision. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F.Supp.3d 737, 756 (S.D.N.Y. 2018) ("The scienter requirement for forward-looking statements—actual knowledge—is 'stricter than for statements of current fact.'") (citation omitted).

April 17, 2014, J.P Morgan Conference Call

On April 17, 2014, J.P. Morgan hosted a conference call with Wasson. At the conference call, the J.P Morgan analyst asked Wasson about the impact of generic price inflation. Wasson replied, "we think that it was really kind of a one-time phenomenon" and that it "was probably an anomaly." He further stated that Walgreens had "a better opportunity than anyone to offset that generic inflation." Plaintiff argues that Wasson knew that these statements were false or misleading

10

because the generic inflation and reimbursement problems were structural and systemic—not an "anomaly" or "one time phenomenon."

Defendants contend that these statements are not actionable because plaintiff has failed to sufficiently allege that Wasson knew generic inflation and reimbursement problems were more than an anomaly. On the contrary, plaintiff has adequately alleged that Wasson was aware of the systemic generic drug price inflation and reimbursement pressures at the time he made these statements. Allegations in the first amended complaint, taken as true for purposes of this motion to dismiss, reveal that during the relevant time period, Wasson and Miquelon, as Walgreens' most senior officers, were regularly informed of generic inflation and pricing trends in the generic drug market, along with third-party reimbursement trends, both of which had a substantial impact of Walgreens' profits. They had ultimate responsibility for directing and managing the company's financial performance, public statements, and business affairs raising an inference that Wasson knew by late April/early May 2014 that Walgreens' third-party payer reimbursement contract negotiations were not going well, along with the inflation and pricing trends in the generic drug market.

Next, plaintiff points to the J.P. Morgan analyst's question at the April 17 investor conference call about reimbursement pressures by third-party payers, including prescription drug plans, Medicare, and PBMs, to which Wasson replied "we're not seeing anything that I would call unusual. I think it's more normal course of business." Defendants, in turn, argue that these statements are not false or misleading because Wasson was discussing pressure from third-party payers—not price increases by generic drug manufacturers resulting in the generic price inflation. In making this argument, defendants ignore the interconnection between the two trends. As explained, Walgreens has contracts with third-party payers, including PBMs, that provide for fixed maximum rates of reimbursement based on the assumption of a deflationary generic price trend. Thus, whether a reasonable investor would have interpreted Wasson's statement about reimbursement

11

pressure to say anything about generic price inflation is a question of fact.  *See SEC v. Ustian*, 229 F.Supp.3d 739, 765 (N.D. Ill. 2017) ("how a reasonable investor would interpret facts and the significance the investor would afford the inferences she reaches," is "for the trier of fact."). Wasson's April 17, 2014 statements survive defendants' motion to dismiss.

April 30, 2014, Barclay's Conference

Plaintiff next re-alleges its claim in relation to statements made by Walgreens' Head of Investor Relations, Rick Hans, who appeared at the Barclay's Retail and Consumer Discretionary Conference on April 30, 2014.  Plaintiff highlights the following question posed to Hans: "When we think about maybe this fiscal year, how has the gross margin advantage from generics helped you?  I'm not talking about the supply chain changes."  In response, Hans stated, "we've had a kind of a dearth of new generics.  So that caused a big mismatch, it's kind of that peak to trough that we've talked about relative to the introduction of new generics and that had an impact on the margin."  Plaintiff asserts that this statement misled investors by explaining that the drop in pharmacy margin was due to the lack of new generic drugs, rather than the generic drug price inflation combined with Walgreen's unfavorable contracts with PBMs.

The questioned posed, however, unequivocally states that the inquiry did not involve "supply chain changes," such as generic pricing or generic drug price inflation.  Rather, the question asked about the gross margin advantages generics have over branded drugs.  As previously discussed, generic drugs generate a higher profit margin than branded drugs due to their lower production costs, and, as alleged in the first amended complaint, the profit margins on generic drugs are typically 50% higher than branded competitors.  Therefore, Hans' answer concerning the lack of new generics directly responds to the question about the gross margin advantage on generics and not generic drug price inflation.  Accordingly, Hans' answer is not misleading nor actionable.

12

May 16, 2014, Morgan Stanley Conference Call

Last, plaintiff seeks to revive its claim concerning a May 16, 2014 analyst report issued by Morgan Stanley after a conference call with Wasson and Miquelon. In the report, Morgan Stanley stated Walgreens "has not seen any unusual activity" in relation to generic price inflation and that its joint venture with Alliance leaves Walgreens in "better shape than peers to cope with generic price increases." In the September 2016 ruling, the Court concluded it was unclear who made these statements, therefore, the allegations were insufficient to state a claim. *See Janus,* 564 U.S. at 142 ("attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made" by "party to whom it is attributed."); *see also Fulton Cty. Empls.' Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364, at *6 (E.D. Wis. Feb. 18, 2010) (conclusions analysts drew after meeting with corporation's executive were not executive's statements).

