UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 15-cv-3187 |
| | ) | |
| Plaintiffs, | ) | Judge Sharon Johnson Coleman |
| | ) | |
| v. | ) | |
| | ) | |
| WALGREEN CO., GREGORY D. WASSON, and WADE MIQUELON, | ) ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Lead plaintiff Industriens Pensionforsikring, A/S ('plaintiff') brings this shareholder class action lawsuit against defendants Walgreen Co. ("Walgreens"), former Walgreens Chief Executive Officer Gregory D. Wasson, who was also on the company's Board of Directors during the relevant time period, and former Walgreens Chief Financial Officer Wade Miquelon for violations of the Securities Exchange Act of 1934. Before the Court are plaintiff's motion for partial summary judgment and defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the Court grants in part and denies in part defendants' motion and denies plaintiff's motion.

**Background**

Walgreens is a retail drugstore chain headquartered in Deerfield, Illinois, that sells prescription and non-prescription drugs, along with general merchandise. Prior to its merger with Boots Alliance GmbH ("Alliance") in December 2014, Walgreens stock was publicly traded on the New York Stock Exchange and the Chicago Stock Exchange under the ticker symbol WAG. In July 2014, an investment manager purchased shares of Walgreens stock on behalf of plaintiff pension fund.

Walgreens' largest business unit is the pharmacy division. Prescription drugs represent Walgreens' largest class of products and the majority of prescription drugs sold by Walgreens are generic. The profit margin for generic drugs is dependent on the difference between the cost of the generic drug and the reimbursement rate Walgreens receives for supplying a customer with the drug. For years, generic drug prices followed a deflationary trend, but starting in 2013 that trend began to change. At that time, Walgreens had contracted with third-party payers, such as the federal government, commercial health insurance plans, and pharmacy benefit managers, to provide fixed maximum rates of reimbursement for each generic drug based on the assumption that generic drug prices would continue to decline. Typically, these contracts were negotiated on annual cycles for Medicare Part D or multi-year cycles for private health insurance. At issue in this fraud-on-the-market case are Walgreens' statements concerning the influence of generic drug price inflation and reimbursement expenses on Walgreens' long-range financial goals for fiscal year 2016 ("FY16"), which began on September 1, 2016 and ended on August 31, 2016.

In June 2012, Walgreens announced that it was entering into a two-step merger with Alliance. The first step involved Walgreens acquisition of 45% of Alliance's stock in 2012. The second step allowed for Walgreens to exercise an option of acquiring the remaining 55% of Alliance's stock approximately three years later if Walgreens' shareholders approved. Around that time, Walgreens also set forth long-range goals for FY16, which reflected the expected benefits of the new partnership with Alliance, including generating $1 billion in combined synergies and between $9 and $9.5 billion in adjusted earnings before interest and taxes ("EBIT"), among other goals. Walgreens made this information available to the public in September 2012.

In December 2013, the pharmacy division finance team forecasted a shortfall in the pharmacy budget for FY14, after which senior management reduced the FY16 EBIT estimate from between $9 and $9.5 billion to $8.4 billion. During a quarterly earnings call on December 20,

2013, Miquelon told the public that the performance with respect to the adjusted operating income goal of $9 billion to $9.5 billion was currently tracking "a bit" below the compound annual growth rate ("CAGR") required to meet this goal, but Walgreens remained focused on delivering this goal. Meanwhile, evidence in the record shows that by the end of 2013, Miquelon and his team had identified that inflation in the price of generic drugs and that Walgreens' contracts with third-party payers were two potential risks to meeting the FY16 EBIT goal.

On January 9, 2014, Walgreens' management presented the internal FY16 EBIT estimate of $8.4 billion to the Board of Directors. The materials presented to the Board in advance of the January 9 meeting explained that generic drug manufacturers took an aggressive industry-wide pricing action in mid-September 2013 creating price inflation above historical and expected levels. Shortly thereafter, on a January 15, 2014, J.P Morgan conference call, Wasson reiterated Miquelon's December 2013 statement that performance with respect to the adjusted operating income goal of $9 billion to $9.5 billion was tracking below the CAGR required to achieve this goal, but that Walgreens remained focused on delivering it.