Plaintiff contends that it has cured this deficiency by alleging new surrounding facts in the first amended complaint. The Court agrees. It is undisputed that Wasson and Miquelon were the only Walgreens' executives in attendance on the conference call. Moreover, Wasson's statement that Walgreens "has not seen any unusual activity" is similar to his earlier statement at the J.P. Morgan investor conference raising an inference that he made the later statement. Plaintiff further relies on Wasson's September 17, 2017 testimony in the SEC proceedings where he stated it was "most likely it could've been both of us" who addressed the generic price inflation at the May 2014 call. Viewing the well pleaded allegations in plaintiff's favor, its additional allegations sufficiently connect Wasson to the statements made in the May 16 Morgan Stanley report. The May 2014 Morgan Stanley statements thus survive defendant's motion to dismiss.

**Loss Causation**

Walgreens further argues that the Court should dismiss all of plaintiff's § 10(b) claims because plaintiff fails to adequately allege loss causation under the "fraud-on-the-market" theory of

13

damages. The fraud-on-the market theory is based on the presumption that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246. Walgreens contends that because it withdrew its FY16 earnings target at the June 24, 2014 conference call, the relevant misrepresentations were publicly known on that date. Yet, Walgreens points out, the stock price did not drop until after the August 6, 2014, disclosure. Walgreens therefore argues that because it disclosed the actionable misrepresentations to the public on June 24, over a month before the August 6 stock drop, there was no causal connection to establish loss causation.

To prove loss causation, the plaintiff has "the burden to establish that the price of the securities they purchased was 'inflated'—that is, it was higher than it would have been without the false statements—and that it declined once the truth was revealed." *Glickenhaus*, 787 F.3d at 415. The loss causation element of a § 10(b) claim "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). At the motion to dismiss stage, "a plaintiff who has suffered an economic loss" must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). As the Seventh Circuit instructs, the requirement of loss causation "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997); *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) ("Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by [the] circumstances").

In essence, Walgreens is arguing that the "truth" was known to the public on June 24, well before the stock price dropped 14.3% on August 6. According to plaintiff's allegations, however,

the June 24 conference call at which Walgreens withdrew its FY16 earnings target revealed only part of the truth because it did not fully disclose that the shortfall would be $1.8 to $2.3 billion less than the original target. At the call, Miquelon explained:

> As a result of the many Step 2 considerations in current business performance we are withdrawing the fiscal year 2016 goals that were previously announced in 2012. Once key decisions have been made on the above matters Walgreens anticipates being in a position to hold an investor call, which is expected to occur by late July or early August. Many of the areas under consideration are interdependent and so we believe that the prudent course is to share the scope of our decisions and related financial objectives and metrics together all at that time.

(First Am. Compl. ¶ 231.) In contrast, as plaintiffs allege, the August 6 disclosure provided the full magnitude or scope of the FY16 earnings shortfall and reasons for the shortfall, including systemic generic price inflation and reimbursement pressures. The August 6 investor call also announced that Walgreens would not re-domicile as part of its merger with Alliance, therefore, the significantly lower corporate tax rate resulting from a tax inversion would not be realized.

Drawing all reasonable inferences in plaintiff's favor, it has adequately alleged a direct casual connection between defendants' various misstatements and omissions and the stock drop on August 6 by asserting that the artificial inflation in Walgreens common stock prices was removed through the corrective disclosure on August 6, which revealed the true magnitude of the FY16 EBIT target shortfall, along with generic price inflation and unfavorable reimbursement contracts. This causal connection is further supported by analysts' reactions to August 6 disclosures, such as a Credit Suisse report dated August 6 that stated:

> After more than a year of positive investor meetings and earnings calls where management hinted at the large potential of a combined WAG/AB, management shocked investors when its new fiscal '16 targets fell well short of elevated expectations and prior guidance. Fiscal '16 EBIT is now expected to be almost 20% lower than the guidance provided when the deal was initially announced.

(First Am. Compl. ¶ 261.) Under the detailed allegations in the first amended complaint, defendants' loss causation argument fails at this procedural posture.

15

**Section 20(a) Claims**

Plaintiff also brings claims based on "controlling person" liability against Wasson and Miquelon in violation of § 20(a) of the '34 Act. A violation of § 10(b) and Rule 10b-5 is necessary predicate to support a violation of § 20(a). *Pension Trust Fund for Operating Eng'r v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018). Defendants argue that plaintiff cannot bring a § 20(a) claim because there is no predicate violation of § 10(b)—an argument that is unavailing at this juncture. The Court thus denies this aspect of defendants' motion to dismiss.

**Conclusion**

For the foregoing reasons, the Court grants in part and denies in part defendants' Rule 12(b)(6) motion to dismiss.

SO ORDERED.

SHARON JOHNSON COLEMAN
United States District Court Judge

DATED: 9/23/2019