There is evidence in the record that by March 2014 Miquelon believed the deflation in the pricing of generic drugs, which had once been the trend, may have reverted to an inflationary trend. Walgreens admits that by mid-May 2014, generic price inflation was a well-known industry phenomenon and had been publicly remarked upon by Walgreens' competitors and other market participants. Evidence also suggests that Walgreens was having a difficult time negotiating with a certain group of third-party payers during the spring of 2014.

On March 25, 2014, Walgreens held its second quarter earnings call, at which time Miquelon read the following statement:

> As stated on our last call, our adjusted operating income goal of $9 billion to $9.5 billion is currently tracking below the CAGR required to meet this goal and below our initial expectations. We continue to recognize that there are risks to achieving this goal, however, we remain focused on delivering it.

3

> And as I also stated, we have identified a range of further opportunities, including benefits from our [drug wholesaler] relationship; incremental Alliance [] synergies; business expansion and new initiatives; and cost savings, which can all help mitigate these risks.

During the March 25, 2014 earnings call, Miquelon simultaneously presented a slide that stated the FY16 EBIT goal was "$9.0 to $9.5 billion." Also during this earnings call, Miquelon stated: "While we always experience some level of reimbursement pressure, the most significant factor affecting the pharmacy margin was dramatically slower rate of new generic introductions year over year." Similarly, in its March 27, 2014, second quarter 10-Q filed with the Securities and Exchange Commission ("SEC"), Walgreens stated "[r]etail pharmacy margins were negatively impacted by a significant reduction in the number of brand to generic drug conversions and lower market driven reimbursements."

At a Board meeting on April 10, 2014, Miquelon informed the Board that the FY16 EBIT target "now appeared to have an additional risk well in excess of $1 billion primarily based on third party reimbursement negotiations (including Medicare Part D contracts), continued unprecedented inflation in the price of generic drugs, and underperformance of Alliance." Miquelon also told the Board that there were "opportunities to mitigate some of these risks."

Shortly thereafter, on April 17, 2014, J.P. Morgan hosted a conference call with Wasson. On that call, the J.P Morgan analyst asked Wasson about the impact of generic drug price inflation. Wasson replied, "we think that it was really kind of a one-time phenomenon" and that it "was probably an anomaly." He further stated that Walgreens had "a better opportunity than anyone to offset that generic inflation." In relation to reimbursement expenses, Wasson stated "we're not seeing anything that I would call unusual. I think it's more normal course of business." Similarly, an analyst's report that memorialized a May 16, 2014 Morgan Stanley conference call with Miquelon and Wasson stated: "Generic price inflation. WAG has not seen any unusual activity, but

4

purchasing JV [joint venture] leaves it in better shape than peers to cope with generic price increases."

On May 14-15, 2014, Miquelon made statements during investor meetings hosted by Goldman Sachs. On May 23, 2014, Goldman Sachs issued an analyst report regarding the May 2014 meetings:

> During our meetings, Wade Miquelon, CFO, highlighted that WAG is tracking on or ahead of plan for each of its five FY16 financial targets with the lone exception of adj. EBIT. That said, management believes this target remains achievable and sees further upside beyond FY16 by leveraging a global footprint, expanding in growth markets, and bringing [Alliance's] best practices to the U.S[.]

By late May 2014, Walgreens' executives began discussing how they would present the withdrawal of the FY16 EBIT target to the public. In early June 2014, Wasson argued for delaying Walgreens' upcoming third quarter earnings conference call so the negative news regarding the withdrawal of the FY16 EBIT goal could be bundled with positive developments in relation to step two of the Alliance merger.

Walgreens then held its regularly scheduled third quarter earnings call on June 24, 2014, withdrawing its FY16 EBIT target. At the call, Wasson stated:

> One final note, as a result of the many Step 2 considerations and current business performance, the company is withdrawing its fiscal year 2016 goals that were previously announced in 2012. The company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal 2016 and we will communicate those to you on our call, which we expect to hold in late July or early August.

> Let me speak directly to two of the prior goals. Regarding our adjusted operating income goal of $9 billion to $9.5 billion, on previous calls we noted we were tracking below the CAGR required to meet the goal. We now no longer expect to reach that goal.

Approximately six weeks later, Walgreens issued a press release and held an investor call on August 6, 2014, during which it disclosed the extent of the resulting earnings shortfall. Specifically,

Walgreens announced the new FY16 EBIT target as $7.2 billion, which was at least $1.8 billion below the original estimated $9 to $9.5 billion goal.  At the investor call, Wasson stated:

> [W]e have been challenged by the ongoing global pharmacy reimbursement pressure, which continues and the rapid and pronounced increase in generic drug pricing, which we did not fully anticipate and now expect to persist longer than we anticipated.  Both factors are having an adverse effect on Walgreens' pharmacy margin, which we're not able to fully mitigate given the structure of certain existing contracts.
>
> …
>
> We expect gross margin to be down a similar percentage year-over-year to what we saw in the third quarter.  That's due to the ongoing gross margin pressures on the items we mentioned before.  These include the recent changes in the environment of our pharmacy business including ongoing generic inflation, reimbursement pressure and a shift in pharmacy mix toward 90 day at retail and Medicare part D.

By market close on August 6, Walgreens stock dropped from $69.12 to $59.21 amounting to a decline of 14.3% in a single day.

On December 29, 2014, the vast majority of Walgreens shareholders (97%) voted in favor of step two of the merger with Alliance and the transaction was completed on December 31, 2014. Walgreens Boots Alliance stock trades under the ticker symbol WBA on the NASDAQ.

The class period runs from March 25, 2014 until August 5, 2014.  Plaintiff asserts that certain public statements made by Walgreens during this time period violated Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) and that Wasson and Miquelon are liable for those violations as control persons under Section 20(a) of the Exchange Act.  These public statements include two "forward-looking" statements: (1) Miquelon's remarks at the March 25, 2014 second quarter earnings call that Walgreens remained focused on delivering the FY16 EBIT target of $9 billion to $9.5 billion; and (2) Miquelon's May 14-15, 2014 statements that management believed the FY16 EBIT target remained achievable as memorialized by a May 23, 2014, Goldman Sachs report. Other statements plaintiff challenges are:  (1) Wasson's or Miquelon's statement that Walgreens has not seen anything unusual in relation to generic drug price inflation made at the May 16, 2014

conference call with Morgan Stanley; (2) Wasson's statements made at the April 17, 2014 conference call with J.P. Morgan about the impact of generic price inflation and reimbursement pressures by third-party payers; (3) Miquelon's statement made during the March 25, 2014 second quarter earnings call that "the most significant factor affecting the pharmacy margin was dramatically slower rate of new generic introductions year over year;" and (4) Walgreens' similar statement in its March 27, 2014, second quarter 10-Q filed with the SEC that "[r]etail pharmacy margins were negatively impacted by a significant reduction in the number of brand to generic drug conversions and lower market driven reimbursements."

During this litigation, the SEC issued an administrative cease-and-desist order against Walgreens, Wasson, and Miquelon under § 17(a)(2) of the Securities Act of 1933. The SEC found defendants "acted negligently in failing to adequately disclose to investors the material increase in risk to the company's ability to achieve the FY16 EBIT Goal." Without admitting or denying the findings, Walgreens, Wasson, and Miquelon consented to the entry of the SEC cease-and-desist order. The SEC also required Walgreens to pay a $34.5 million penalty, and Wasson and Miquelon to each pay a $160,000 penalty.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When determining whether a genuine dispute as to any material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Reed v. Brex, Inc.,* 8 F.4th 569, 575 (7th Cir. 2021). After "a properly

supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted).

**Discussion**

To establish violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, a plaintiff must eventually prove (1) a material misrepresentation or omission by defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, 134 S.Ct. 2398, 189 L.E.2d 399 (2014) (*Halliburton II*); *Cornielsen v. Infinium Capital Mgmt, LLC*, 916 F.3d 589, 598 (7th Cir. 2019).

*Loss Causation*

The Court first turns to the parties' arguments concerning loss causation. Loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812, 131 S.Ct. 2179, 1809 L.Ed.2d 24 (2011) (*Halliburton I*) (emphasis in original). "To prove this element of the claim, the plaintiffs ha[ve] the burden to establish that the price of the securities they purchased was 'inflated'—that is, it was higher than it would have been without the false statements—and that it declined once the truth was revealed." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015). In doing so, plaintiffs "need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors." *Id.* at 421. A "corrective disclosure" is a public admission, such as a company's formal announcement, that discloses the truth to the market about prior material misrepresentations or omissions. *See Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864-65 (7th Cir. 2014); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ("[I]f the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."). In

addition, the "truth can come out, and affect the market price, in advance of a formal announcement." *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010).

Although the parties have yet to file their *Daubert* motions, defendants take issue with plaintiff's loss causation expert because he identified the corrective disclosures as the August 6, 2014 pre-market press release and subsequent investor call. These public admissions revealed for the first time that the new FY16 EBIT target was at least $1.8 billion lower than the earlier projections. Defendants argue that the relevant truth was fully disclosed at the June 24, 2014 third quarter earnings conference call, at which time Walgreens indicated that its FY16 EBIT goal was not attainable and that generic inflation and reimbursement pressures significantly affected the goal. Specifically, defendants contend that under an efficient market theory, this earlier disclosed information was already incorporated into the share price before the August 6 disclosures. Thus, defendants argue that no reasonable factfinder could conclude that the relevant truth was disclosed on August 6 because it was fully disclosed on June 24.

Defendants' argument does not take into account that the relevant truth can leak out over time through a series of partial disclosures. *See Dura Pharm.*, 544 U.S. at 342; *Glickenhaus*, 787 F.3d at 422. Further, defendants' argument does not acknowledge that the market may not have realized the significance of Walgreens missing the FY16 EBIT target until the actual shortfall of at least $1.8 billion was announced to the public on August 6. *See Silverman v. Motorola, Inc.*, 798 F.Supp.2d 954, 983 (N.D. Ill. 2011) (St. Eve, J.); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). In fact, the statistically significant decline in Walgreens' share price immediately after the August 6 corrective disclosures creates a genuine dispute of material fact that the information about the actual amount of the shortfall was new information not known to the market. *Silverman*, 798 F.Supp.2d at 983. As such, although the market already knew on June 24 that the FY16 EBIT goal was not attainable and that generic drug price inflation and reimbursement pressure significantly

impacted it, there is a triable issue of fact of whether the August 6 corrective disclosures revealed new information concerning the extent and seriousness of Walgreens missing its FY16 EBIT goal.[1] *See id.*

The Court therefore denies defendants' motion for summary judgment in relation to loss causation. The parties' criticisms of the designated loss causation experts and their reports are best left for the upcoming *Daubert*/Federal Rule of Evidence 702 motions, at which time the parties will have the opportunity to fully develop their arguments. The Court will then consider these criticisms in the proper context and legal framework.

*Forward-Looking Statements*

Next, defendants contend that two forward-looking statements plaintiff argues are false and misleading are not actionable due to the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision. "[S]ecurities laws encourage companies to make public predictions of future performance to assist investors in estimating a firm's future value." *City of Taylor Police & Fire Ret. Sys. v. Zebra Tech. Corp.,* 8 F.4th 592, 595 (7th Cir. 2021) (citation omitted). "For that reason, the Private Securities Litigation Reform Act exempts certain forward-looking statements from liability." *Id.* Specifically, forward-looking statements are protected by the PSLRA's safe harbor provision if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A). "The PSLRA does not require the *most* helpful caution; it is enough to 'identify[ ] important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Asher v. Baxter Int'l, Inc.,* 377 F.3d 727, 734 (7th Cir. 2004) (citation omitted, emphasis in original). The other independent prong of the PSLRA's safe harbor provision is that a forward-looking statement is protected if the statement is made without actual knowledge that it was

---

[1] Due to the disputed issue of fact related to the corrective disclosure dates, defendants' reasonable reliance argument cannot be determined as a matter of law at summary judgment.

false or misleading. *City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013).

The first forward-looking statement plaintiff challenges is Miquelon's remark made during the second quarter earnings call on March 25, 2014, where he stated: "our adjusted operating income goal of $9 billion to $9.5 billion is currently tracking below the CAGR required to meet this goal and below our initial expectations" and we "continue to recognize that there are risks to achieving this goal, however, we remain focused on delivering it." This statement is forward-looking because it expressly concerns future economic performance. And, although this remark is in the present tense, it is a forward-looking statement because the truth or falsity of this statement could not be discerned until a later time. *Desai v. General Growth Prop., Inc.*, 654 F.Supp.2d 836, 848 (N.D. Ill. 2009) (Shadur, J.); *see also Makor Issues & Rights v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (that challenged statements "are in the present tense is not decisive on the question whether the statements include predictions").

On their face, these forward-looking comments includes cautionary statements, namely, that there was a risk in not achieving the projected FY16 EBIT target, that Walgreens was tracking below the CAGR target to meet this goal, and that the goal was tracking below initial expectations. Nonetheless, plaintiff contends that these cautionary statements do not fall within the safe harbor provision because they omit the contingencies of generic drug price inflation and the reimbursement pressures. Plaintiff's argument ignores defendants' reliance on Walgreens' 10-K annual statement from 2013 and its 10-Qs for the first two quarters of 2014 that set forth the specific risks involved— statements that the Court can consider in this fraud-on-the-market case. *Asher,* 377 F.3d at 731-32; *Desai,* 654 F.Supp.2d at 844. The identified risk factors in these SEC filings include: (1) reductions in third-party reimbursement levels; (2) the continued efforts by-third party payers to reduce prescription drug costs and pharmacy reimbursement rates; (3) that the anticipated strategic and

11

financial benefits of the Alliance merger may not be realized; and (4) changes in pharmaceutical manufacturers' pricing. In short, the public statements in the relevant SEC filings explain that the principal risks included drug pricing changes and reimbursement pressures. These cautionary statements firmly place Miquelon's March 25 forward-looking remark within the PSLRA's safe harbor provision. *See Asher,* 377 F.3d at 734 ("the statute calls for issuers to reveal the 'important factors,'" not "to reveal in detail what could go wrong."). The Court therefore grants defendants' summary judgment motion as to Miquelon's March 25 forward-looking statement.

The second forward-looking statement plaintiff challenges concerns Miquelon's May 14-15, 2014 remarks memorialized in a Goldman Sachs report dated May 23, in which he stated that Walgreens is "tracking on or ahead of plan for each of its five FY16 financial targets with the lone exception of adj. EBIT" and that "management believes this target remains achievable and sees further upside beyond FY16 by leveraging a global footprint, expanding in growth markets, and bringing [Alliance's] best practices to the U.S." The Goldman Sachs' analyst further reported that the "key takeaways" from the mid-May meetings included that "FY16 targets remain attainable: Of the five targets, all are tracking on/ahead of plan with the exception being the adjusted EBIT goal of at least $9.0bn, as core growth has lagged. However, WAG did not back away from this target, with synergies and its relationship with [drug wholesaler] providing the additional boost to achieve this goal."

Plaintiff maintains these statements are not forward-looking because their truth or falsity were known at the time they were made. *See Desai,* 654 F.Supp.2d at 848. Specifically, plaintiff argues by the time Miquelon made these mid-May remarks it was clear that the FY16 EBIT target was not attainable. Plaintiff's argument raises a triable issue of fact, namely, when did Walgreens know it could not attain the FY16 EBIT goal. This hotly disputed question of fact also implicates plaintiff's argument that the safe harbor provision does not apply because Miquelon had actual

knowledge that his statement was false or misleading, along with plaintiff's related arguments that there are no disputes as to any material facts concerning falsity or scienter regarding these statements. Because there are genuine disputes as to these material facts, the Court denies both defendants' and plaintiff's summary judgment motions concerning Miquelon's mid-May 2014 remarks made during the Goldman Sachs investor call.

*Other Public Statements*

The Court next considers the statements made during a May 16, 2014 Morgan Stanley conference call with Wasson and Miquelon that were memorialized in a report summarizing "key takeaways." One takeaway stated: "Generic price inflation. WAG has not seen any unusual activity, but purchasing JV [joint venture] leaves it in better shape than peers to cope with generic price increases." In their summary judgment motion, defendants argue plaintiff cannot prove that either individual defendant made this statement citing *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011).[2] In *Janus,* the Supreme Court held "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. On its face, the Morgan Stanley report does not reference whether it was Miquelon or Wasson who made this statement, but as *Janus* teaches, "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.*

In support of their argument, defendants present evidence that the Morgan Stanley associate analyst's notes taken during the call did not indicate who discussed generic price inflation. Moreover, the lead analyst on the call testified she did not have any recollection as to the specific details of the May 16, 2014 call. She further testified she did not provide a draft of the report to

---

[2] Because defendants' *Janus* argument as to Miquelon's May 2014 Goldman Sachs statements is perfunctory and undeveloped, it is waived. *White v. United States,* 8 F.4th 547, 552 (7th Cir. 2021).

Walgreens for its approval before publishing it. Also in the record is Wasson's September 17, 2017 testimony in the SEC proceedings where he stated "most likely it could've been both of us" who addressed the generic price inflation at the May 2014 call, although he also testified he could not specifically recall who addressed this topic. Construing these facts in plaintiff's favor, there is a triable issue of material fact whether Miquelon, Wasson, or the Morgan Stanley lead analyst had the ultimate authority over this statement. In other words, defendants have presented insufficient evidence that this statement is not attributable to Miquelon or Wasson as a matter of law.

Turning to the parties' substantive arguments, plaintiff contends that there are no disputes as to the material facts concerning falsity or scienter in relation to the May 16 Morgan Stanley statements. Plaintiff specifically asserts there is evidence in the record that by May 16, 2014 Walgreens knew that prices for a number of generic drugs were hyperinflated, and therefore, the statement about no unusual activity regarding generic price inflation was false or misleading. Defendants counter by explaining that by mid-May 2014, generic price inflation was a well-known industry phenomenon and had been publicly remarked upon by Walgreens' competitors and other market participants. In this context, defendants explain that what the May 16 Morgan Stanley statement really meant was Walgreens had not seen any unusual activity regarding generic inflation "compared to the rest of the industry."

Based on these arguments, the parties are asking the Court to weigh the evidence, draw inferences from the evidence, and make credibility determinations, which is not the Court's role at summary judgment. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). Accordingly, the issues of falsity and scienter as to the May 16, 2014 Morgan Stanley statements are factual questions for the jury to decide.

Next, the Court examines Wasson's statements made on an April 17, 2014 conference call hosted by J.P. Morgan. Specifically, Wasson made the following statement in relation to generic

price inflation:

> Well I think as we said on probably our last couple calls, we did experience some
> inflation in the latter part of the summer or first quarter. We think that it was really
> kind of a one-time phenomenon of what we saw; it was just a handful of molecules.
> With that said, I think that we believe that we are as well positioned as anyone, if not
> better, to react to that inflation as we are with our team in Bern [Alliance's
> headquarters] that's working with suppliers – and to not only offset, but to drive
> even greater value. So we did see it. We think it was probably an anomaly. We're all
> over it, but I think we've got, as I said, a better opportunity than anyone to offset
> that generic inflation through Bern.

Plaintiff highlights Wasson's statements "[w]e think that it was a one-time phenomenon" and "[w]e

think it was probably an anomaly."

Plaintiff also challenges a statement Wasson made later in the April 17 J.P. Morgan call

where the analyst asked: "And as we think about pharmacy reimbursement we consistently hear

about reimbursement pressures in the retail pharmacy environment. Can you talk about – is there

anything that is out of the norm right now in the marketplace?" Wasson responded: "Yes, we're

not seeing anything that I would call unusual. I think it's more normal course of business."

In the present motion, defendants argue that Wasson's statements are not actionable because

they were his honestly held opinions. *See Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension

Fund*, 575 U.S. 175, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015). In *Omnicare,* the Supreme Court

distinguished factual statements from opinions in the context of § 11 of the Securities Act of 1933

concluding that opinions are actionable if "the speaker did not hold the belief she professed" or if

"the supporting fact[s] she supplied were untrue." *Id.* at 186. Courts in this district have applied

*Omincare's* reasoning to § 10(b) claims. *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.,*

495 F.Supp.3d 622, 650 (N.D. Ill. 2020) (Pacold, J.).

As to Wasson's generic price inflation statements that "[w]e think that it was a one-time

phenomenon" and "[w]e think it was probably an anomaly," defendants argue these statements were

true because generic price inflation ended in 2015, therefore, it was a temporary deviation from the

long-term trend of deflation. Wasson, however, did not know this information at the time he made these statements in April 2014. Meanwhile, construing the evidence in plaintiff's favor, what Wasson did know by mid-April 2014 as a board member was that generic drug manufacturers had taken an aggressive industry-wide pricing action in September 2013 creating price inflation above historical and expected levels. He also knew that by April 10, 2014 the FY16 EBIT target had an additional risk of $1 billion based on third party reimbursement negotiations, continued unprecedented inflation in the price of generic drugs, and Alliance's underperformance. This evidence creates a triable issue of fact whether Wasson's generic price inflation statements were true. Based on this same evidence, whether Wasson honestly believed his statements or whether there was a reasonable basis to make them are factual questions for the jury. *See Ominicare,* 575 U.S. at 188.

Turning to Wasson's statement on reimbursement pressures—"we're not seeing anything that I would call unusual. I think it's more normal course of business," defendants contend that this was Wasson's honestly held opinion based on his deposition testimony. Specifically, Wasson testified that based on his 10 to 15 years of reviewing and being involved in third-party payer contracts, along with the investor relation team's talking points on this subject, Walgreens was not seeing anything that he would describe as unusual at that time. The investor relation team's talking points included that reimbursement pressure is not a new phenomenon to the business and the new global platform resulting from the merger with Alliance would lower costs to maintain an advantage over the competition. Wasson's testimony raises a disputed issue of material fact as to his honest belief in his statements. Whether the jury believes Wasson's testimony is a credibility issue for trial.

On the other hand, plaintiff contends these statements about reimbursement pressures were false, especially in light of the relationship between generic price inflation and reimbursement pressures. As Walgreens Senior Pharmacy Officer Dan Doyle testified, during the relevant time period, Walgreens' generic rate "contracts essentially assumed generic deflation" for "each year and

16

every year into the future" but "instead, what we were seeing was generic inflation, and we did not have a mechanism in our contracts in order to pass those price increases on to the end payers of our product." In this context, evidence in the record viewed in plaintiff's favor shows that by at least March 2014, increased reimbursement pressures existed in relation to third-party payer contracts that did not have generic inflation protections. As such, there is a triable issue of fact whether Wasson's April 2014 statements that nothing was unusual in the context of reimbursement pressures were false.

Because there is a genuine dispute of material fact as to the falsity of Wasson's statements, plaintiff's argument that it has established Wasson's intent to deceive as a matter of law fails. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007) (Scienter is defined as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false."). Again, this is a question for the jury.

The Court next turns to Miquelon's statement made during the March 25, 2014 second quarter earnings call that "the most significant factor affecting the pharmacy margin was dramatically slower rate of new generic introductions year over year." Miquelon specifically stated:

> With respect to margin, our adjusted gross margin reflects our FIFO [first in, first out] inventory was 29.1% in the current quarter compared to 30.5% last year, a 140 basis point decline. While we always experience some level of reimbursement pressure, the most significant factor affecting the pharmacy margin was dramatically slower rate of new generic introductions year-over-year.

Plaintiff also challenges the following statement made in Walgreens' March 27, 2014, second quarter 10-Q:

> Gross margin as a percent of sales was 28.8% in the current quarter and 28.5% for the first six months compared to 30.1% and 29.8% last year. Retail pharmacy margins were negatively impacted by a significant reduction in the number of brand to generic drug conversions and lower market driven reimbursements.

By way of background, generic versions of drugs lead to higher gross profit margins for pharmacies than the branded versions. Accordingly, when drugs come off patent and are first introduced to the

17

market as generic, this conversion usually has a positive impact on Walgreens' gross profit margin.

Plaintiff argues these March 2014 statements are objectively false or misleading because numerous internal Walgreens' documents prepared before or shortly after these statements show that the "most significant factor" impacting Walgreens' pharmacy margin was the issue of generic price inflation and Walgreens' third-party reimbursement contracts that failed to provide meaningful inflationary relief. Plaintiff, however, admits in its response to defendants' Rule 56.1 Statement of Facts that generic price inflation was the third most significant individual factor in 2Q14.

In any event, defendants maintain these statements are accurate based on evidence in the record that there was a lower number of generic conversions in 2Q14 than 2Q13 directly affecting the pharmacy margin. Indeed, evidence in the record shows the lower number of new generic conversions in 2Q14 compared to 2Q13 reduced Walgreens' adjusted gross margin by 73 basis points (0.73%), which was more than half of the total 140 basis point (1.4%) decline. In response, plaintiff does not cite evidence about 2Q14 gross margin percentage year over year, but points to internal budget documents regarding different financial metrics. For example, plaintiff relies on documents comparing actual performance against the internal budget for 2Q14 and documents that discussed the forecasted performance for the remainder of FY14. Because plaintiff has failed to refute defendants' evidence, defendants have established—as a matter of law—the truth of the statement that the lower number of generic conversions in 2Q14 compared to 2Q13 was the most significant factor affecting the pharmacy margin during that time period. As such, the Court grants defendants' motion for summary judgment as to these March 2014 statements.

Furthermore, plaintiff argues because Miquelon publicly discussed that lower generic conversions were the most significant factor affecting the pharmacy margin, defendants had a duty to disclose the existence of generic price inflation and Walgreens' reimbursement issues. "There is generally no affirmative independent duty for a company to disclose all information that could

18

potentially affect share prices, even when that information is material, unless such silence renders an affirmative statement misleading." *Cornielsen v. Infinium Capital Holdings, LLC*, 168 F.Supp.3d 1033, 1043 (N.D. Ill. 2016) (Wood, J.). The fact that generic drug inflation and reimbursement pressures impacted the pharmacy margin does not render false the fact that the most significant factor affecting the pharmacy margin in 2Q14 compared to 2Q13 was the slower rate of new generic introductions. As such, defendants did not have a duty to disclose information about generic drug inflation and reimbursement pressures under the circumstances. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 239, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). The Court grants defendants' summary judgment motion in this respect.

Plaintiff also takes issue with Miquelon's statement that "we always experience some level of reimbursement pressure" as objectively false when Miquelon made the statement in mid-March 2014 about 2Q14. Specifically, plaintiff argues that the reimbursement pressures caused by generic price inflation and third-party payer contracts were anything but routine. Plaintiff, however, has failed to present evidence that the impact of reimbursement pressures on gross margin percentage in 2Q14 was not "routine," but instead points to documents that do not reflect the entire quarter. Moreover, defendants have presented unrebutted evidence that reimbursement pressures were ongoing within the industry and that it took place every year. The Court grants defendants' summary judgment motion in this respect.

Accordingly, the remaining actionable statements in this shareholder class action lawsuit include: (1) Wasson's statements made at the April 17, 2014 conference call with J.P. Morgan about the impact of generic price inflation and reimbursement pressures by third-party payers; (2) Miquelon's May 14-15, 2014 statements that management believed the FY16 EBIT target remained achievable as memorialized by a May 23, 2014, Goldman Sachs report; and (3) Wasson's or Miquelon's statement that Walgreens has not seen anything unusual in relation to generic drug price

inflation made at the May 16, 2014 conference call with Morgan Stanley.

On a final note, the Court reminds the parties that arguments made for the first time in reply briefs and cursory arguments made in footnotes are waived, especially when, as here, the Court granted the parties' motions to file oversized briefs.  *See White v. United States,* 8 F.4th 547, 552 (7th Cir. 2021); *Chicago Joe's Tea Room, LLC v. Village of Broadview,* 894 F.3d 807, 817 (7th Cir. 2018).

**Conclusion**

For the foregoing reasons, the Court grants in part and denies in part defendants' summary judgment motion [394] and denies plaintiff's motion for partial summary judgment [406].

SO ORDERED.

SHARON JOHNSON COLEMAN
United States District Court Judge

DATED: 11/2/2021